No. 08-99031

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff-Appellee,<br><br>v.<br><br>JOSEPH EDWARD DUNCAN, III,<br><br>Defendant-Appellant. | D.C. No. CR-07-023-N-EJL<br>District of Idaho |

Appeal From the United States District Court
For the District of Idaho

---

## APPELLANT'S OPENING BRIEF IN SUPPORT OF JURISDICTION ON APPEAL

---

MARK E. OLIVE, FL Bar #578533
Law Offices of Mark E. Olive, P.A.
320 West Jefferson Street
Tallahassee, Florida 32301
Telephone:  (850) 224-0004

DANIEL J. BRODERICK, CA Bar
#89424
Federal Defender
JOSEPH SCHLESINGER, CA Bar
#87692
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  ( 916) 498-6666

Standby Counsel for Defendant-Appellant
JOSEPH E. DUNCAN, III

## **TABLE OF CONTENTS**

**ISSUES PRESENTED** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**SUMMARY OF ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**STATEMENT OF THE CASE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    **A.**    **Pre-plea Proceedings: The Incapacity of Lead Defense Counsel, The District Court's Unrecorded Refusal to Consider Requests for Any Continuance, and Defense Efforts to Obtain Adequate Time to Prepare** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        1.    The Setting of a Trial Date . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        2.    The District Court's In-Chambers Meeting, Alone, With Defense Counsel Peven, and The Appointment of New Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        3.    New Counsel's Request for a Continuance . . . . . . . . . . . . . . 13
        4.    The District Court's Revelation that the Entry of New Counsel Had Been Premised On Counsel Not Seeking a Continuance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        5.    Defense Counsel Peven's Incapacity . . . . . . . . . . . . . . . . . . 17
    **B.**    **Guilty Plea, Mental Health Experts, and Defense Efforts to Obtain Time to Prepare** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        1.    The Guilty Plea . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        2.    Disclosure of Possible Expert Testimony . . . . . . . . . . . . . . 21
    **C.**    **The Request for Self-Representation, The Absence of Competency Proceedings, and the Pro Se Sentencing Trial, and The Death Penalty** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    **D.**    **Post-trial Proceedings: The Alleged Appellate Waiver** . . . . . . . 25

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    **A.**    **Standby Counsel Have Standing to Appeal the Competency Question and Ineffective Waiver of Appeal** . . . . . . . . . . . . . . . . . 28
    **B.**    **The District Court's Flawed Determination that Mr. Duncan Was Competent to Stand Trial and Represent Himself Fails to Establish that Mr. Duncan Competently Waived His Right to Appeal** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        1.    The District Court's Actions Were Multiply Flawed . . . . . . . 31

a.   The District Court Refused to Hold a Competency Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

b.   The Cause to Doubt Mr. Duncan's Competency Was More Than Reasonable . . . . . . . . . . . . . . . . . . . . . . . . . 35
1)   Dr. Ruben Gur . . . . . . . . . . . . . . . . . . . . . . . . . . 37
2)   Dr. George Woods . . . . . . . . . . . . . . . . . . . . . . . 40
3)   Dr. James Merikangas . . . . . . . . . . . . . . . . . . . . 43

c.   The Court Erroneously Resolved Conflicts in the Evidence In Deciding Whether to Hold an Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

d.   The District Court's Implied Finding That the Issue Was Illegitimate Because it Was Not Raised Earlier Is Clearly Erroneous . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

2.   Even If The District Court Properly Found that Mr. Duncan's Mental Disorder Did Not Render Him Incompetent to Stand Trial, the Record Clearly Establishes that He Lacked the Capacity to Make a Rational Choice Whether to Appeal . . . 53

C.   **Even Assuming Mr. Duncan Was Competent To Waive Appeal, The Waiver Based on a Delusional Belief as to Its Consequences Failed to be Knowing, Intelligent, and Voluntary** . . . . . . . . . . . . **57**
1.   The District Court's Attempted Colloquy . . . . . . . . . . . . . . . 59
2.   Mr. Duncan Expressed No Clear and Unequivocal Desire That His Conviction and Sentence Not Be Appealed . . . . . . . . . 68
3.   The Record Establishes that the Purported Waiver Was Anything But Knowing, Intelligent and Voluntary . . . . . . . . 71
4.   Mr. Duncan's Delusional Ramblings With the Court Required A Post-Judgment Competency Inquiry . . . . . . . . . . . . . . . . 72
5.   Because The District Court Failed to Inform Mr. Duncan that Refusal to Authorize an Appeal of the Conviction Constituted Legal Authorization for an Appeal of the Competency Decision, The Waiver Was Not Knowing and Intelligent . . . 74

D.   **The Federal Death Penalty Act of 1994 ("FDPA") Requires Sentence "Review" In Addition to Consideration of the Issues Raised on Appeal** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **76**
1.   The FDPA's Appellate Review Provisions . . . . . . . . . . . . . . 77
2.   The Eighth Amendment Requires Mandatory Appellate Review of a Federal Death Sentence . . . . . . . . . . . . . . . . . . . . . . . . 82

3.    At a Minimum FDPA Should Be Interpreted to Avoid
Constitutional Problems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

**E.    The Very Troubling Circumstances of this Proceeding Require
that At a Minimum the Entire Case Be Reviewed In Connection
With Deciding Jurisdiction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **97**

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **101**

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Blazak v. Ricketts*, 1 F.3d 891 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Boykin v. Alabama*, 395 U.S. 238 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Brewer v. Williams*, 430 U.S. 387 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Campbell v. Lockhart*, 789 F.2d 644 (8th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . 48

*Carolene Products Co. v. United States*, 323 U.S. 18 (1944) . . . . . . . . . . . . . . 95

*Chavez v. United States*, 656 F.2d 512 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . 35

*Clemens v. Mississippi*, 494 U.S. 738 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Darrow v. Gunn*, 594 F.2d 767 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . 48

*de Kaplany v. Enomoto*, 540 F.2d 975 (9th Cir. 1976) . . . . . . . . . . . . . . . . . 31, 32

*Demosthenes v. Baal*, 495 U.S. 731 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*Dennis v. Budge*, 378 F.3d 880 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . 54, 55, 56

*Dobbs v. Zant*, 506 U.S. 357 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Drope v. Missouri*, 420 U.S. 162 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Dusky v. United States*, 362 U.S. 402 (1960) . . . . . . . . . . . . . . . . . . . . 31, 54, 56

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Const.
   Trades Council*, 485 U.S. 568 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 90, 91

*Faretta v. California*, 422 U.S. 806 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Furman v. Georgia*, 408 U.S. 238 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Giarratano v. Procunier*, 891 F.2d 483 (4th Cir. 1989) . . . . . . . . . . . . . . . . . . . 54

*Gilmore v. Utah*, 429 U.S. 1012 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Godinez v. Moran*, 509 U.S. 389 (1993) . . . . . . . . . . . . . . . . . . . . . . . . 56, 57, 75

*Gregg v. Georgia*, 428 U.S. 153 (1976) . . . . . . . . . . . . . . . . . . . 83, 84, 85, 89

*Hernandez v. Ylst*, 930 F.2d 714 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 73

*Hodges v. Easton*, 106 U.S. 408 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Indiana v. Edwards*, 128 S. Ct. 2379 (2008) . . . . . . . . . . . . . . . . . . . . . . . . 3, 35

*Johnson v. Zerbst*, 304 U.S. 458 (1938) . . . . . . . . . . . . . . . . . . . . 7, 55, 72, 75

*Jones v. United States*, 527 U.S. 373 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*Jurek v. Texas*, 428 U.S. 262 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . 83, 84, 89

*Kokoszka v. Bedford*, 417 U.S. 642 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*Mason ex rel. Marson*, 5 F.3d 1220 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . passim

*Massie v. Sumner*, 624 F.2d 72 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . 68, 100

*McMurtrey v. Ryan*, 539 F.3d 1112 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . 36

*Miles v. Stainer*, 108 F.3d 1109 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . 36

*Moore v. United States*, 464 F.2d 663 (9th Cir. 1972) . . . . . . . . . . . . . . . . . 6, 47

*Morris v. United States*, 414 F.2d 258 (9th Cir. 1969) . . . . . . . . . . . . . . . . . . 36

vi

*NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979) . . . . . . . . . . . . . . . . . 91

*Nash v. Ryan*, 581 F.3d 1048 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*National Union Fire Insurance Co. of Pittsburgh v. City Sav., F.S.B.*,
    28 F.3d 376 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Parke v.  Raley*, 506 U.S. 20 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 85

*Parker v. Dugger*, 498 U.S. 308 (1991) . . . . . . . . . . . . . . . . . . . . . 77, 83, 85, 88

*Pate v. Robinson*, 383 U.S. 375 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Philbrook v. Glodgett*, 421 U.S. 707 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*Proffitt v. Florida*, 428 U.S. 242 (1976) . . . . . . . . . . . . . . . . . . . . . . . . 83, 89, 90

*Pulley v. Harris*, 465 U.S. 37 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 84, 85, 88

*Rappa v. New Castle County*, 18 F.3d 1043 (3d Cir. 1994) . . . . . . . . . . . . . . . . . 91

*Rees v. Peyton*, 384 U.S. 312 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Richerson v. Jones*, 551 F.2d 918 (3d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . 95

*Sandoval v. Reno*, 166 F.3d 225 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 91

*Smith v. Magras*, 124 F.3d 457 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . 92

*Speedy v. Wyrick*, 702 F.2d 723 (8th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . 48

*Summerlin v. Schriro*, 427 F.3d 623 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . 75

*Torres v. Prunty*, 223 F.3d 1103 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 36, 73

*United States ex rel. Attorney General v. Delaware & Hudson Co.*,
    213 U.S. 366 (1909) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*United States v. Arlt*, 41 F.3d 516 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Bradshaw*, 690 F.2d 704 (9th Cir. 1982) . . . . . . . . . . . . . . . . . 32

*United States v. Cochran*, 770 F.2d 850 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . 75

*United States v. Erskine*, 355 F.3d 1161 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . 58

*United States v. Farhad*, 190 F.3d 1097 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . 58

*United States v. George*, 56 F.3d 1078 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . 58

*United States v. Hammer*, 226 F.3d 229 (3d Cir. 2000) . . . . . . . . . . . . . . . . 82, 88

*United States v. Hemsi*, 901 F.2d 293 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Kienenberger*, 13 F.3d 1354 (9th Cir. 1994) . . . . . . . . . . . . . . 58

*United States v. Lopez-Osuna*, 232 F.3d 657 (9th Cir. 2000) . . . . . . . . . . . . . . 58

*United States v. Miller*, 197 F.3d 644 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 96

*White v. Horn*, 112 F.3d 105 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 54, 57

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) . . . . . . . . . . . . . . . . . . . . . . . 86, 87, 88

*Zant v. Stephens*, 462 U.S. 862 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

## STATE CASES

*Calhoun v. State*, 297 Md. 563 (Md. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Cole v. Nevada*, 707 P.2d 545 (Nev. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*Commonwealth v. McKenna*, 383 A.2d 174 (Pa. 1978) . . . . . . . . . . . . . . . . 90, 100

*Geary v. State*, 977 P.2d 344 (Nev. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*Judy v. State*, 416 N.E.2d 95 (Ind. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*State v. Brewer*, 826 P.2d 783 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

*State v. Dodd*, 838 P.2d 86 (Wash. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 79, 94

*State v. Ivey*, 502 S.E.2d 92 (S.C. 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*State v. Martini*, 677 A.2d 1106 (N.J. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Vandiver v. State*, 480 N.E.2d 910 (Ind. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 94

## FEDERAL STATUTES

18 U.S.C.
   § 1201(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   § 3005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11
   § 3593(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
   § 3594 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
   § 3595 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 80, 91, 96
   § 3595(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
   § 3595(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   § 4241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33, 34, 35
   § 4241(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
   § 4244 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Fed. R. App. P.
   32(a)(7)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

Fed.R.Civ.P.
   41(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

Fed.R.Crim.P.
   12.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

16(b)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

## STATE STATUTES

Ala. Code
    § 12-22-150 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Ariz. Rev. Stat. Ann.
    § 13-756 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Cal. Penal Code Ann.
    § 1239(b) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Conn. Gen. Stat.
    § 53a-46b(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
    § 53a-46b(c) (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Del. Code. Ann. tit. 11
    § 4209(g)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78, 79

Fla. Stat. Ann.
    § 921.141(4) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

Ga. Code Ann.
    § 17-10-35(a)(2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
    § 17-10-35(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Idaho Code
    § 19-2827(a) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
    § 19-2827(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
    § 19-2827(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Ind. Code
    35-50-2-9(j)(2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Ky. Rev. Stat. Ann.
    § 532.075(1) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
    § 532.075(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
    § 532.075(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Md. Ann. Code of 1957, Art. 27
    § 414(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Md. Crim. Law Code Ann.
    § 2-401(a) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
    § 2-401(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Mo. Ann. Stat.
    § 565.035(1) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
    § 565.035(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
    § 565.035(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

N.C. Gen. Stat.
    § 15A-2000(d)(1) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

N.H. Rev. Stat. Ann.
    § 630:5(X) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

N.J. Stat. Ann.
    2C:11-3(e) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

N.M. Stat. Ann.
    § 31-20A-4(A) (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Nev. Rev. Stat.
    § 177.055(1) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
    § 177.055(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Pa. Cons. Stat. Ann. 42
    § 9711(h)(1)(2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Rev. Code Wash
    10.95 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

S.C. Code Ann.
§ 16-3-25(A)(2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
§ 16-3-25(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
§ 16-3-25(F) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Tex. Code Crim. P. Ann. Art.
37.071(h)(2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Utah Code Ann.
§ 76-3-206(2) (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
§ 76-3-206(2)(a)(2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
§ 77-35-26(10) (Supp. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Wash. Rev. Code Ann.
§ 10.95.100 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Wyo. Stat. Ann.
§ 6-2-103(a) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
§ 6-2-103(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

## MISCELLANEOUS

American Psychiatric Association, *Diagnostic and Statistical Manual of PsychiatricDisorders*, 297 (4th ed. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*G. Strafer, "Volunteering for Execution: Competency, Voluntariness and the Propriety of Third Party Intervention,"* 74 J. Crim. L. & Criminology 860, 862 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

H. Kaplan & B. Sadock, *Comprehensive Textbook of Psychiatry*, 1041 . . . . . . . 52

H.R. Conf. Rep. No. 103-711 (1994), *reprinted in* 1994 U.S.C. C. A.N. 1839, 1856 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

H.R. Rep. No. 103-324 (1994), *reprinted in* 1994 U.S.C. C.A.N. 1801, 1815 . . 81

H.R. Rep. No. 103-467 (1994), 1994 WL 107578 . . . . . . . . . . . . . . . . . . . . . . . . . 81

H.R. Rep. No. 104-23 (1995), 1995 WL 56412 . . . . . . . . . . . . . . . . . . . . . . . . . 81

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff-Appellee,<br><br>v.<br><br>JOSEPH EDWARD DUNCAN, III,<br><br>Defendant-Appellant. | No. 08-99031<br>D.C. No. CR-07-023-N-EJL<br>District of Idaho<br><br>APPELLANT'S OPENING BRIEF IN SUPPORT OF APPELLATE JURISDICTION |

## ISSUES PRESENTED

The defendant, Joseph E. Duncan, III, pleaded guilty to a number of death-eligible offenses, including kidnapping resulting in death, 18 U.S.C. §§ 1201(a)(1) and (g). Despite the diagnosis of three evaluating experts that he suffers from a psychotic disorder rendering him incompetent to proceed, and the objections of his attorneys, the district court permitted him to represent himself at his capital sentencing hearing. Acting on a grandiose delusion of exclusive access to universal Truth, he surrendered in order for the world to share in his enlightenment. He was sentenced to death.

Upon entry of the death judgment, his attorneys, who by then had been

1

relegated to a standby role, filed a notice of appeal. On a motion of the

Government based on information obtained from Mr. Duncan during a series of

FBI interviews, the district court held a hearing on whether Mr. Duncan wished to

appeal. Following a series of rambling, delusion-laden, equivocal responses from

Mr. Duncan, the district court accepted a waiver and ordered the notice of appeal

stricken. By order of this Court, entered February 9, 2009, Appellant has been

directed to submit this preliminary brief to address the issues:

(1) Whether this appeal should be dismissed for lack of jurisdiction because

standby counsel's notice of appeal, stricken by the district court, is ineffective to

appeal the underlying judgment; and

(2) To the extent that the district court's determination that defendant

Duncan was competent to represent himself at sentencing is relevant to the

appellate jurisdiction issue, whether Duncan was properly allowed to represent

himself.

Pursuant to the February 9th order, the merits of the appeal are to be briefed

only in the event that a merits panel concludes that the notice of appeal properly

vested jurisdiction in this Court. The significant congruity of jurisdiction and

merits notwithstanding, the arguments herein are therefore limited to the reasons

that this appeal must go forward; anticipating further briefing, Appellant does not

present the arguments comprehensively as grounds for reversing the judgment of

conviction and sentence.[1]

## SUMMARY OF ARGUMENT

Mr. Duncan's view of the world is dramatically different from most

people's and springs from an epiphany that provides him a singular understanding

of Truth and all sentient beings' relationship to it. The Truth cannot be described

or taught, but can be discovered only experientially. All people's decisions,

mundane or exceptional, ultimately reduce to the single cardinal decision whether

to approach or avoid Truth. Attempting to turn from Truth is the root cause of all

evil and injustice and is a sin far worse than any crime defined by the "System,"

---

[1]An important part of the full briefing before this Court would be the issue, not addressed herein, of whether the lower court properly allowed Mr. Duncan to proceed *pro se*, even if the district court's decision that Mr. Duncan was competent to stand trial was sound. As the Supreme Court instructed in *Indiana v. Edwards*, 128 S. Ct. 2379 (2008), "'[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self- representation even if he can play the lesser role of represented defendant.'" *Id*. at 2397 (*quoting and adopting* the Brief for the American Psychiatric Association, *et al.*, as *Amici Curiae*). A trial court judge who witnesses unfair proceedings brought about by a competent, but mentally ill, defendant's self representation, ought to correct that unfairness. In light of the facts and arguments set forth in this brief, *infra*, if Mr. Duncan's case is not covered by this rule, no case is.

including murder.

Litigation obscures Truth, and thus Mr. Duncan must disengage from it to the fullest possible extent. Because all efforts by him to dictate the actions of others would ultimately only hinder their understanding of Truth, Mr. Duncan must allow others (lawyers, jurors, judges, prosecutors) to do as they choose. If others engage in litigation they believe is about him, he understands it is about something else entirely. He has no objection *per se* to litigation that purports to be about him; he just cannot lend his authorization to such litigation because to do so would undermine his personal relationship to Truth.

Most people would find Mr. Duncan's thoughts to be delusional, and three defense experts so informed the district court, writing that there was substantial reason to doubt Mr. Duncan's competence. Nonetheless, the district court granted free reign to Mr. Duncan's delusions of "non-resistance equals Truth enhancement" by allowing him to represent himself without holding a competency hearing. Then, undeterred by Mr. Duncan's disengagement from a capital sentencing trial, and ignoring a series of bizarre equivocal responses to questions about an appeal, the district court continued not to question Mr. Duncan's competency and accepted a purported appellate waiver prompted by Mr. Duncan's patently delusional thinking.

The circumstances plainly required an appeal. But the district court failed to inform Mr. Duncan that by the very act of not authorizing an appeal of the conviction he was in fact authorizing of an appeal of the competency finding and waiver proceedings. *See Mason ex rel. Marson*, 5 F.3d 1220 (9th Cir. 1993).

Other flaws in the proceedings below bear on questions of jurisdiction and the validity of purported waivers. The defense was beset by the hidden, debilitating psychiatric difficulties of lead counsel, the district court's refusal to allow sufficient time to prepare, and the defense's inability to obtain timely funding for investigation and experts. Despite repeated showings that defense preparations remained in shambles up to and including the eve of trial, the district court consistently rebuffed all reasonable requests for an adequate opportunity to prepare. The defense informed the court that due to funding problems they had been unable to retain experts by the time required expert disclosure were due, yet the court still refused to extend the due date. Even worse, the court unreasonably used the defense's failure to present expert opinions of Mr. Duncan's incompetence at an earlier stage of the proceedings as a reason for denying a competency hearing.

The foregoing presents several reasons this appeal should not be dismissed. First, appellate jurisdiction was properly invoked by standby counsel. As

participants in the case when Mr. Duncan was deemed competent to dismiss them

and to waive appeal, they had authority under *Mason ex rel. Marson*, *supra*, to

appeal the trial court's "decision of mental competence, which would otherwise

remain unreviewed in a death penalty case," 5 F.3d at 1223, irrespective of Mr.

Duncan's authorization.

Second, the district court's recitation that Mr. Duncan knowingly,

voluntarily and competently waived his right to appeal was predicated on the

improper and summary conclusion made earlier in the case that Mr. Duncan was

competent to stand trial and to represent himself. Despite substantial evidence of

incompetency the district court refused to conduct a hearing thereon in violation of

*Drope v. Missouri*, 420 U.S. 162 (1975). The court instead improperly weighed

(without hearing) conflicting evidence of incompetency and made credibility

findings regarding different experts' <u>written</u> opinions, in violation of *Moore v.

United States*, 464 F.2d 663 (9th Cir. 1972). The failure to credit the opinions of

defense experts due to their supposed failure to doubt Mr. Duncan's competency

until after he pleaded guilty flies in the face of the facts known to the court--that

due to the psychiatric problems of former lead counsel for Mr. Duncan, the

defense was unable to hire experts in time to render opinions earlier.

Third, Mr. Duncan's rambling, delusional responses at the appeal waiver

6

hearing themselves demonstrated his incapacity to make rational decisions regarding an appeal, making any waiver invalid under *Rees v. Peyton*, 384 U.S. 312 (1966). His bizarre, equivocal responses simultaneously underscored the need for a *Drope* competency hearing at that stage of the proceedings and precluded the court from finding a clear and unequivocal waiver, as required by *Johnson v. Zerbst*, 304 U.S. 458 (1938). To the extent any clear position emerged from Mr. Duncan's responses, it was merely an expression of his overall "non-resistance equals Truth enhancement" delusions: his concern was not whether an appeal would be taken, but only whether he would need to endorse it. Once this became evident, the district court was obliged to inform him that under *Mason ex rel. Marson*, *supra*, an appeal of the competency determination and purported appellate waiver was available not *despite* his non-authorization, but *because of it*. Because Mr. Duncan's concern was the avoidance of any action that would authorize an appeal, the district court's failure to inform him that his non-authorization was itself a form of authorization precludes any finding that the purported waiver was knowing and intelligent.

Finally, an appeal based on any of these reasons also requires this Court under the Federal Death Penalty Act of 1994, 18 U.S.C. § 3595, to undertake an independent "sentence review" to determine "whether the sentence of death was

imposed under the influence of passion, prejudice, or any other arbitrary factor and

whether the evidence supports the special finding of the existence of any

aggravating factor." 18 U.S.C. § 3595(c)(1).[2]

For all of these reasons, the Court should hold that the notice of appeal filed

by standby counsel was a proper basis of appellate jurisdiction and establish a

schedule for the parties' briefing of the merits of the appeal.

## STATEMENT OF THE CASE

**A.     Pre-plea Proceedings:  The Incapacity of Lead Defense Counsel, The**

**District Court's Unrecorded Refusal to Consider Requests for Any**

**Continuance, and Defense Efforts to Obtain Adequate Time to Prepare**

On January 18, 2007, the Government obtained a ten count indictment

against Mr. Duncan charging him with murder and other offenses related to the

kidnapping and abuse of two juveniles, S.G. and D.G., in 2005.  Dkt. #1.[3]  The

---

[2]Appellant will also show that to avoid Eighth Amendment conflict, the Federal Death Penalty Act should be interpreted to require mandatory appellate sentence review even in the absence of an appeal.

[3]Unless otherwise indicated, all of the docket numbers refer to the district court docket in this case.  The excerpts of record submitted with this brief are tabbed to correspond with the district court docket numbers.  Because this brief is limited to jurisdiction to appeal, and does not extend to the appeal itself, some provisions of the Circuit Rules regarding organization of the excerpts of record are

federal charges followed Idaho State proceedings on related charges, which were resolved by a guilty plea and a sentence of life imprisonment. Roger Peven, Executive Director of Federal Defenders of Eastern Washington and Idaho, Inc., was appointed prior to the return of the federal indictment when it first became evident federal charges would be filed.

### 1. The Setting of a Trial Date

Mr. Duncan had his initial appearance in federal court on January 19, 2007. In accord with local practice, a trial date a mere three months away—March 20, 2007—was set at that time. Dkt. #9. On January 23, 2007, the Government filed a six page Notice of Aggravating Factors and Intent to Seek the Death Penalty, Dkt. #11, and on January 26, Seattle attorney Mark Larranaga joined the case as learned capital counsel pursuant to 18 U.S.C. § 3005. Dkt. #13 [sealed].

On March 7, the Government moved for a brief continuance of the trial date until July 9, 2007. Dkt. #22. The next day, the defense moved for a continuance until August 18, 2008, based on its need to review the voluminous discovery recently provided, to interview potential witnesses, to gather documents and compile the client's life history, to investigate several prior unadjudicated offenses

---

not applicable. Appellant submits as an initial volume of excerpts the documents most directly relevant to questions of appellate jurisdiction.

asserted in the notice of aggravating evidence, and to retain and consult with experts. Dkt. #24.

A hearing was held and on March 22, 2007, the Court set January 28, 2008—the precise mid point between the dates requested by the Government and defense—as the date for trial. Dkt. #32. The district court selected the January 2008 trial date based on the presumption that Mr. Peven's prior involvement in the Idaho State proceedings would speed defense team readiness for trial. *Id*. at 9 (noting that Mr. Peven's prior involvement would be "invaluable in pursuing the preparation required for this case.")

As the defense would later explain to the court, Mr. Peven's involvement in the state case had been limited to "work[ing] with this very complex, mentally ill client to prepare him for the possibility of a guilty plea in state court." Dkt. #68 [Declaration of Roger Peven] at 2. The court was also soon to learn that no later than a month after Mr. Larranaga was appointed, events occurring in Mr. Peven's life made it impossible for him to fulfill any meaningful defense responsibilities.

### 2. The District Court's In-Chambers Meeting, Alone, With Defense Counsel Peven, and The Appointment of New Counsel

On August 8, 2007, Mr. Peven sent Mr. Larranaga an email stating he was contemplating withdrawing from the case. Dkt. #80 [Declaration of Mark

10

Larranga] at 11. The email did not provide any reason and Mr. Larranga could not reach Mr. Peven to discuss the matter further. *Id*. By August 17, Mr. Peven apparently had decided that he would move to withdraw and asked Mr. Larranaga to alert the court at the next status conference, which was scheduled for August 22, 2007. *Id*.

At that status conference, which was unrecorded, Mr. Larranaga advised the court that Mr. Peven wanted to speak privately to the court about needing to withdraw from the case. *Id*. at 11. With a trial date just five months away, the Government expressed concern over the apparent lack of investigation by the defense, including Mr. Peven's failure to review the physical evidence despite a Government email indicating that it had been available for months. *Id*.

An ex parte conference was arranged for August 28, 2007, at the beginning of which Mr. Peven asked to meet privately with the district court in chambers. 8/28/07 RT 1. Mr. Larranga's request to attend the meeting was denied. *Id*. at 3-4. After approximately 15 minutes, Mr. Larranaga was summoned to chambers and was informed that Mr. Peven would not be withdrawing but would be taking on the role of "advisory counsel" for Mr. Duncan. Dkt. #179 at 3-4. The court instructed Mr. Peven to prepare a sealed ex parte declaration describing the in-chambers proceeding. *Id*. at 4.

On September 7, 2007, Mr. Peven filed a sealed declaration "in support of appointment of attorney" which was written to "memorialize information I provided to the Court during a private off the record meeting … on Tuesday, August 28, 2007, and to detail some of the resulting impact of the personal and professional pressures I am experiencing." Dkt. #68 at 1. Mr. Peven then detailed a number of personal and professional disasters that had befallen him, beginning in February 2007, and which had prevented him from fulfilling his obligations in this case. *Id*. at 5. In the concluding paragraph, Mr. Peven stated that he had advised the court that "[n]ew counsel need to be appointed to meet the necessary responsibilities of investigation and preparing the case for trial," but inasmuch as "I have a good relationship with Mr. Duncan and have built credibility with the victim's family, I advised the court I can remain in an advisory capacity to the defense team." *Id*.

Neither the declaration nor the record as a whole discloses whether assumption of an advisory capacity role was something Mr. Peven had requested, or something to which he had acquiesced upon being denied leave to withdraw. The declaration also fails to describe any discussion regarding whether new counsel would or would not be able to obtain a continuance of the trial date in order to prepare. However, following the hearing, Mr. Peven told Mr. Larranaga

that his request had been for leave to withdraw entirely, but that the court had assigned him the role of advisor to any new counsel and the remainder of the team. Dkt. #179 at 8. In describing the in-chambers conversation to Mr. Larranaga, Mr. Peven also said nothing about a preemptive denial of a continuance by the court. Since Mr. Peven and Mr. Larranaga had previously discussed the need for a continuance, Mr. Larranaga's understanding was that nothing had occurred in chambers that would preclude a continuance. *Id.*

Accordingly, on September 11, 2007, the defense filed a motion to have Judy Clarke of Federal Defenders of San Diego, Inc. appointed to replace Mr. Peven as counsel of record and to have Federal Defenders of San Diego, Inc. replace Federal Defenders of Eastern Washington and Idaho, Inc. as the institution responsible for funding the case. Dkt. #69. In a September 17, 2007, sealed order the District Court appointed Ms. Clarke, not in Mr. Peven's stead, but in addition to him, citing the need for Mr. Peven to "reduce his involvement in the matter." Dkt. #70. The order also transferred the funding authority for the case to Federal Defenders of San Diego, as the motion requested. *Id.* at 2.

3.     New Counsel's Request for a Continuance

On October 3, 2007, the defense filed a 19-page motion, Dkt. #74, supported by the sealed declarations of Mr. Larranaga and others, Dkt. #80,

requesting a one (1) year continuance of the trial date, until January 2009. The defense relied on the "numerous obstacles" that the defense had encountered after the Court established the January 2008 trial date. The defense described the substantial difficulties it had encountered in distributing the enormous amount of discovery materials to the members of the team. As a result, defense investigators were unable until late June 2007 to begin interviewing Mr. Duncan's relevant life history witnesses, the number of which was staggering.[4] The motion noted that there had been no investigation of the guilt phase, no defense investigation into the Government's allegations in the Notice of Intent to Seek the Death Penalty, and no defense experts had been identified, let alone retained, despite an impeding due date for the filing of the defense's Fed.R.Crim.P. 12.2 notice of expert evidence of a mental condition.

Mr. Larranaga's sealed declaration detailed many of the difficulties he had encountered attempting to have Mr. Peven secure adequate funding for experts

---

[4]As stated in the motion:

> Mr. Duncan lived in thirteen separate residence prior to his incarceration at age 16, in several state and out of the country. He attended seven different schools in those multiple locations prior to high school. While incarcerated between 1979, Mr. Duncan was housed in sixteen different correctional facilities.

Dkt. #74 at 6-7.

and investigators.  For instance:

> During late June and early July 2007, I sent drafts of a supplemental budget to Mr. Peven, but often numerous days would pass before I received any response.  Although I inquired, I was never provided a complete explanation for the reasons for the lack of communication or why there were delays in submitting a supplemental budget to the Administrative Office of the Courts.  Out of frustration and desperation, I contemplated seeking the appropriate funds through the District Court since I—as a CJA attorney—did not have access to funding directly from the Administrative Office of the Courts.

Dkt. #80 at 9.  Notably, Mr. Larranaga advised the court that until he received Mr. Peven's September 7, 2007 declaration, he had been unaware that Mr. Peven had been neglecting the defense for which he was responsible.  *Id*. at 11-12.  Mr. Larranaga explained:

> While I was primarily focused on getting the "life history" investigation started, I was led to believe that other investigation and preparation was being done by [Mr. Peven's] Office.  However, promised work, including production of witness lists and files, discovery summaries, and investigation of factors related to the guilt phase and aggravation was not being done, and largely remains at this time not even a work in progress.

*Id*. at 3.  The defense explained, "It is not Mr. Peven's withdrawal from the case that affects the trial date; it is the state of the defense preparation prior to that withdrawal that drives this request to vacate the current trial date."  *Id*. at 6 n. 6.

Case: 08-99031, 12/04/2009, ID: 7152820, DktEntry: 47-3, Page 29 of 117

4.     The District Court's Revelation that the Entry of New Counsel Had

Been Premised On Counsel Not Seeking a Continuance

A hearing was held on October 12, 2007, at which the court denied a

continuance explaining *inter alia* that Mr. Peven had not been allowed to

withdraw from the case and that "[h]e is a valuable tool to the defense because of

the information he had prior to present counsel entering the case."  10/12/07 RT

41.[5]  Regarding the need to investigate the court stated, "[M]y judgment is that

while it is a difficult situation, it is a complex situation, it is not an extreme

circumstance, so I am staying with the trial date of January 20."  *Id*. at 45.  Even

though the motion had explained that funding for experts had been unavailable

through Mr. Peven's office, the court ordered:

> the defense is going to have to disclose its expert witnesses in
> accordance, at least give notice of those experts, pursuant to Rule
> 12.2 and then comply with Rule 16 as far as the summary of the
> testimony and experience is concerned.  So there is going to have to
> be a disclosure of those witnesses as well and that is  within the
> deadline set for the motions.  So that is November 5[, 2007] as well.

---

[5]A written order confirming the oral ruling issued on November 19, 2007,
which explained that: Mr. Duncan was being represented by experienced, capable
counsel; Mr. Peven had not been permitted to withdraw and would be of
substantial benefit to the defense despite his personal problems; the defense had an
advantage of at least some work-up from the Idaho State case; and the Court had
on several prior occasions urged the defense to not neglect the need to hire
experts.  Dkt. #157.

Case: 08-99031, 12/04/2009, ID: 7152020, DktEntry: 49-3, Page 30 of 123

*Id*. at 47.

On October 25, 2007, Mr. Peven filed a motion, which was prompted by the court's comments about him, "formaliz[ing] and renew[ing] [his previous] unrecorded request of this Court to withdraw as counsel." Dkt. #89. The motion was supported by a declaration filed under seal describing Mr. Peven's psychological problems as far more severe than previously disclosed to the court. Dkt. #90.

On November 1, 2007, the district court entered a sealed order denying the motion. Dkt. #104. The court wrote that during their private in-chambers meeting Mr. Peven had not asked to withdraw but only to reduce his involvement and the Court had advised Mr. Peven that any attorney coming into the case due to Mr. Peven's reduced involvement "would have to know up front" that the Court would not continue the trial date. The court also wrote that there was nothing in Mr. Peven's declaration "that would suggest that the difficulties Mr. Peven is undergoing would prevent him from assisting the defense team in [] a limited capacity [in that] Mr. Peven has been and remains the Executive Director of the Federal Defenders of Eastern District of Washington and Idaho." *Id*. at 2-3.

5.    Defense Counsel Peven's Incapacity

On or about November 13, 2007, the President of the Board of Directors of

Federal Defenders of Eastern Washington and Idaho, Inc., wrote to the Court that after meeting with the Executive Committee of the Board on November 8, 2007, Mr. Peven had been put on indefinite leave of absence based on information set forth in declarations executed by several senior staff members of the organization. The declarants had sworn that Mr. Peven had been virtually incapacitated by psychiatric problems for a considerable time. On November 20, 2007, Stephen Hormel, Acting Executive Director of the Federal Defenders of Eastern Washington and Idaho, followed up on November 13th letter with a motion for the agency to be relieved as counsel for Mr. Duncan. Dkt. #173, #174.

On November 5, 2007, the defense filed a motion to extend the time to file its Fed.R.Crim.P. 12.2 notice of expert testimony, Dkt. #117, because "inadequate work has been completed to provide reliable or accurate notice." More specifically, the motion stated that "to date, appropriate experts have not been retained, and what may be necessary evaluation and/or testing has not been completed." *Id*. at 2. On November 21, the district court denied the motion. Dkt. #175.

On November 24, 2007, the defense filed a motion to clarify what had occurred during the August 28, 2007, private in-chambers meeting with Mr. Peven. Dkt. #179. The motion recited that at various times the court had stated

18

that the meeting with Mr. Peven was limited to personal issues not affecting the case, while the November 1, 2007, order denying the motion to continue said something quite different. The motion pointed out that the record was unclear as to what assurances Mr. Peven had made to the court and what conditions were placed on his being "advisory counsel." In particular, the defense noted that Mr. Peven had never told Ms. Clarke or other members of the team that he had requested merely a reduced role in the case and with that role he could insure the case could go forward on the same time table. *Id.* at 8.

On November 28, 2007, the district court denied the motion to clarify, Dkt. #185, stating that there was no ambiguity in the record as to what had occurred and chiding counsel for implying otherwise. The court reiterated that Mr. Peven had only asked to have a reduced role and that the court had made clear at that time (and thereafter) that any new counsel coming into the case in light of Mr. Peven's reduced role "would have to be apprised of the trial date so that he or she would know of the time requirements that would apply." *Id.* at 3.

19

**B.** **Guilty Plea, Mental Health Experts, and Defense Efforts to Obtain Time to Prepare**

<u>1. The Guilty Plea</u>

On December 3, 2007, without the benefit of any plea agreement, Mr. Duncan entered a plea of guilty to each of the ten charges alleged in the indictment, whereupon the previously-selected January 28, 2008, trial date was confirmed as the date the penalty trial would begin. Dkt. #189. On December 5, the Government moved to continue the trial date until April 7, 2008—the estimated date on which the sentencing hearing would have begun had the guilt phase gone to trial—in return for a defense stipulation that S.G.'s testimony could be presented through the statements she made to law enforcement officers at the time of Mr. Duncan's arrest. Dkt. #192 at 5. A defense motion to continue the trial date, with a requested date of September 15, 2008, was also filed on December 5. Dkt. #193. The defense motion stated that twice before the defense had "sought sufficient time to investigate and prepare this capital case for trial, and now seeks again to persuade this court of the need for additional time, to provide this Court with new information and to challenge the assumptions relied on by the Court in denying a continuance." Dkt. #193 at 1-2.

By order entered December 12, 2007, Dkt. #202, the district court granted

the Government's request and denied the defense's; trial was set for April 14, 2008.  The court expressed great irritation with the defense, *see e.g., id.* at 3-4 (characterizing the defense arguments concerning the magnitude of necessary preparations as the "marching out once again the Sixth Amendment"), criticizing them for "placing blame for their alleged unpreparedness upon not only Mr. Peven but also with the Court." *Id*. at 4.  Although the issues regarding Mr. Peven were only one of the many grounds argued by the defense, the court stated that "[f]or the defense to continue to argue that it has been so hamstrung by the personal issues of Mr. Peven that they are still unprepared to go forward in this matter any earlier than next fall indicates either a lack of diligence or gamesmanship on the part of the defense." *Id*. at 5.  Despite the history of having refused to allow the defense *any* additional time as a result of Mr. Peven's disability, the court also stated:  "The issues surrounding Mr. Peven have been utilized to the fullest by the defense and do not justify any further basis for delay.  The issue is closed." *Id*.

> 2.    Disclosure of Possible Expert Testimony

At a February 12, 2008, status conference, the court set March 12, 2008, as the due date for the defense's written summary of expert witness testimony under Fed.R.Crim.P. 16(b)(1)(C).  Dkt. #266 (minute order).  On February 20, the district court issued orders authorizing the defense to conduct medical and

psychological tests and examinations of Mr. Duncan. Dkt. #273, #274. On March

12, the defense filed a sealed "Status Report and Notice of Defense Experts," Dkt.

#306, stating that only limited information regarding defense experts could be

provided because

> Experts who have been retained (1) have not completed their review
> of materials, (2) have not had an opportunity to interview potential
> witnesses regarding Mr. Duncan's genetic and developmental history,
> including critical developmental years in prison as well as others
> relevant to an understanding of Mr. Duncan's life, and/or (3) have not
> been able to review and interpret testing that has recently been
> completed.

Dkt. #306 at 3. The notice did indicate, however, that psychologist Ruben Gur,

Ph.D., may offer an opinion interpreting neuropsychological testing that was in

progress at the time of the notice, and that psychiatrist and neurologist James

Merikangas may offer an opinion regarding Mr. Duncan's neurological, physical,

genetic and psychiatric impairments after reviewing test results likely to be

unavailable for another month. *Id*. at 6-8.

On March 20, the Government moved to bar the testimony of Drs. Gur and

Merikangas on the ground that their opinions seemed to relate to a mental disease

or defect, and as such the defense had been obligated, but had failed, to make the

required Fed.R.Crim.P. 12.2 disclosures on November 5, 2007, as ordered by the

court. Dkt. #322. On March 25, the defense filed a response conceding that Drs.

Gur and Merikangas would be testifying about a mental disease or defect and that the court had never extended the November 7, 2007, Rule 12.2(b) deadline, but asserting that since that time it had twice sought to continue the trial date on grounds that included a detailed account of its problems retaining experts. Dkt. #330 at 3-4 (*citing* Dkt. #193, #194 (sealed, ex parte); #239, #240-#242 (sealed, ex parte)).

Before the court could rule on issues relating to mental health expert testimony at the penalty trial, the case took the different direction described below.

**C.     The Request for Self-Representation, The Absence of Competency Proceedings, and the Pro Se Sentencing Trial, and The Death Penalty**

From the end of March to mid-April 2008, both sides filed various motions regarding the procedures for selecting the sentencing trial jurors and conducting the sentencing trial. Jury selection began on April 14, 2008. On April 16, the second day of jury selection, Mr. Duncan advised the court that he would waive counsel and proceed *pro se*. As described in more detail below, *see infra* at 32, the question of Mr. Duncan's competency to represent himself was raised by the

court *sua sponte* and by defense counsel in various pleadings.[6]  On July 24, 2008,

after reviewing the reports of three defense experts, including Drs. Gur and

Merikangas, concluding that Mr. Duncan was incompetent, and of two court-

appointed experts holding the contrary view, the district court, without holding a

hearing, found Mr. Duncan competent to proceed and to represent himself.  Dkt.

#493 [sealed version]; #494 [redacted public version].

As a result of the court's ruling, Mr. Duncan represented himself at the

sentencing trial with former counsel in a standby role.  Mr. Duncan did next to

nothing on his own behalf during the trial.  For most of the witnesses he had no

questions at all; when he did examine it was rarely to ask more than a handful of

questions.  *See e.g.*, 8/20/08 RT 2543-44, 2620; 8/21/08 RT 2702 (2 questions);

8/26/08 RT 3112 (1 question), 3234 (1 question).  After the Government rested,

Mr. Duncan called himself as a witness, and the following transpired:

> THE COURT:  You may proceed.
> MR. DUNCAN:  I have no statement prepared.  I was just
> intending to sit and answer whatever questions the Government might
> have.
> THE COURT:  You have nothing to testify to?
> MR. DUNCAN:  No.
> THE COURT:  No questions?

---

[6]Additional facts regarding the competency proceedings appear within the argument concerning the district court's handling of the competency question, *infra*.

MR. MOSS:  No, Your Honor.

8/21/08 RT 2635-36.  Mr. Duncan then rested his case.

On August 27, 2008, the jury returned verdicts recommending a sentence of death on each of Counts One, Five and Seven.  18 U.S.C. § 3593(e). The court then imposed the death sentences as required under 18 U.S.C. § 3594.  Dkt. #598. On November 3, 2008, the court sentenced the defendant on the remaining seven counts of the indictment to which the defendant had pled guilty.  Dkt. #601.  The Court entered written judgments on the capital counts on November 3 and on the remaining aspects of sentencing on November 5.  The Court entered an amended judgment on November 13, 2008.  Dkt. #602.

**D.     Post-trial Proceedings:  The Alleged Appellate Waiver**

On November 17, 2008, standby counsel filed a notice of appeal.  Dkt. #605.  On November 19, the Government filed a motion to strike the notice of appeal for lack of Mr. Duncan's authorization, Dkt. #606, which was supported by an FBI Agent's affidavit describing portions of a number of recent interviews with Mr. Duncan.  On November 20, the district court set a hearing for November 24, 2008, to determine whether or not Mr. Duncan was "knowingly and voluntarily waiving his right to appeal."  Dkt. #609.

On November 21, 2008, standby counsel filed an objection to the scheduling of a status conference on the ground that the court lacked jurisdiction to inquire into the validity of the notice of appeal. Dkt. #610. At the outset of the November 24 hearing, the court overruled the objection to the hearing and engaged in a colloquy of sorts with Mr. Duncan regarding his right to an appeal and whether or not he wished to waive that right. 11/24/08 RT 5. After a series of rambling and confusing exchanges, Mr. Duncan eventually stated that he understood what others may call the right to an appeal and that he did not chose to participate in it. Ms. Clarke alleged that the FBI had likely influenced Mr. Duncan in his decision not to participate in an appeal during the many hours of interviews it conducted with him and by its tendency to provide small gifts and favors at the jail. *Id*. at 3-4. The court declined to inquire into issues of inducement other than to ask Mr. Duncan whether he was "making [his] decision voluntarily and of [his] own free will?" *Id*. at 12.

The court made no inquiry into the reasons for Mr. Duncan's decision, and consistently discouraged Mr. Duncan from expressing them when he frequently sought to do so throughout the hearing. At the conclusion of the hearing, the court found that "your choice to forego your right to file an appeal is the product of a free and deliberate choice. It is made knowingly and intelligently. You have

26

clearly expressed your understanding of the significance and consequences of your decision to waive appeal and, nevertheless, desire to do so." *Id.* at 21; *see also* Minutes, 11/24/08, Dkt. #612 ("The Court finds the defendant's waiver is a free and deliberate choice."). Despite the fact that Mr. Duncan's responses tended to indicate not that he objected to any appeal being taken but only that he wished to do nothing to authorize or endorse any appeal, the court never advised him that as a matter of law his refusal to endorse an appeal of the conviction and sentence would itself constitute the legal authorization for an appeal of the issues of competency and waiver.

Shortly after the hearing, Mr. Duncan submitted an 8-page typewritten affidavit from the jail attempting to explain the reasoning not elicited by the district court. Its contents are discussed *infra* at 65.

# ARGUMENT

**A.    Standby Counsel Have Standing to Appeal the Competency Question and Ineffective Waiver of Appeal**

Notwithstanding any issue regarding the validity of Mr. Duncan's purported waiver of appeal, the notice of appeal filed by standby counsel Clarke, Larranaga, and Monaghan was valid and properly vested this Court with appellate jurisdiction.  Their authority to appeal is clearly established by *Mason ex rel. Marson*, 5 F.3d 1220 (9th Cir. 1993), and the district court's actions of holding a hearing and striking the notice appeal was contrary to this Court's directives.

In *Mason ex rel. Marson*, California condemned inmate David Mason requested that his attorney, Charles Marson, withdraw the federal habeas proceeding Mr. Marson had filed on his behalf.  Mr. Marson refused to do so, and the petitioner moved to have Mr. Marson relieved and replaced with substitute counsel who would dismiss the petition.  After conducting an evidentiary hearing (unlike here) into allegations that the petitioner's desires were the product of his Post Traumatic Stress Disorder, the district court found petitioner competent.  Several days later, a notice of substitution of counsel and a motion for voluntary dismissal of the petition under Fed.R.Civ.P. 41(a)(1) were filed on petitioner's behalf.

Mr. Marson, the "replaced" attorney, filed a notice of appeal from the order granting voluntary dismissal, as did three of petitioner's siblings who sought to intervene as "next friends" for purposes of moving to set aside the judgment. The Court noted that the appeal of the next friends was "tenuous" because they had not participated in the competency proceedings and because to have standing they would have to establish that the petitioner was incompetent. At the same time, the Court held that Mr. Marson, the attorney who had been relieved, did have standing to appeal:

> This case presents an unusual circumstance in which the petitioner and his appointed attorney are actively contesting the petitioner's competence. To add to the unusual character of this case, petitioner sought and was granted permission to have counsel of his choice represent him in upholding his competence to guide the course of his litigation. Marson was the court appointed attorney who had represented Mason … . As his attorney he believed he had an ethical obligation, acting in the best interest of his client, to contest Mason's competency to dismiss his action. … [¶] … Mason as the petitioner is entitled to guide the course of his litigation, including dismissing his action either on his own or through an attorney of his choice, provided he is mentally competent to do so. *Attorney Marson, as a participant for Mason in the proceedings, is also entitled to appeal the court's decision of mental competence, which would otherwise remain unreviewed in a death penalty case*.

*Id*. at 1223 (emphasis added).

Applied here, *Mason* clearly establishes standby counsel's standing to appeal all rulings involved in the district court's flawed judgment that Mr. Duncan

was competent to stand trial, to have appointed counsel relieved, and to waive his appellate rights, as well as the district court's determination that he did subsequently waive those rights unequivocally, knowingly and voluntarily. The only material difference between this case and *Mason* is that, in light of the sentence review requirement of the Federal Death Penalty Act, which by the express language of the statute is mandatory whenever an appeal is taken, the subsequent proceedings in this case cannot be limited to the competency and waiver issues but must also include a review of the sentence for compliance with specific statutory criteria. *See* discussion, *infra*, at 76.

**B.      The District Court's Flawed Determination that Mr. Duncan Was Competent to Stand Trial and Represent Himself Fails to Establish that Mr. Duncan Competently Waived His Right to Appeal**

The district court's statements that Mr. Duncan was competent to waive appeal were predicated on its earlier statements that Mr. Duncan was competent to proceed and to represent himself. The earlier statements were unconstitutional and procedurally and substantively infirm, however. Moreover, the tests for competency to be tried and for competency to waive proceedings are not coextensive. Even if Mr. Duncan had possessed a general capacity to understand

the proceedings and to rationally assist counsel, *Dusky v. United States*, 362 U.S.

402, 402 (1960), it is clear that his mental disorder has a substantial deleterious

effect on his capacity for rational thought as to the specific decision whether or not

to authorize an appeal. *Rees v. Peyton*, 384 U.S. 312 (1966). Thus, the record not

only fails to support the district court's statements that Mr. Duncan competently

waived appeal, but also plainly demonstrates quite the opposite.

### 1. The District Court's Actions Were Multiply Flawed

Due Process prohibits trying an accused person who is legally incompetent.

*Pate v. Robinson*, 383 U.S. 375 (1966). "[A] due process evidentiary hearing is

constitutionally compelled at any time that there is 'substantial evidence' that the

defendant may be mentally incompetent to stand trial." *de Kaplany v. Enomoto*,

540 F.2d 975, 980 (9th Cir. 1976) (en banc) (*quoting Moore v. United States*, 464

F.2d 663, 666 (9th Cir. 1972)); *see also* 18 U.S.C. § 4244. As will be shown

below, the district court failed to hold a hearing despite substantial evidence of

incompetency, improperly weighed conflicting written reports and other evidence

to discount evidence of incompetency, and made improper credibility

determinations based crabbed interpretations of written reports, providing no

opportunity to rebut or clarify.[7]

### a. The District Court Refused to Hold a Competency Hearing

On April 16, 2008, prior to the court's commencement of individual voir dire for the capital sentencing trial, Mr. Duncan requested to waive his right to representation by counsel and to proceed *pro se*. The court deferred the matter until April 18, 2008, whereupon the court decided to have Mr. Duncan's competency evaluated before ruling on the request for self-representation. The court ordered Dr. Robert Engle to conduct an evaluation for the court. The court memorialized its ruling in writing on April 21, 2008. Dkt. #404.

On May 2, 2008, the defense filed a motion requesting the court to find Mr. Duncan incompetent or, alternatively, to hold a competency hearing under 18

---

[7]As stated previously, this brief addresses the propriety of the competency determination only to the extent it is relevant to appellate jurisdiction. Before this Court could affirm the conviction and sentence despite a claim that Mr. Duncan may have been incompetent to proceed and/or represent himself, the Court would have to engage in "comprehensive" review, "not limited by either the abuse of discretion or clearly erroneous standard." *de Kaplany v. Enomoto*, 540 F.2d at 983; *United States v. Bradshaw*, 690 F.2d 704, 707 (9th Cir. 1982). When there is briefing of this appeal on the merits, as appellant believes should occur, appellant will discuss *de Kaplany* standard of review in more detail there. To the extent that this jurisdictional briefing is analogous to an appeal of the district court's finding that Mr. Duncan was competent to waive appeal, this Court is required to thoroughly review the record to satisfy itself as to the adequacy of the evidence for the district court's conclusions regarding Mr. Duncan's competency. *See Gilmore v. Utah*, 429 U.S. 1012, 1014-15 (1976) (plurality opinion of Burger, C.J.).

U.S.C. § 4241.  Dkt. #415.  With the motion, the defense submitted the reports of three experts, George W. Woods, M.D., James R. Merikangas, M.D., and Ruben Gur, Ph.D., all of whom concluded that Mr. Duncan was incompetent to proceed. On May 7, 2008, the Government filed a motion seeking a government-sponsored competency examination and also initially opposed the defense motion regarding Mr. Duncan's competency.  Dkt. #418.

On May 8, 2008, after having been provided with the defense expert reports, Dr. Engle submitted his report finding Mr. Duncan competent to proceed *pro se*. Dkt. #420.  On May 12, 2008, the Government filed a motion to withdraw its request for a competency examination by its own expert.  Dkt. #422.  On May 13, 2008, pursuant to 18 U.S.C. §§ 4241 and 4247(b), the court issued an order committing Mr. Duncan to the Federal Detention Center at SeaTac for a mental competency evaluation. Dkt. #427.  The court indicated in its order that it was taking the defense motion seeking an order for Mr. Duncan to be declared incompetent or for a competency hearing under advisement.

On June 16, 2008, the court issued an order extending Mr. Duncan's competency evaluation at the FDC by an additional 15 days, based on a request by the Bureau of Prisons (BOP).  Dkt. #434.  On July 2, 2008, in response to a second BOP request, the court granted another extension of time, directing BOP to submit

its competency evaluation of Mr. Duncan by July 16, 2008. Dkt. #452. The court also indicated that any competency hearing deemed necessary would likely be conducted the week of August 4, 2008. *Id*. On July 17, 2008, a status conference was held, at which the defense received the report generated by the BOP. Dkt. #485.

On July 24, 2008, the court issued an order denying the defense motion to find Mr. Duncan incompetent or alternatively to hold a hearing to determine competence under 18 U.S.C. § 4241. Dkt. #493 [sealed version]; #494 [redacted public version]. In declining to hold a competency hearing, the court wrote that there "is no bona fide doubt or reasonable cause to believe the Mr. Duncan is incompetent." *Id.* at 6. Moreover, the court wrote that "there is no evidence that Mr. Duncan suffers from a mental disease or defect which renders him incompetent to waive his right to counsel." *Id.* at 7. The court wrote that it found "the reports and conclusions of Dr. Engle and BOP to be more credible and afforded greater weight," noting:

> Dr. Engle utilized standardized psychological testing instruments. BOP, who regularly conducts these types of evaluations, had the benefit of observing Mr. Duncan consistently over a period of at least forty-five days. Notably, the reports of Dr. Engle and BOP applied the appropriate statutory standard whereas two of the three defense experts arguably did not.

*Id*. at 12.[8]

    b.  *The Cause to Doubt Mr. Duncan's Competency Was More*

      *Than Reasonable*

  The prohibition against trying a person while incompetent generally

requires that a motion for a competency hearing be granted when "reasonable

cause" exists to believe that the defendant is incompetent. *See* 18 U.S.C. §

4241(a); *Nash v. Ryan*, 581 F.3d 1048 (9th Cir. 2009).[9] "Many factors, including

history of mental illness and treatment, a finding of prior insanity, memory

problems, erratic behavior, variety and quantity of medications, and attempts at

suicide have been considered by courts determining whether a competency hearing

---

  [8]Upon writing that Mr. Duncan was competent to proceed, the court turned its attention to whether he "lacks the mental capacity to conduct his trial defense unless represented by counsel." Dkt. #493 at 16 [also #494 at 15]; *Indiana v. Edwards*, 554 U.S. 208 (2008). Relying on the *Edwards* opinion, the court framed the inquiry as follows: "If it is determined that he still desires to do so [proceed *pro se*], the Court may then set a limited competency hearing to determine whether Mr. Duncan should be allowed to represent himself with standby counsel or if it is necessary to order that he proceed with counsel to ensure the integrity and efficiency of a fair trial." *Id.* at 16. On July 28, 2008, the court conducted a hearing to advise Mr. Duncan of the pitfalls and disadvantages of self-representation and in an order filed on July 29, granted Mr. Duncan's request to represent himself. Dkt. #502.

  [9]The terms "sufficient doubt," "bona fide doubt," "good faith doubt," "genuine doubt," "reasonable doubt," and "substantial question," are used interchangeably in this context. *See Chavez v. United States*, 656 F.2d 512, 516 n.1 (9th Cir. 1981).

Case: 08-99031, 12/04/2009, ID: 7152828, DktEntry: 47-2, Page 49 of 117

should have been granted." *Nash v. Ryan*, 581 F.3d at 1057 (*citing McMurtrey v. Ryan*, 539 F.3d 1112, 1118 (9th Cir. 2008); *Morris v. United States*, 414 F.2d 258, 259 (9th Cir. 1969)). "Even one of these factors, standing alone may, in some circumstances, be sufficient." *Drope v. Missouri,* 420 U.S. 162, 180 (1975); *Miles v. Stainer*, 108 F.3d 1109, 1112 (9th Cir. 1997). Evidence suggestive of the need for a due process competency hearing may include any current evaluation of the defendant's competency to proceed, *McMurtrey v. Ryan*, 539 F.3d 1112, 1118-19 (9th Cir. 2008), as well as any doubt about a defendant's competency expressed by defense counsel.[10]

In this case, despite overwhelming evidence compelling a competency hearing, the district court three times refused to hold one. In addition to the defense team members' own assessment of incompetency, the defense submitted three expert mental health professionals' reports that Mr. Duncan suffers from a mental disease or defect that rendered him incompetent to waive counsel or

---

[10]*See e.g., Hernandez v. Ylst*, 930 F.2d 714, 718 (1991) ("a defendant's counsel is in the best position to evaluate a client's comprehension of the proceedings."); *Torres v. Prunty*, 223 F.3d 1103, 1109 (9th Cir. 2000) (counsel's view assessment of the defendant's incompetency while not dispositive "should have been considered seriously by the court"); *see also Pate*, 383 U.S. at 384 (noting that "counsel throughout the proceedings insisted that Robinson's present sanity was very much in issue," was evidence that petitioner was entitled to a hearing on that issue).

represent himself. These conclusions were based on comprehensive neuropsychiatric and clinical evaluations of Mr. Duncan, which included neuropsychological testing, structural and functional neuroimaging, specialized computerized testing, and clinical interviews.

*1)     Dr. Ruben Gur*

Dr. Ruben Gur, Ph.D., the Director of Neuropsychology at the University of Pennsylvania Department of Psychiatry, interviewed Mr. Duncan on April 22, 2008, and concluded that Mr. Duncan "suffers from moderate to severe brain dysfunction that is manifested in psychotic behavior" that "renders him unable to have a rational understanding of the proceedings or to waive his right to counsel and to represent himself." Report of Dr. Ruben Gur, Ph.D. (Dkt. #415, attach. 1) at 7. To reach his conclusion, Dr. Gur relied upon clinical assessment and quantitative data analysis to assess behavior and brain function, which included: results of intellectual assessment; magnetic resonance imaging (MRI) of Mr. Duncan's brain; positron emission tomography (PET) scan of Mr. Duncan's brain; records, computerized testing, and a clinical interview. *Id*. at 1.

As part of his overall assessment, Dr. Gur relied on neuropsychological testing that demonstrated deficits in Mr. Duncan's left fronto-temporal functioning. *Id*. at 2. The pattern of deficits is consistent with head injury, but

could reflect a learning disability or other neurodevelopmental disorders including schizophrenia. *Id.* Mr. Duncan was also given an MRI that examined 92 regions of interest and which demonstrated "an unusual brain structure" with several abnormalities reaching five standard deviations below the normative values. *Id.* More specifically, the examination revealed significant reduction in volume in the frontal regions, dramatic bilateral reduction in amygdala volume, and abnormalities in the parietal region of Mr. Duncan's brain, supporting the conclusion that Mr. Duncan suffers from significant deficits in his ability to make rational plans and modulate emotions. *Id.* at 3.

The results of the positron emission tomography (PET) further supported the evidence seen on the MRI concerning Mr. Duncan's "unusual brain structure." According to the PET results, Mr. Duncan has:

> reduced metabolism in the temporal and limbic areas [that] is especially marked in the hippocampus and amygdala, where metabolism is several standard deviations lower than normal. Low metabolism was also documented in the corpus callosum (anteriorly and posteriorly) and caudate nucleus, while higher than normal metabolism was observed in both the thalamus and hypothalamus, especially on the right.

*Id.* at 4.

In addition to the scientific analysis, Dr. Gur conducted a clinical interview with Mr. Duncan. He described Mr. Duncan's communication during the

38

interview as "tangential and circumstantial, showing a poverty of content of speech, grandiosity, paranoia, delusions, hallucinations, inappropriate affect (laughing at odd times) and moments of possible dissociation." *Id*. at 6. Mr. Duncan's mental impairments were also demonstrated during this interview. For example, Mr. Duncan described intrusive thoughts controlled by sentry "that monitors his thoughts and keeps vigil and pays attention to his thinking so that it can warn him if he is having fantasies or bad thoughts or when the intrusion is happening." *Id*. at 5. Mr. Duncan also held to the delusional belief that while on a mountain he had experienced an "epiphany" that permitted him to see things in a light he had never seen before even though he could not articulate it. *Id*. This "epiphany" was so profound that it provided him the insight to see the "Truth" in everything from books and songs, and changed his core belief to a state of altruism where all decisions are not for him but for the world. *Id*. at 5-6.

Mr. Duncan expressed the belief, attributable to the important information and insight he singularly possessed, that his trial would take on historic proportions and others could achieve the understanding he had gained. *Id*. Consequently, his "epiphany" was directly connected to his desire to fire his attorneys because having representation by counsel would prevent the jury and observers in the courtroom from achieving the Truth. *Id*. at 6.

Dr. Gur also performed computerized neurocognititive testing to further establish behavioral manifestations of regional brain dysfunction. The valid test results are consistent with characteristics of individuals with paranoid schizophrenia. *Id*. at 7.

As a result of the neuropsychological testing, quantitative analysis of structural and functional neuroimaging studies (PET and MRI), and clinical interview, Dr. Gur concluded that Mr. Duncan suffers from "moderate to severe brain dysfunction that is manifested in psychotic behavior, [which] renders him unable to have a rational understanding of the proceedings or to waive his right to counsel and to represent himself." *Id*. at 7.

### 2) *Dr. George Woods*

Dr. George Woods, M.D., also opined to that Mr. Duncan suffers from a mental disease or defect that rendered him incompetent. Report of Dr. George Woods, M.D. (Dkt. #415, attach. 2) at 4. Dr. Woods' first contact with Mr. Duncan was in 2005 when he was retained by the Kootenai County, Idaho, Public Defender's Office to assist in understanding Mr. Duncan's mental condition as part of mitigation. During that time period, Dr. Woods interviewed Mr. Duncan four times over the course of several months, noting that Mr. Duncan "displayed neuropsychiatric symptoms that included disordered and psychotic thinking,

dissociation, delusions, pressured, perseverative and tangential speech, mood lability, paranoia, grandiosity, and lack of insight." *Id*. at 1.

During these interviews, Mr. Duncan expressed having "epiphanies" that came in forms of thoughts, dreams, signs and symbols that permitted him to see "patterns in chaos." *Id*. Mr. Duncan also explained that these epiphanies found themselves in song, messages from television, and stories from books he read. *Id*. Mr. Duncan also discussed an intelligent entity that sent him thoughts, which Dr. Woods described as "paranoid, grandiose delusions" with "the psychotic belief that the outside environment can put thoughts directly in one's brain or consciousness." *Id*. at 2.[11]

Dr. Woods was later contacted by federal counsel with regard to Mr. Duncan's competency to waive counsel and represent himself. Dr. Woods reinterviewed Mr. Duncan on April 27, 2008, and in addition to observing that Mr. Duncan appeared more depressed than previously, Dr. Woods noted that "Mr. Duncan displayed a formal thought disorder and significant delusional thinking which has characteristics of delusional hyper-religiosity, grandiosity and paranoia." *Id*. at 2. Mr. Duncan described that he was melding into books, songs,

---

[11]Because Dr. Woods' focus was assisting state counsel in developing potential mitigation evidence for a capital sentencing trial, he was then concerned with Mr. Duncan's life experience over time, not competency.

and ideas, believing that these media were speaking directly to him — to the extreme of explaining how he had to throw a book under his bed because he believed the book was speaking to him about his current situation. *Id*.

Mr. Duncan's delusions, as noted by Dr. Woods, fundamentally controlled his thinking, permeating all aspects of his behavior in the court proceedings as well as with his relationship with his lawyers. *Id*. Mr. Duncan's delusional beliefs included his mountain-top awareness or epiphany, which provided him with unique and tremendous understanding of the world, religion, science, and knowledge, that he was obligated to transmit to, and not keep from, others. It was this delusional belief that drove Mr. Duncan to represent himself because, unhindered by the representation of counsel, the "Truth" would come out and change the world. *Id*. According to Dr. Woods, in Mr. Duncan's delusional belief system, he is a "conduit through which this magical thinking emanate[s]" and "controls all aspects of his behavior in these court proceedings and his relationship with his lawyers." *Id*. To Mr. Duncan, "rational thought intervention, and assistance as required by the court dilutes the 'Truth' and destroys the 'Truth'." As such, Mr. Duncan believed his trial would without representation would provide a miraculous awakening for humanity, in which his participation was unnecessary. *Id*. at 4.

Mr. Duncan's thought disorder and delusional thinking, which is consistent with the brain impairment as documented in the structural and functional neuroimaging and neuropsychological testing, caused an irrational and incoherent effort to proceed *pro se*. *Id*. at 4. Dr. Woods concluded to a reasonable degree of medical certainty that Mr. Duncan suffered from a mental disease and defect which rendered him incompetent to represent himself or make rational decisions. *Id.*

### 3) Dr. James Merikangas

Mr. Duncan was also examined by Dr. James R. Merikangas, M.D., a board certified psychiatrist and neurologist. Dr. Merikangas conducted a neurological examination and clinical interviews on February 6, 7, and 8, 2008. Finding that Mr. Duncan: suffered significant injury to his head during a car accident in 1979; was a victim of extensive physical, emotional, and sexual abuse, which began in his early childhood and continued throughout his time in prison; and, had a family history that demonstrates a genetic pre-disposition to major mental illness, including mental retardation, anxiety, depression, schizophrenia, and post-traumatic stress disorder, Dr. Merikangas requested that Mr. Duncan undergo brain-imaging studies including the magnetic resonance imaging (MRI) and positron emission tomography (PET), as well as additional neuropsychological

testing. Report of James R. Merikangas (Dkt. #415, attach. 3) at 2. Dr. Merikangas conducted further interviews of Mr. Duncan on April 1 and 2, 2008.

Following Mr. Duncan's April 16, 2008 request to proceed *pro se*, counsel requested that Dr. Merikangas assess Mr. Duncan's competence. Thereafter, Dr. Merikangas met with Mr. Duncan on April 25 and 26, 2008, to focus on the issue of competence to waive counsel and proceed *pro se*. Dr. Merikangas observed a number of symptoms of serious thought disorder including: poverty of content of speech (excessive and unnecessary verbiage to convey a point); tangential and circumstantial speech (oblique, indirect, or only vaguely related answers to questions); derailment of ideas (connectionless slipping from one idea to another); and pressured and perseveration in speech (an excessive flow and pace of speech and the repetition of the same word or idea). *Id*. at 2-3. Formal thought disorders are more than merely unusual beliefs; instead they involve fundamental impairments in the very process of one's thinking. Moreover, these fundamental impairments observed in Mr. Duncan, and the core feature of psychosis, were the result of multiple disruptions of logical reasoning, rational decision-making, and effective problem solving. *Id*. at 3.

Dr. Merikangas also found Mr. Duncan's thinking delusional. Mr. Duncan described experiencing an "epiphany" that provided him with a core understanding

of the world and the meaning of life. *Id*. This epiphany gave him an extraordinary insight into the Bible, the Koran, and the "Truth", placing himself in the likes of Jesus and Gandhi. *Id*. at 4. This epiphany—and his enlightened understanding of the world and his place in it which could transform others' understanding of the world—motivated his desire to remove counsel and proceed *pro se*. Mr. Duncan's *pro se* request did not stem from any rational consideration of the meaning of his trial. *Id*. at 3-4.

Mr. Duncan like others who suffer from delusions, was able to mask his delusional thinking and appear "normal" or "functional" on a superficial level. *Id*. However, when asked about the ideology that prompted him to proceed *pro se* he expressed a belief that the court process and all participants in the process (including his attorneys) would obscure the "Truth." Dr. Merikangas identified Mr. Duncan's belief: all the participants in the court process are like white noise or static covering the "Truth," which he had discovered. The court system was part of the barrier between the conscious and unconscious that the "Truth" breaks down. Mr. Duncan felt that his lawyers (as well as the prosecution, judge and jury) were part of a system that obscures the "Truth." He expressed the belief that because the "Truth" can be communicated only silently, any effort to communicate to the jury anything about him would be futile. It would take years to try, and

ultimately anyone who had not already achieved "Truth" would still fail to understand. Words impede the "Truth" and he therefore could not be represented by counsel. *Id*. at 5. Mr. Duncan believed that the jury can experience a similar "epiphany" without evidence or information being presented.

As a result, Dr. Merikangas found Mr. Duncan suffered from a mental disease or defect that renders him incompetent to remove counsel and proceed *pro se*. Along with counsel's own view that Mr. Duncan was incompetent, these expert opinions constituted not only "substantial," but indeed overwhelming, evidence of incompetency, and the district court clearly erred in denying the motion for an evidentiary hearing. Thus, the decision that Mr. Duncan was competent to proceed provides no basis for concluding that Mr. Duncan was competent to execute the purported appeal waiver.

> ### c. The Court Erroneously Resolved Conflicts in the Evidence In Deciding Whether to Hold an Evidentiary Hearing

As stated previously, *supra* at 34, the district court disregarded the defense written, proffered evidence because "the reports and conclusions of Dr. Engle and BOP [were] more credible and [should be] afforded greater weight." Dkt. #493 at 12; #494 at 11. This was because: (1) Dr. Engle "utilized standardized psychological testing instruments" (implying, incorrectly, that the defense experts

46

did not); (2) the BOP regularly conducts these types of evaluations, and had the benefit of observing Mr. Duncan consistently over a period of at least forty-five days (although Mr. Duncan refused to be interviewed there, and his delusions cannot be detected other than through conversation); and (3) Dr. Engle's and the BOP's reports recited the statutory standard for competency whereas "*two of the three* defense experts *arguably* did not." *Id*. (emphasis added).

This stated basis for denying an evidentiary hearing was in clear conflict with controlling authorities that make clear than in competency proceedings especially weight and credibility can be assessed only by means of an evidentiary hearing. A court is not to engage in evidentiary weighing to determine that evidence that would be on its face substantial has been rendered insubstantial by other, conflicting evidence. As this Court explained in *Moore v. United States*, 464 F.2d 663, 666 (9th Cir. 1972):

> Under the rule of *Pate v. Robinson* (1966) 383 U.S. 375, 86 S. Ct. 836, 15 L. Ed. 2d 815, a due process evidentiary hearing is constitutionally compelled at any time that there is "substantial evidence" that the defendant may be mentally incompetent to stand trial. … Evidence is "substantial" if it raises a reasonable doubt about the defendant's competency to stand trial. *Once there is such evidence from any source, there is a doubt that cannot be dispelled by resort to conflicting evidence*. The function of the trial court in applying *Pate*'s substantial evidence test is not to determine the ultimate issue: Is the defendant competent to stand trial? Its sole function is to decide whether there is any evidence which, assuming

47

its truth, raises a reasonable doubt about the defendant's competency. At any time that such evidence appears, the trial court sua sponte must order an evidentiary hearing on the competency issue. It is only after the evidentiary hearing, applying the usual rules appropriate to trial, that the court decides the issue of competency of the defendant to stand trial.

(emphasis added); *accord Blazak v. Ricketts*, 1 F.3d 891, 898 (9th Cir. 1993);

*Darrow v. Gunn*, 594 F.2d 767, 770 (9th Cir. 1979); *Campbell v. Lockhart*, 789

F.2d 644 (8th Cir. 1986); *Speedy v. Wyrick*, 702 F.2d 723 (8th Cir. 1983). As

stated in *Drope v. Missouri*, 420 U.S. 162 (1975):

The import of our decision in *Pate v. Robinson* is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. *That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts*.

Id. at 182 (emphasis added).

The defense presented the court with ample reason to harbor a substantial or

bona fide doubt regarding Mr. Duncan's incompetency—three expert opinions,

and their own views of Mr. Duncan's functioning. In a misguided effort to parry,

the court improperly credited the contrary views of Dr. Engle and the BOP. In so

doing, he deprived the defense of an opportunity to respond to the purported

deficiencies of the expert opinions (*e.g.*, the "arguable" failure to apply the correct

standard) or to introduce additional, corroborating, rebuttal evidence.

The failure to grant an evidentiary hearing resulted in the unconstitutional

failure to adequately resolve the doubts as to Mr. Duncan's competency as well as

an unreliable an invalid competency finding.[12]

---

[12]The 1984 amendments to the competency statutes also suggest that that district court erred. The superseded and now defunct version of § 4244 set forth a procedure much like that wrongly followed here by the district court. Under the prior statute a prima facie showing of incompetency resulted in the appointment of an expert, and if the expert agreed that the defendant was incompetent a hearing would be held. *See* former § 4244 (providing that upon motion of the prosecution, defense or court to determine a defendant's competency, "the court shall cause the accused … to be examined as to his mental condition by at least one qualified psychiatrist, who shall report to the court … . If the report of the psychiatrist indicates a state of present insanity or such mental incompetency in the accused, the court shall hold a hearing, upon due notice, at which evidence as to the mental condition of the accused may be submitted, including that of the reporting psychiatrist, and make a finding with respect thereto." In 1984, P.L. 98-473, Title II, Ch IV, § 403(a), altered the procedure. Notably, the interim step of appointment of an expert was deleted, and a hearing was required upon a prima facie showing of a "reasonable cause" to believe the defendant is incompetent. ("The court shall ...shall order [] a hearing [on incompetency], if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.")

49

### d.   The District Court's Implied Finding That the Issue Was Illegitimate Because it Was Not Raised Earlier Is Clearly Erroneous

The district court discounted defense counsel's assessment of the competency question, and the opinion of the defense experts as well, because defense counsel had expressed no doubt as to competency until Mr. Duncan sought to represent himself, and the defense experts had been retained not because the defense suspected Mr. Duncan was incompetent but to testify at the sentencing trial. *See* Dkt. #493 at 13 (noting that "the [defense] evaluation [is] less compelling than the reports of Dr. Engle or the BOP" because "[t]he defense experts appear to have initially been retained as mitigation experts, not to conduct a mental competency evaluation"); *id*. at 8 ("Prior to the Defendant asking to proceed *pro se*, defense counsel had not sought a competency evaluation of their client" but "did indicate that certain medical testing had been sought but was not yet completed at that time."). This was flawed reasoning.

There was nothing insidious about the timing of the defense request for a competency hearing. The defense was without funds to hire experts until after September 17, 2007, when the district court transferred funding from Federal Defenders of Eastern Washington and Idaho to Federal Defenders of San Diego.

50

Dkt. #70 at 2.  As a result, Mr. Duncan was not seen by the first defense expert, Dr. Merikangas, until February 2008, and was seen again by him in early April 2008.  Drs. Woods and Gur interviewed Mr. Duncan in late April.  The defense motion for a hearing to determine Mr. Duncan's competency, which was based on the three experts' opinions, was filed on May 2, 2008.

Thus, the failure to declare a doubt as to Mr. Duncan's competency until after he pleaded guilty in December 2007 does not suggest any lack of *bona fides*. As counsel stated in the motion to find Mr. Duncan incompetent:

> For an extended period of time, counsel expressed concerns about Mr. Duncan's thinking process and belief system.  Counsel has long had doubts about Mr. Duncan's competence, but lacked sufficient evidence to conclusively demonstrate it.  The full extent of Mr. Duncan's delusional belief system only became clear to counsel when investigating his competence to proceed *pro se,* following his April 16, 2008 request.  In the context of trying to determine Mr. Duncan's ideology driving his decision to proceed *pro se* it became clear to counsel the full breadth and impact of his delusional beliefs.

Dkt. #415 at 15.

Defense counsel cannot always, or even often, doubt competency without expert assistance.  Perhaps the district court imagined that if it required expert assistance to raise a doubt in defense counsel's mind, it could not have been substantial enough a doubt to raise a legitimate competency concern.  But, a defendant may be found incompetent even when his attorney asserts and believes

that he is competent. *United States v. Hemsi*, 901 F.2d 293, 294-96 (2d Cir. 1990); *see also Pate v. Robinson*, 383 U.S. 375, 386 (1966) (noting that a trial court's personal observations "cannot be relied upon to dispense with a hearing on that very issue" if there is substantial other evidence that the defendant is incompetent). Mr. Duncan's psychiatric illness is not one that would always or constantly be obvious to lay observers. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Psychiatric Disorders*, 297 (4th ed. 1994) ("[A] common characteristic of individuals with Delusional Disorder is the apparent normality of their behavior and appearance when the delusional ideas are not being discussed or acted on."); H. Kaplan & B. Sadock, *Comprehensive Textbook of Psychiatry*, 1041 ("Persons with delusional disorder may behave in a remarkably normal way much of the time; they become strikingly different when the delusion is focused on, at which time thinking, attitude, and mood may change direction abruptly.")

The evidence of incompetency focused on the connections between Mr. Duncan's delusional belief system and his inability to engage in a rational thought process concerning important decisions in his case. The record clearly suggests that the defense team did not fully appreciate the adverse and escalating effect of Mr. Duncan's delusions on his ability to rationally assist counsel until he began,

by abruptly pleading guilty, to carry out his plan to bring the world to the Truth by declining to defend himself.

An evidentiary hearing is the way the district court had to explore its questions regarding the defense experts' understanding and application of the relevant legal standards, as well as the reasons defense counsel did not earlier assert that Mr. Duncan was incompetent. By denying a hearing, the court wrongfully deprived the defense of any opportunity to explain, rebut, or even address the court's concerns. None of the perceived (or imagined) deficiencies of the written reports rendered the showing insubstantial. The district court's failure to hold a hearing on Mr. Duncan's competency to stand trial and to represent himself was erroneous.[13]

2.      Even If The District Court Properly Found that Mr. Duncan's Mental Disorder Did Not Render Him Incompetent to  Stand Trial, the Record Clearly Establishes that He Lacked the Capacity to Make a Rational Choice Whether to Appeal

---

[13]The district court expressed the view that a competency hearing should be denied because of Mr. Duncan's intelligence and factual understanding of the proceedings. Dkt. #493 at 13. That, too, was error. Under the *Drope/Dusky* competency standard, a factual understanding of the proceedings is necessary for competence, but not sufficient. Being intelligent is neither necessary nor sufficient.

In *Rees v. Peyton*, 384 U.S. 312 (1966), the leading case concerning a

capital defendant's competency to abandon litigation, the Supreme Court

described the test for competency, not in terms of the *Drope/Dusky* rational and

factual understanding, but as follows:

> The court must determine whether [the defendant] has the capacity to
> appreciate his position and make a rational choice with respect to
> continuing or abandoning further litigation or on the other hand
> whether he is suffering from a mental disease, disorder, or defect
> which may substantially affect his capacity in the premises.

*Id*. at 314.  Although the *Rees* and *Drope*/*Dusky* tests are quite similar, *see Dennis*

*v. Budge*, 378 F.3d 880, 889 n. 6 (9th Cir. 2004) (declining to decide whether the

*Rees* standard for competence to waive appeals in a capital case differs from the

*Dusky* test for competence to stand trial because difference would not affect

outcome); *Giarratano v. Procunier*, 891 F.2d 483, 487 (4th Cir. 1989), there is an

important difference.

The *Drope*/*Dusky* inquiry involves the generalized capacity for rational

thought, whereas *Rees* focuses on the capacity for rational-decision making as to

the specific question whether or not to appeal.  *See White v. Horn,* 112 F.3d 105,

112 (3d Cir. 1997) (holding that an apparently otherwise competent person

suffering from an irrational belief  that his death would result in "the public …

becom[ing] convinced that he was an innocent victim of a conspiracy and that the

realization that he has been executed though innocent will end capital punishment

once and for all," lacked the *Rees* capacity for making a rational choice.) This

distinction makes a difference:

> As compared to the competency standard for entering a guilty plea, established by *Johnson v. Zerbst*, 304 U.S. 458, 468, 82 L. Ed. 1461, 58 S. Ct. 1019 (1938), the *Rees* requirement that a capital defendant has the ability to make a "rational choice" accounts for the irrevocable permanency of the decision. Even if a capital defendant enters a guilty plea, an action that has both substantive and procedural consequences, later considerations or revelations may occasion review of the plea. For example, in post-conviction review or on direct appeal, a capital defendant might argue that he received ineffective assistance of counsel when he entered the plea, or that the state court erroneously determined that he was competent to enter the plea, or that information has turned up indicating prosecutorial misconduct. In contrast, the decision to waive post-conviction review of alleged constitutional errors stemming from proceedings that concluded in the issuance of a death warrant is a permanent procedural waiver, with no opportunity for rescission. Adding to other competency inquiries consideration of the ability to make such an irrevocable choice accounts for the manner in which this decision differs from others.

*Dennis v. Budge*, 378 F.3d at 901 (Berzon, J., concurring in the judgment)

(footnote omitted).

Like most delusional individuals, Mr. Duncan's capacity for rational

thought varies across different decision-making domains. Whatever his capacity

"'to consult with his lawyer with a reasonable degree of rational understanding'

and a 'rational as well as factual understanding of the proceedings against him,'"

*Godinez v. Moran*, 509 U.S. 389, 396 (1993) (*quoting Dusky v. United States*, 362

U.S. 402, 402 (1960)), regarding trial decisions in general, the record makes clear

that Mr. Duncan's delusional belief systems function in such a manner as to utterly

deprive him of the ability for rational thinking in the matter of whether or not to

authorize an appeal.

As will be explained in more detail below, Mr. Duncan's stated refusal to

authorize an appeal arises from none of the classic "volunteer" motivations, such a

personal preference for death over confinement for life, a desire for death for its

own sake, or a commitment to the appropriateness of the death sentence. Mr.

Duncan has stated that he does not wish to die and that he believes that society's

crime in killing him (if that is what ultimately results from him not participating in

appeal) would be worse than his own crimes. He does not see his sentence as just.

Whether he ultimately lives or dies does not matter; what matters is only that he

refrain from the self-deception of endorsing litigation so that the "System" can

make its own decision regarding punishment free from his enlightened influence.

Society must achieve its own epiphany that all evils, including the evil of State-

sanction homicide, are derived from the paramount sin of forsaking the Truth, and

he must refrain from attempting to influence that process.

In contrast to *Dennis v. Budge*, 378 F.3d at 890, where the Court

acknowledged that a depressed person can rationally decide on suicide as an appropriate course of action, Mr. Duncan's decisions are the result of a delusional, not rational, thought process. They reflect his inability to engage in any rational decision making process regarding the decision whether or not to appeal. Like the petitioner in *White v. Horn*, *supra*, who was deemed incompetent to waive appeal, Mr. Duncan has a grandiose delusion that his case – whether or not he is executed – may well ring in a new era for society, in which all killing is seen as wrong – provided that he does not exert his own powers of enlightenment in a manner that will prevent Society from discovering the "Truth" for itself.

## C. Even Assuming Mr. Duncan Was Competent To Waive Appeal, The Waiver Based on a Delusional Belief as to Its Consequences Failed to be Knowing, Intelligent, and Voluntary

Even if Mr. Duncan were competent to waive appeal, that alone would not be sufficient for a valid waiver. "A finding that a defendant is competent … is not all that is necessary before he may be permitted to plead guilty or waive his right[s]. … In addition to determining that a defendant is competent …, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." *Godinez v. Moran*, 509 U.S. 389, 400-401 (1993) (*citing Parke v.*

*Raley*, 506 U.S. 20 517 (1992); *Faretta v. California*, 422 U.S. 806 (1975). The federal courts are required to indulge every reasonable presumption against waiver of fundamental constitutional rights. *See Hodges v. Easton*, 106 U.S. 408 (1982); *United States v. Arlt*, 41 F.3d 516, 520 (9th Cir. 1994) (*citing Brewer v. Williams*, 430 U.S. 387 (1977)). Because of this, only clear and unequivocal waivers may be accepted. *See United States v. Farhad*, 190 F.3d 1097, 1099 (9th Cir. 1999) (waiver of right to counsel). A district court's finding that a waiver was knowing, intelligent and voluntary is a mixed question of law and fact reviewed de novo. *See United States v. Erskine*, 355 F.3d 1161, 1166 (9th Cir. 2004); *United States v. Lopez-Osuna*, 232 F.3d 657, 663-64 (9th Cir. 2000).[14]

The proceedings in the district court provide no reasonable assurance that any of these requirements were satisfied. The proceeding brought out no clear, unequivocal and voluntary relinquishment of a known right. Despite the district court's considerable effort to squelch discussion of Mr. Duncan's irrational, deluded thought process, his disordered ruminations pervade the record. To the extent that Mr. Duncan made anything clear it was simply that he wished not to do

---

[14]Factual findings supporting the district court's decision are reviewed for clear error. *See United States v. George*, 56 F.3d 1078, 1084 (9th Cir. 1995); *United States v. Kienenberger*, 13 F.3d 1354, 1356 (9th Cir. 1994).

anything to facilitate an appeal in order to leave it solely up to the "System" whether there would be an appeal. Neither the district court nor anyone else ever advised Mr. Duncan that his failing to participate in an appeal of the conviction and sentence is precisely what would authorize an appeal of the competency and purported appeal waiver proceedings. *See Mason ex rel. Marson*, *supra*, 5 F.3d 1220. Thus, Mr. Duncan's "choice" not to authorize an appeal that he attempted to exercise at the hearing was uniformed and unintelligently made.

### 1.    The District Court's Attempted Colloquy

The district court began the November 24, 2008, hearing by announcing its intent to inquire of Mr. Duncan "for the Ninth Circuit to understand exactly what your position is." 11/24/08 RT 7. Mr. Duncan's disordered thinking immediately became an obstacle to any such understanding. In response to the simple yes-or-no question, "Mr. Duncan, do you understand you have a right to file an appeal?," Mr. Duncan responded:

> I understand it I think as it was meant to be understood. In other words, Your Honor, I have – I don't know what the word for it is, but philosophical reservations about my understanding that extend beyond the intended understanding. In other words, my understanding goes beyond the intended understanding rather than below.

*Id*. at 8. Not surprisingly, the court sought a more direct answer and tried again:

"[Y]ou have a right to have that sentence reviewed by the Court of Appeals, if you desire to do so, in its entirety. That is what I am asking you. Do you understand that?" Mr. Duncan replied:

> I think at this point I should be as clear as possible because I realize the decision you are trying to make and I want to help you make that decision as best as I can by letting you know my position. If I get out of line, of course, I will try and curb my comments.
>
> But the affidavit that I wrote that I intended to file that is only missing a cover page right now, it states in there, I don't know, I was talking to the attorneys about it earlier, I don't know if it is clear or not, but to me it seemed clear that what I was trying to say is that in my opinion this whole proceeding is criminal, and as a criminal proceeding, any appeal doesn't make any sense.
>
> And so I understand the intention and I understand the criminal mind you might say of society. But in that regard I understand the intention of the appeal, the philosophy behind the appeal, the theory behind the appeal. You know, I know a lot. I am an educated person—well, I'm not saying I know everything, but I know enough to have an opinion about, you know, what the appeal means, which it goes beyond the normal opinion of what the appeal means.

*Id.* at 9-10. The district court responded by saying that "[w]hether [the death judgment] is a continuation of a crime in your mind is not the issue," *id.* at 10, and asked once again whether "you understand you have a right to that [appellate] process." *Id.*

> MR. DUNCAN: I want to be as clear as possible. You have to excuse me if I am not being clear. But I don't believe that this Court has the authority to grant such a right or a right as that. And so on the surface I can say honestly that I understand your intention of granting me that, what you call a right, but—and I accept your intention. I'm

60

> not opposed to your intention.  I accept that. That is your view, that is your world, that is your law, but it is not mine and I don't accept it.
>
> *But at the same time I don't reject it. I am neutral. I wish to allow you to do what you feel you need to do.  I will allow the attorneys to do what they feel they need to do.*
>
> Now, to answer your question, I want to get back to it, I am not avoiding your question or evading it.  I will answer your question. And my answer is in that context my answer is I certainly understand my right, my right in quotes, and I have no desire, as I mentioned in the letter I wrote to you, to invoke it.

*Id*. at 9-10 (emphasis added).

The court then told Mr. Duncan that "we are going to have to get away from the theoretical or how you view it in your own mind," *id*. at 11, and then asked again whether he understood he had a right to an appeal.  Finally, Mr. Duncan answered simply, "Yes."  *Id*. at 12.  With that hurdle cleared, eliciting a waiver of that right was initially less problematic

> THE COURT:  [I]s it your decision not to appeal or is your position that you want to appeal the verdicts of the jury as well as the sentence of the Court?
>
> MR. DUNCAN: My choice is to not appeal.

*Id*.

Despite the fact that Mr. Duncan had just said that he "was neutral" regarding an appeal and "will allow the attorneys to do what they feel they need to do," the court did not ask Mr. Duncan to elaborate on what he meant by his "choice."  But, the proceedings nevertheless soon hit another hurdle—Mr. Duncan

was not so easily quieted.  After the court told Mr. Duncan that for a few more

days he could still change his mind, Mr. Duncan asked:

> MR. DUNCAN: Your Honor, can I say one more thing real quick?
>
> THE COURT: Certainly.
>
> MR. DUNCAN: Just to clean up some of the things I said.  I consider the system criminal, but at the same time I'm not in a position to judge the system. So in other words, that is why I must allow the system to do what it needs to do, that it feels is  the correct thing to do, without judging it.
>
> In other words, what I am saying is that my view is that— well, I'm not going to say what my view is because that is not what is important.  What I am saying now is my view is my view and I recognize it as my view, and my view is limited and has a clear history of being in error. Therefore, I have to acknowledge that my view is not the end all, my view is not, you know, but at the same time I have to take responsibility for my view. I have to own my view. I have to be—that is all I have is my view and that is what I am saying.
>
> But at the same time what I am trying to say is I respect your view, and I respect my attorneys' view, and I respect the prosecutors' view, and I respect society's view. That doesn't mean I agree with it, you know, but I respect it and I allow you to have that view.  I think that is important to understand also.

*Id*. at 13-14.  Faced with this perplexing equivocation, the court tried to lead Mr.

Duncan back to a simple yes-or-no response.

> THE COURT: I do not feel it is appropriate or even necessary for the Court to try to get into some kind of philosophical argument or discussion with you.  Again, we have to come back around to the fact that you, just like everybody else in the United States under the United States Constitution, has a right to have these matters reviewed and appealed to a circuit court that reviews the entire record and

makes their own individual judgments concerning whether there was error by this Court, or that something was not properly handled by the Court, or that the jury's verdict was not supported by the evidence. So it is again a completely independent review of the record and you have a right to that, as the Court has explained previously.

You have a right, however, to waive that right so long as it is done unequivocally and knowingly and voluntarily. That is what I am trying to make sure the record is clear on so that it does not have to go up to the Ninth Circuit and then be sent back because it is unclear as to what your position was.

So while you may not agree with the system or you feel the system is committing some separate crime on its own, we are not talking about those matters, we are just simply talking about your right to have this matter appealed and reviewed by the Ninth Circuit.

What I believe you have told me is that you have made up your mind that you do not desire to appeal this issue or these matters and that you are doing that voluntarily and of your own free will, but I don't want to put words in your mouth.

Is that what you are telling me or are you telling me that you do desire to have this reviewed independently by the Ninth Circuit Court?

*Id*. at 14-15.

The following then transpired:

MR. DUNCAN: Your Honor, can I confer with counsel for one moment?

THE COURT: Certainly.

(Conferring with standby counsel.)

THE COURT: Mr. Duncan, you have had a chance to confer with counsel. What is it you would like to say to the Court?

MR. DUNCAN: I guess there is some concern about -- I realize the purpose of this hearing is not to get into a philosophical discussion and I am trying to avoid that, I really am. At the same time I do want the Court to understand where I am coming from, how I feel about appealing.

To answer your question directly, my answers are very clear: I do not have any intention of appealing. I understand the process, I understand the law, I understand the history of the law, where it comes from going all the way back to Rome and before that, the beginning of mankind. I'm not saying my understanding is perfect, but in other words, I have an extensive understanding of the whole process.

But the reason I chose to represent myself, the reason why I asked my counsel to step down and allow me to make some decisions in this case is not because I wanted to participate, but because I didn't want to participate.

I want you, I want the Court, I want society, I want the prosecutors, I want my attorneys, I want everyone to do this without me. I want you to make your choices. I don't want to be a part of that decision-making process.

That is why I defended myself the way I defended myself, by not defending myself. My answer to the Court was my argument is no argument, Your Honor. I don't want to argue. I don't want to get involved in the rationalization process of killing again. And so it becomes philosophical and I apologize for that.

My position is that the system has a choice to make. I've made my choices and now you have to make yours as a system, as society or whatever you want to call it. And I want to allow and I want to accept that choice, but I don't want to participate in it.

*Id*. at 16-17.

The court then asked Mr. Duncan whether he had authorized counsel to file

the notice of appeal, to which he responded:

MR. DUNCAN: No, I did not. That needs to be clarified, too. We had a discussion on it. And I didn't -- in the discussion I told them, "You do what you feel you need to do. You know my position and my position is I do not want to appeal. But if you feel that you need to do something, you know, I don't want to get in your way and I don't want to interfere," and they took that as permission.

64

*Id.* at 17-18.

The court then asked again whether Mr. Duncan had given counsel permission to file an appeal. *Id.* at 18. In response to Mr. Duncan's request to confer with counsel, the court told him, "I just want an answer, yes or no." *Id.* Mr. Duncan said, "No." *Id.* In response to the court's follow-up question, "Do you want to appeal this matter or do you not?," Mr. Duncan responded "I do not" and the court immediately found that Mr. Duncan had competently and unequivocally waived his right to appeal. The court also found that the waiver was knowing and intelligent because "the Court has informed you of the serious ramifications of your decision [and] you acknowledge that standby counsel have also counseled you." *Id.* at 20-21.

The same day, Mr. Duncan filed an affidavit attempting to further explain his position. It provides in relevant part:

> Up until now I have personally filed no litigation or other documents in regard to this case. All filings have been executed by the attorneys who were assigned to represent either the government or the "defendant" (myself) and in any case I have generally been opposed to all filings and have consistently expressed my opinion accordingly, though I have never asserted my opinion in any other way (i.e. by attempting to prevent filings that I was opposed to, with the exception of informing the court that I do not wish to appeal). My position has been, and remains, that this case is more about them (and society in general) than it is about me, so I should allow them (and society in general) to do as they think they should so that they can

65

learn from their own mistakes as I have learned from mine.

After reviewing some of the numerous documents that have been filed I've decided that it is in the interest of the Truth (my best interest) to file at least one document stating my position in this matter as clearly as literarily possible.  I feel now is the time for such a document to be filed since society by-and-large has already made its decision and I have no intention of prolonging the process by appealing, so my words should have no bearing on the choice that society has made in this matter.

(Not attempting to influence society's choice is important to me since  I have realized that the choices we make are our own, and no one outside of ourselves under any circumstance (or delusion) is responsible for the choices we make. Nobody and no circumstance can "make us" choose anything, though we can allow ourselves to be deceived (i.e. deceive ourselves). The true consequences of the choices we make fall back upon the ones making the choice, always, without exception. So society must be allowed to choose for itself, so it, as a whole, can learn this valuable truth.)

\* \* \* \* \*

So this is why I focus my energy and attention on my inner self, because I know that as a limited being I am a reflection of this world, and this society.  And as a reflection the only power I have to change the world is the power to change myself--if the reflection changes, then what is reflected must also change.  What the "Church of American Justice" (or the so called "Criminal Justice System") does to fight "evil" is trivial by comparison to this task, and most of the time even contrary to it.  This is why I pay little heed to the plethora of documents and proceedings that use my name in their attempts to further justify the system's own delusional murderous rampage (i.e. "insanity").

\* \* \* \* \*

I have learned that the true heinousness of my crimes was far worse than merely murdering children; it was murdering the Living Truth within my being.  In fact, the act of murdering children was a mere shadow--or reflection--of this greater crime.  This is why I have said in open court that "You people really don't have any clue yet of the true heinousness of what I have done …" because if you did you

66

could not possibly be so eager to do the same thing yourselves.

Rape and murder are no more than symptoms of the one true crime; the crime of denying the truth within ourselves. And this is why (or at least the best simile of why that my words can represent) that I have objected to nearly every piece of litigation filed in this case by the people who have been appointed to represent me. They are caught up in the illusion that the Truth is something that exists outside of themselves and that it can be manipulated to represent their own view of how things should be. Capital punishment--what society calls justice--is nothing more than the result of the same delusional thinking--and just another reflection of the greater crime--only much worse than even murdering children, because it affects the conscience of so many more people, not to mention ultimately resulting in more children being raped and murdered, or even worse … led away from the living Truth within their own being! (The very crime that I believe the legendary man/god Jesus was referring to when he spoke of leading children to harm).

So clearly, I view the system's desire to kill me is a crime far worse than my own, yet stemming from the same root cause. I understand what brings such "evil" into this world (I generally equate the word "evil" with the word "deception"), and I know that it cannot be overcome by fighting it on its terms. So I refuse to "defend" myself in the public arena called a courtroom (where deception ("evil") has the advantage) much as early Roman Christian's refused to defend themselves in the public arenas of their day (which were also thought of as perfectly reasonable "Criminal Justice Systems").

* * * * *

I will no longer condemn society even as it condemns me. No man, no church and no government has the authority to judge another living being. We are each given only the authority to judge ourselves (if we so choose), and when we seek to judge others it is only ourselves that we are judging. Someday all people will understand and cherish this Truth. And I know in my own heart that even if my words are mocked today, someday they will be heard by people who know and honor this Truth. These people will be (and already are) my brothers and sisters, and no amount of time or space, or even death can separate me from them.

Dkt. #613.

For the reasons discussed in the succeeding sections, none of this constitutes an adequate waiver of the right to appeal.

### 2. Mr. Duncan Expressed No Clear and Unequivocal Desire That His Conviction and Sentence Not Be Appealed

Initially, it should be noted that this case bears none of the hallmarks of the classic "volunteer" for execution. Such individuals usually fall into one of two categories: "(1) those suffering from psychological illnesses characterized by suicidal impulses who, for whatever reasons, are unable to commit the act themselves and seek the State's assistance through the death penalty; and (2) those suffering, both physically and psychologically, from the combined stress of being condemned to die at some indefinite point in the future while being confined for prolonged periods in brutalizing and dehumanizing conditions on 'death rows' across the country." G. Strafer, "*Volunteering for Execution: Competency, Voluntariness and the Propriety of Third Party Intervention*," 74 J. Crim. L. & Criminology 860, 862 (1983); *see e.g.*, *Gilmore v. Utah*, 429 U.S. 1012, 1015 (1976) (quoting Mr. Gilmore's statement that "he did not 'care to languish in prison for another day'"); *Massie v. Sumner*, 624 F.2d 72, 73 (9th Cir. 1980) (noting that Mr. Massie found "execution preferable to spending a lengthy period

68

incarcerated on death row"). Mr. Duncan has been incarcerated for most of his life, and his stated goal is neither to escape confinement nor to die. In the FBI interviews that were used to support the Government's motion to strike the notice of appeal, he specifically stated:

> It's like I said, it's not that I want to die. I don't want to die, so if my attorneys want to file an appeal, and I told them this too, just to be honest. You know I told them, "If you want to file an appeal, if you can find some way to file an appeal without my permission, then I'm not going to try to stop you. Go right ahead."

Dkt. #606, Gneckow affidavit at 4. Little else about the "waiver" or its reasons is as clear.

This equivocal and unreliable shift pervades the entire proceeding. "[M]y words [regarding the appeal] should have no bearing on the choice that society has made in this matter." Dkt. #613. "I want the Court, I want society, I want the prosecutors, I want my attorneys, I want everyone to do this without me. I want you to make your choices. I don't want to be a part of that decision-making process." 11/24/08 RT 17. "I've made my choices and now you have to make yours as a system, as society or whatever you want to call it. And I want to allow and I want to accept that choice, but I don't want to participate in it." *Id*. "I am neutral [regarding an appeal]. I wish to allow you to do what you feel you need to do. I will allow the attorneys to do what they feel they need to do." *Id*. at 11. "I

69

told [the attorneys], 'If you want to file an appeal, if you can find some way to file an appeal without my permission, then I'm not going to try to stop you. Go right ahead.'" Dkt. #606.

Mr. Duncan is at best agnostic about an appeal until he is cornered. It is true that he ultimately stated that it was his desire that there not be an appeal. This was only the result, however, of the district court's insistence that he not elaborate, confer with counsel, or answer anything but "yes" or "no." The district court's error of attempting to isolate Mr. Duncan's final response from "the philosophical arguments you have been making," 11/24/08 RT 20, or from "how you view it in your mind," *id*. at 11, was fundamental. Having repeatedly stated that the lawyers were free to do as they chose provided he did not have to give his personal authorization, the only possible answer—whether truthful or not—to the follow-up question of whether that statement should be construed as his personal authorization was "no."

This philosophical view of the act of *authorizing* an appeal, as opposed to merely *having* an appeal, makes this case unlike any other of which counsel is aware. Mr. Duncan does not wish to be put to death, does not accept the appropriateness of the punishment, and appears to have no objection to there being an appeal. His position is only a philosophical one of not participating in the

process by giving affirmative authorization. As stated previously, *supra* at 55, it is only a result of his delusional belief that his "philosophy" not to participate – which if prompted requires him to state that he is disavowing an appeal – will bring about a worldwide epiphany of the Truth, including that all killing, including that sanction by the State – is morally wrong. He has a grandiose delusion that he is on a higher plane of understanding which he wants the rest of the world to attain, but it can do so only if he declines to interfere with the world's spiritual evolution.

       3.     The Record Establishes that the Purported Waiver Was Anything But Knowing, Intelligent and Voluntary

The record is replete with statements indicating that Mr. Duncan's view of an appeal bears little resemblance to reality. *See e.g.*, 11/24/08 RT at 10 ("... I don't believe that this Court has the authority to grant such a right [to appeal] or a right as that. And so on the surface I can say honestly that I understand your intention of granting me that, what you call a right, but -- and I accept your intention. I'm not opposed to your intention. I accept that. That is your view, that is your world, that is your law, but it is not mine and I don't accept it."); *id.* at 9 ("I don't know if it is clear or not, but to me it seemed clear that what I was trying to say is that in my opinion this whole proceeding is criminal, and as a criminal

proceeding, any appeal doesn't make any sense.")  A waiver "cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts."  *Boykin v. Alabama*, 395 U.S. 238, 243 (1969) (*citing Johnson v. Zerbst*, 304 U.S. 458, 466 (1938).)  Mr. Duncan's statements reveal an insufficient rational and factual understanding of the consequences of waiving review.  He may or may not believe that death is the likely outcome of a decision not to authorize an appeal, and, unlike the majority of inmates involved in waiving review, he provides no reassuring statement that death is his ultimate goal.

Instead, what he says he seeks is the world's enlightenment, which depends not on whether he lives or dies but only on his steadfast adherence to a principle of non-interference, *i.e.*, his belief that we can only reach a state of enlightenment if he refuses to lead the way.  As such, his actions cannot be based on a knowing and intelligent choice made voluntarily, but only one entirely dictated by his delusional belief system in the service of a delusional goal.  In the parlance of *Rees v. Peyton*, *supra*, 384 U.S. at 314, rather than making a knowing, intelligent and voluntary choice, he is reacting to "a mental disease, disorder, or defect which may [that is] substantially affect[ing] his [decisional] capacity."

4.      Mr. Duncan's Delusional Ramblings With the Court Required A Post-Judgment Competency Inquiry

Mr. Duncan's responses not only failed to demonstrate a knowing, intelligent, and voluntary waiver, but it also should have alerted the district court to the need for a competency hearing notwithstanding the court's prior denial. The Supreme Court has instructed that "even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence." *Drope v. Missouri*, 420 U.S. at 181. Observed irrational behavior, demeanor in court, and prior medical opinions must be taken into consideration. *Id*. at 180. "Bizarre actions," that may not be alone sufficient to compel a competency hearing, must also be considered. See *Hernandez v. Ylst*, 930 F.2d at 718. "Unusual" and "self-defeating" courtroom behavior can also suggest the need for a competency hearing. *Torres v. Prunty*, 223 F.3d at 1110.

Mr. Duncan rambled on and on about participating by not participating, defending by not defending. *E.g.*, 11/24/07 RT 16-17. Mr. Duncan attempted to espouse his delusional world view until quieted by the court. The written statement, Dkt. #613, was not similarly constrained — "I understand what brings … "evil" into this world … and I know that it cannot be overcome by fighting it on its terms." Capital punishment "affects the conscience of so many more people, not to mention ultimately resulting in more children being raped and murdered, or

even worse … led away from the living Truth within their own being!"

The impact of Mr. Duncan's delusions on his capacity to consider the appeal question rationally was unmistakable and more than sufficient to trigger the *sua sponte* obligation to conduct a competency hearing, even assuming the court had properly denied the prior request.

> 5. Because The District Court Failed to Inform Mr. Duncan that Refusal to Authorize an Appeal of the Conviction Constituted Legal Authorization for an Appeal of the Competency Decision, The Waiver Was Not Knowing and Intelligent

To the extent that any clear position eventually emerges from the record and the court's jousting with Mr. Duncan, it was one of indifference to whether an appeal would be prosecuted on his behalf. All that mattered to him, he indicated, was he personally take no action to endorse or facilitate such an appeal, because to him all litigation is antithetical to Truth. Having received enlightenment, he no longer concerned himself with attempting to influence the actions of others. So others are free to do as they chose, even if it leads them to turn from Truth in the deluded belief that any of this matters.

Neither the court nor counsel ever advised Mr. Duncan that his choices were limited to: (1) authorizing an appeal of the conviction and sentence on the one

74

hand by endorsing counsel's notice of appeal; or (2) authorizing an appeal of the flawed competency proceeding and purported appellate waiver by disavowing counsel's notice of appeal. Mr. Duncan clearly expressed a willingness to have counsel appeal if they could do so despite his desire not to participate. He was never properly advised that under *Mason ex rel. Marson*, counsel's entitlement to appeal was not *in spite of* his non-authorization, but *because of* his non-authorization. Mr. Duncan was therefore unaware that the consequences of his "choice" not to participate in appeal were the exact opposite of what he supposedly hoped to accomplish.

Thus, the purported waiver is invalid. "Because a waiver is an 'intentional relinquishment or abandonment of a known right,' a trial court should make sure that a defendant knows what the right guarantees before waiving it." *United States v. Cochran*, 770 F.2d 850, 852 (9th Cir. 1985) (*quoting Johnson v. Zerbst*, *supra*, 304 U.S. at 464.). As explained by the Supreme Court, the purpose of the "'knowing and voluntary' inquiry … is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision." *Godinez v. Moran*, *supra*, 509 U.S. at 401 n.12 (emphasis in original). An uninformed waiver decision is not knowing and intelligent. *See Summerlin v. Schriro*, 427 F.3d 623, 639 (9th Cir. 2005).

Mr. Duncan's purported waiver of appeal was invalid and fails to deprive the Court of jurisdiction to entertain an appeal of the conviction and death sentence.

**D. The Federal Death Penalty Act of 1994 ("FDPA") Requires Sentence "Review" In Addition to Consideration of the Issues Raised on Appeal**

The Federal Death Penalty Act of 1994 ("FDPA") expressly provides that in addition to any appeal taken by a defendant, the Court of Appeals must undertake a statutory review of the sentence to ensure that "the sentence of death was [not] imposed under the influence of passion, prejudice, or any other arbitrary factor and [that] the evidence supports the special finding of the existence of an aggravating factor." 18 U.S.C. § 3595(c). Appellant has cited case law clearly establishing the Court's jurisdiction to hear an appeal of the district court's competency determination and related orders, *see* Argument A, *supra*, and has argued at length that Mr. Duncan's purported waiver of all other issues for appeal cannot be accepted. *See* Arguments B and C, *supra*.

If the Court agrees with Appellant as to any of those arguments, mandatory sentence review will be triggered by the FDPA's express terms. Should the Court disagree with all of the arguments presented above, for the reasons set forth below,

the Court should undertake FDPA sentence review in order to avoid conflict with

the Eighth Amendment's prohibition against the arbitrary or capricious application

of the death penalty.

1.      The FDPA's Appellate Review Provisions

As explained in more detail below, Supreme Court jurisprudence

emphasizes the importance of appellate sentencing review in complying with the

Eighth Amendment's ban on the arbitrary and capricious imposition of the death

penalty.  *See e.g.*, *Parker v. Dugger*, 498 U.S. 308, 321 (1991).  Accordingly, the

vast majority of states having the death penalty provide for an automatic,

nonwaivable appeal in all cases appellate review of cases in which a death

judgment has been imposed.  *See e.g.*, Ala. Code § 12-22-150 (2009) ("In all cases

wherein … the death sentence is imposed, it shall be the duty of the trial judge,

immediately after the imposition of sentence, to enter of record, with or without

the direction or election of the defendant, that the defendant appeals from said

judgment of conviction."); Cal. Penal Code Ann. § 1239(b) (2009) ("When upon

any plea a judgment of death is rendered, an appeal is automatically taken by the

defendant without any action by him or her or his or her counsel."); Fla. Stat. Ann.

§ 921.141(4) (2009) ("The judgment of conviction and sentence of death shall be

subject to automatic review by the Supreme Court of Florida.").[15]  A significant

number of jurisdictions differentiate the process of mandatory sentence "review"

and from "appeal," and in many of those on the review is mandatory; the plenary

appeal may be waived.  *See e.g.*, Conn. Gen. Stat. Ann. § 53a-46b(c) (2008) ("The

sentence review shall be in addition to direct appeal and, if an appeal is taken, the

review and appeal shall be consolidated for consideration"); Idaho Code §

19-2827(f) ("The sentence review shall be in addition to direct appeal, if taken,

and the review and appeal shall be consolidated for consideration"); Ky. Rev. Stat.

Ann. § 532.075(8) (similarly providing for consolidation of automatic review of

death sentence with any appeal, if taken); Md. Crim. Law Code Ann. § 2-401(d);

Mo. Ann. Stat. § 565.035(7) ("In addition to the mandatory sentence review, there

shall be a right of direct appeal of the conviction to the supreme court of Missouri.

---

[15] *See also* Ariz. Rev. Stat. Ann. § 13-756 (2009); 11 Del. Code § 4209(g)
(2009); Ga. Code Ann. § 17-10-35(a)(2009); Idaho Code § 19-2827(a) (2009);
Ind. Code 35-50-2-9(j)(2009); Ky. Rev. Stat. Ann. § 532.075(1) (2009); Md. Crim.
Law Code Ann. § 2-401(a) (2009) ; Mo. Ann. Stat. § 565.035(1) (2009); N.C.
Gen. Stat. § 15A-2000(d)(1) (2009); N.H. Rev. Stat. Ann. § 630:5(X) (2009);
(former) N.J. Stat. Ann. 2C:11-3(e) (2006) (New Jersey abolished the death
penalty in 2007); (former) N.M. Stat. Ann. § 31-20A-4(A) (2008) (New Mexico
abolished the death penalty in 2009); Nev. Rev. Stat. § 177.055(1) (2009); 42 Pa.
Cons. Stat. Ann. § 9711(h)(1)(2009); Tex. Code Crim. P. Ann. Art.
37.071(h)(2009); S.C. Code Ann. § 16-3-25(A)(2009); Utah Code Ann.
§ 76-3-206(2)(a)(2009); Wash. Rev. Code Ann. § 10.95.100 (2009); Wyo. Stat.
Ann. § 6-2-103(a) (2009).

This right of appeal may be waived by the defendant. If the appeal is taken, the appeal and the sentence review shall be consolidated for consideration."); S.C. Code Ann. § 16-3-25(F) ("The sentence review shall be in addition to direct appeal, if taken").[16] Typically, the mandatory sentence review is limited to and guided by statutory factors intended to enhance sentence reliability. *See e.g.*, Conn. Gen. Stat. § 53a-46b(b) (on automatic review, the high court shall consider whether "(1) the sentence was the product of passion, prejudice or any other arbitrary factor; or (2) the evidence fails to support the finding of an aggravating factor"); Del. Code. Ann. tit. 11 § 4209(g)(2) (on automatic review, the high court "shall limit its review" to consideration of whether "the death penalty was either arbitrarily or capriciously imposed or recommended"); Ga. Code Ann. § 17-10-35(c) (on automatic review, high court shall consider "whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor" and whether "the evidence supports the jury's or judge's finding of a statutory aggravating circumstance"); Idaho Code § 19-2827(c) (on automatic

---

[16]*See also State v. Dodd*, 838 P.2d 86, 93 (Wash. 1992) (discussing Rev. Code Wash 10.95 requirement of mandatory review of a death sentence, and explaining that "the Legislature distinguished between 'sentence review' and general 'appellate review'. ... [I]t requires sentence review, but indicates general review is not required, as evidenced by the phrase 'if any', referring to general appellate review. The directive that sentence review is 'in addition to any [general] appeal' also suggests general review must be available, but may be waived.")

review, high court shall consider "whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor," and "whether the evidence supports the judge's finding of a statutory aggravating circumstance"). *See also* Ky. Rev. Stat. Ann. § 532.075(3); Md. Ann. Code of 1957, Art. 27 § 414(e); Mo. Ann. Stat. § 565.035(3); Nev. Rev. Stat. § 177.055(2); S.C. Code Ann. § 16-3-25(C); Wyo. Stat. Ann. § 6-2-103(d).

The FDPA, 18 U.S.C. § 3595, is patterned on a review/appeal model. Section 3595(a), entitled "Appeal," provides:

> In a case in which a sentence of death is imposed, the sentence shall be subject to review by the court of appeals upon appeal by the defendant. Notice of appeal must be filed within the time specified for the filing of a notice of appeal. An appeal under this section may be consolidated with an appeal of the judgment of conviction and shall have priority over all other cases.

Section 3595(b) is entitled "Review," and it provides

> The court of appeals shall review the entire record in the case, including — (1) the evidence submitted during the trial; (2) the information submitted during the sentencing hearing; (3) the procedures employed in the sentencing hearing; and (4) the special findings returned under section 3593(d).

Section 3595(c), "Decision and disposition" describes the appellate court's dual role in assessing issues a defendant raises on appeal and reviewing the sentence for compliance with certain criteria, whether or not appellant assigns them as error:

80

(1) The court of appeals shall address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of any aggravating factor required to be considered under section 3592.

(2) Whenever the court of appeals finds that – (A) the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (B) the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor; or (C) the proceedings involved any other legal error requiring reversal of the sentence that was properly preserved for appeal under the rules of criminal procedure, the court shall remand the case for reconsideration under section 3593 or imposition of a sentence other than death.

Unlike its appeal/review statutory predecessors, despite requiring extraordinary review extending beyond normal appellate issues, § 3595 has no express provision requiring such review in the absence of an appeal by the defendant. The legislative history appears to shed no light on whether Congress specifically intended to deviate from the model, or if so why. *See e.g.*, H.R. Rep. No. 103-324 (1994), *reprinted in* 1994 U.S.C. C.A.N. 1801, 1815; H.R. Rep. No. 103-467 (1994), 1994 WL 107578; H.R. Rep. No. 104-23 (1995), 1995 WL 56412; H.R. Conf. Rep. No. 103-711 (1994), *reprinted in* 1994 U.S.C. C. A.N. 1839, 1856.

The Third Circuit is the only federal court of appeals to have addressed the question. In *United States v. Hammer*, 226 F.3d 229 (3d Cir. 2000), the court held

81

that because § 3595(a) refers to "review ... upon appeal by the defendant," the

court's statutory review obligations are outside the normal appeal obligations are

triggered only in the event that the defendant opts to file an appeal.[17]  For the

reasons previously stated, Appellant believes issued decided by *Hammer* is not

presented by this case.  In the event that the Court may find the notice of appeal

insufficient to vest this Court with jurisdiction, Appellate argues below that this

Court should disagree with *Hammer* and interpret FDPA to require sentence

review even in the absence of an appeal.

   2.    The Eighth Amendment Requires Mandatory Appellate Review of a

         Federal Death Sentence

 The Eighth Amendment requires capital sentencing schemes to provide

mechanisms for ensuring that only those as to whom death is the legally

appropriate penalty are in fact executed.  The United States Supreme Court has

articulated this requirement, in part, through its consistent holdings that the Eighth

Amendment requires a capital sentencing scheme to provide for meaningful

appellate review.  The Court has "emphasized repeatedly the crucial role of

meaningful appellate review in ensuring that the death penalty is not imposed

---

[17]On the other hand, § 3595(b) provides that "the court of appeals shall
review" the sentence, without qualification such as "in any case in which the
defendant has filed an appeal."

Case: 08-99031, 12/04/2009, ID: 7152626, DktEntry: 49-3, Page 96 of 117

arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321 (1991). *See also*

*Clemens v. Mississippi*, 494 U.S. 738, 749 (1990); *Gregg v. Georgia*, 428 U.S.

153, 204-06 (1976); *Proffitt v. Florida*, 428 U.S. 242, 253 (1976); *Jurek v. Texas*,

428 U.S. 262, 276 (1976). Indeed, in *Gregg*, *Proffitt*, and *Jurek* – the first three

cases following *Furman v. Georgia*, 408 U.S. 238 (1972), in which the Supreme

Court found the death penalty to be constitutional – the Court upheld the capital

sentencing schemes of Georgia, Florida, and Texas, respectively, in large part

because those states' statutes required in-depth appellate review of every death

sentence. For example, in *Gregg*, the Court held:

> As an important additional safeguard against arbitrariness and
> caprice, the Georgia statutory scheme provides for automatic appeal
> of all death sentences to the State's Supreme Court. That court is
> required by statute to review each sentence of death and determine
> whether it was imposed under the influence of passion or prejudice,
> whether the evidence supports the jury's finding of a statutory
> aggravating circumstance, and whether the sentence is
> disproportionate compared to those sentences imposed in similar
> cases.

*Gregg*, 428 U.S. at 198. Similarly, the provision of thorough appellate review was

a significant factor in the Court's decisions upholding the capital sentencing

schemes of Florida and Texas. *See Proffitt*, 428 U.S. at 253 (risk of arbitrary or

capricious infliction of death penalty "is minimized by Florida's appellate review

system, under which the evidence of the aggravating and mitigating circumstances

is reviewed and reweighed by the Supreme Court of Florida 'to determine independently whether the imposition of the ultimate penalty is warranted'") (citation omitted); *Jurek*, 428 U.S. at 276 ("By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under the law.").

In *Zant v. Stephens*, 462 U.S. 862 (1983), the Court reiterated the importance of appellate review to the constitutionality of a death penalty scheme. The Court observed that the appellate review of every death penalty proceeding "to determine whether the sentence was arbitrary or disproportionate" was one of the primary features upon which the Court's approval of the Georgia scheme in *Gregg* had rested. *Zant*, 462 U.S. at 877. In reaffirming the validity of the Georgia statute, the Court found that appellate review process central to its holding that the statute was constitutional. *Id*. at 876-77. *See also Pulley v. Harris*, 465 U.S. 37, 58 (1984) (Stevens, J., concurring) ("While the Court [in *Zant*] did not focus on the comparative review element of the scheme in reaffirming the constitutionality of the Georgia statute, appellate review of the sentencing decision was essential to upholding its constitutionality.").

In *Parker v. Dugger*, 498 U.S. 308, 321-23 (1991), the Court reversed a

death sentence in part because the Florida Supreme Court had failed to conduct the meaningful appellate review required by the Constitution. The Court held that the state court's affirmance of the death sentence "neither based on a review of the individual record in the case nor in reliance on the trial judge's findings based on that record," 498 U.S. at 321-23, rendered the sentence unconstitutionally arbitrary in violation of the Eighth Amendment. A death sentence that is not subject to meaningful appellate review, the Court held, cannot survive constitutional scrutiny. Similarly, in *Dobbs v. Zant*, 506 U.S. 357 (1993), the Court reversed a denial by the Court of Appeals for the Eleventh Circuit of a petition for habeas corpus in a capital case, based upon that court's failure to consider the full sentencing transcript. The Supreme Court stated "[w]e have emphasized before the importance of reviewing capital sentences on a complete record," 506 U.S. at 558, and quoted *Gregg* for the proposition that appellate review of a complete record is important as a "'safeguard against arbitrariness and caprice.'" *Id.* (*quoting Gregg*, 428 U.S. at 167). Thus, the Supreme Court has repeatedly made clear that for a capital punishment system to be constitutional, "some form of meaningful appellate review is required." *Pulley v. Harris*, 465 U.S. 37, 45 (1984); *see also id.* at 59 (Stevens, J., concurring) ("some form of meaningful appellate review is an essential safeguard against the arbitrary and capricious imposition of

85

death sentences by individual juries and judges").

Despite this strong emphasis on rigorous appellate review in its Eighth Amendment jurisdiction, the Supreme Court has never squarely decided the question of whether a capital sentencing scheme must provide for automatic appellate review. In none of the Court's well-known death-row "volunteer" cases did it reach the fundamental issue whether the Eighth Amendment requires at least one level of mandatory appellate review. Instead, the Court declined on grounds of standing to entertain a federal challenge to a state court death penalty scheme without mandatory appellate review.

For example, in *Gilmore v. Utah*, 429 U.S. 1012 (1976), which involved a Utah statute that did not require an appeal and a choice by the defendant not to appeal,[18] the Court held that Article III's standing requirement precluded it from reaching the question whether the Eighth Amendment requires an initial round of appellate review regardless of a defendant's wishes because the petition for review of Gilmore's sentence had been filed by Gilmore's mother. *See Gilmore v. Utah*, 429 U.S. at 439 (Burger, C. J., concurring) (noting that question of whether

---

[18]After Gilmore's execution, Utah amended its law to provide for automatic, nonwaivable appellate review of all death sentences. *See* 495 U.S. 149, 175 (1990); Utah Code Ann. § 77-35-26(10) (Supp. 1989); *see also* Utah Code Ann. § 76-3-206(2) (1978).

Gilmore was unable as a matter of law to waive the right to state appellate review "simply is not before us").

Similarly, in *Whitmore v. Arkansas*, 495 U.S. 149 (1990), the Court did not reach the question of whether a person sentenced to death may waive direct appellate review. Instead, the Court dismissed the petition for certiorari which had been filed by another death row inmate, on the ground that the petitioner lacked standing. *Id*. at 166. As Chief Justice Rehnquist wrote in the opening sentence of his opinion: "[t]his case presents the question whether a third party has standing to challenge the validity of a death sentence imposed on a capital defendant who has elected to forgo his right of appeal to the State Supreme Court." 495 U.S. at 151. Finding that the third party – the other death row inmate – did not have such standing, the Court held that it could not reach the underlying question of whether "the Eighth and Fourteenth Amendments require the State of Arkansas to conduct an appellate review of his conviction and sentence before it can proceed to execute him." *Id*. at 154.[19]

---

[19]In a case involving this Court, *Demosthenes v. Baal*, 495 U.S. 731 (1990), the Supreme Court applied the same reasoning to hold that Article III required federal courts to dismiss a petition for habeas corpus filed by the parents of a death row inmate. *Demosthenes*, however, involved no question whether the Eighth Amendment makes appellate review a necessity; *Demosthenes* involved only a waiver of post-conviction review after affirmance by the Nevada Supreme Court.

In sum, the Supreme Court has never held that, consistent with the Eighth

Amendment, a defendant may waive direct appeal of his death sentence.  In *United*

*States v. Hammer*, 226 F.3d at 236-37, the Third Circuit rejected the Eighth

Amendment challenge to an interpretation of the Federal Death Penalty Act that

would make appellate review contingent on a defendant's choosing to appeal in a

six sentence analysis, which amounts to little more than an supported leap of

logic:  because the Supreme Court has never expressly held that the Eighth

Amendment's reliability requirement dictates at least one level of mandatory

review, no such requirement exists.

> While the Supreme Court has discussed the importance of making
> appellate review available to defendants, *see, e.g.*, *Parker v. Dugger*,
> 498 U.S. 308, 32, 111 S.Ct. 731, 739 (1991) (discussing the "crucial
> role of meaningful appellate review in ensuring that the death penalty
> is not imposed arbitrarily or irrationally"), it never has suggested that
> this right cannot be waived.  *Cf. Pulley v. Harris*, 465 U.S. 37, 104
> S.Ct. 871 (1984).  In *Harris*, the Court upheld the California death
> penalty statute which had no provision for proportionality review.  It
> noted that several, but not all, of state death penalty statutes provided
> for (1) proportionality review; and (2) an automatic appeal.  It
> concluded that the former was not constitutionally necessary, and
> made no comment about the latter. *See id*. at 44-45, 104 S.Ct. at 876.
> Furthermore, the Court never has allowed that society at large has a
> constitutionally cognizable interest in appellate review of capital
> sentences. *See Whitmore v. Arkansas*, 495 U.S. 149, 110 S.Ct. 1717
> (rejecting third party attempt to raise appeal on defendant's behalf);
> *Gilmore v. Utah*, 429 U.S. 1012, 97 S.Ct. 436 (1976) (same).

> Several state supreme court decisions take an oppositive view.  For instance

88

the New Jersey Supreme Court wrote in *State v. Martini*, 677 A.2d 1106 (N.J.

1996):

> In *Gilmore v. Utah*, 429 U.S. 1012, 97 S. Ct. 436, 50 L. Ed. 2d
> 632 (1976), the United States Supreme Court declined on standing
> grounds to consider an appeal by Gary Gilmore's mother that the
> Utah death penalty act was unconstitutional. That approach may be
> constitutionally permissible for the United States Supreme Court
> because it is not part of a state system of administration of the death
> penalty.  In contrast, the New Jersey judiciary is an integral part of the
> administration of the death penalty.  There are three requirements for
> the constitutionality of a death penalty statute: (1) that sentencers be
> "given guidance regarding the factors about the crime and the
> defendant that the State, representing organized society, deems
> particularly relevant to the sentencing decision," *Gregg v. Georgia*,
> 428 U.S. 153, 192, 96 S. Ct. 2909, 2934, 49 L. Ed. 2d 859, 885
> (1976) (opinion of Stewart, Powell, and Stevens, JJ.), (the
> aggravating and mitigating factors); (2) that there be an
> individualized determination of the sentence on the basis of the
> character of the individual and the circumstances of the crime,
> *Eddings v. Oklahoma*, 455 U.S. 104, 110-12, 102 S. Ct. 869, 874-75,
> 71 L. Ed. 2d 1, 8-9 (1982); and (3) that "the further safeguard of
> meaningful appellate review is available to ensure that death
> sentences are not imposed capriciously … ."  *Gregg*, *supra*, 428 U.S.
> at 195, 96 S. Ct. at 2935, 49 L. Ed. 2d at 886-87.

*Id*. at 1112.  In *Calhoun v. State*, 297 Md. 563, 607 (Md. 1983), the Maryland

Supreme Court interpreted *Gregg*, *Proffitt*, and *Jurek* as "saying that [mandatory]

appellate review of capital punishment cases is essential to the constitutionality of

the death penalty statutes."  *Accord Judy v. State*, 416 N.E.2d 95, 108 (Ind. 1981)

(observing that "[m]andatory review by this Court, in each case, of the articulated

reasons for imposing the death penalty, and the evidence supporting those reasons, assures 'consistency, fairness, and rationality in the evenhanded operation' of the death penalty statute") (*quoting Proffitt*, 428 U.S. at 259-60); *Commonwealth v. McKenna*, 383 A.2d 174, 181 (Pa. 1978) (appellate review of death sentences cannot be waived, in light of the "overwhelming public interest [in] insuring that capital punishment in this Commonwealth comports with the Constitution of the United States"); *State v. Brewer*, 826 P.2d 783, 790 (1992) (Eighth and Fourteenth Amendments require Arizona Supreme Court to review all death sentences to ensure that they are in compliance with Arizona law).  Moreover, the fact that the vast majority of other states require automatic appellate review of all death sentences suggests that those states, too, regard automatic appellate review as constitutionally required.

3.     At a Minimum FDPA Should Be Interpreted to Avoid Constitutional Problems

With these principles in mind, the Court should interpret the Federal Death Penalty Act to provide for automatic, mandatory appellate review of every death sentence imposed pursuant to its provisions, in order to avoid a square conflict with the Eighth Amendment to the United States Constitution.  *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S.

568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress"); *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 508-09 (1979); *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909) (court should interpret statute to avoid "grave and doubtful constitutional questions"); *Sandoval v. Reno*, 166 F. 3d 225, 237 (3d Cir. 1999); *National Union Fire Ins. Co. of Pittsburgh v.City Sav., F.S.B.*, 28 F. 3d 376, 389 (3d Cir. 1994); *Rappa v. New Castle County*, 18 F.3d 1043, 1051 n. 10 (3d Cir. 1994). If this Court construes the Federal Death Penalty Act as allowing a defendant to waive direct review of his death sentence by the Courts of Appeals, then it must necessarily reach the constitutional question of whether the Eighth Amendment requires automatic, mandatory appellate review.

This question is not forced by the text of the statute. Automatic, mandatory appellate review is not "plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp.*, 485 U.S. at 575. Indeed, an examination of the appellate provisions of the statute, 18 U.S.C. § 3595, reveals Congress's plain intention to provide searching appellate review of federal death sentences for consistency with constitutional requirements.

That the statute directs the Courts of Appeals to engage in such thorough review of death sentences at least suggests that the dominant purpose of the appellate provision is to ensure the reliability of every federal death sentence. Each of the subsections of § 3595 must be interpreted in light of this guiding purpose. *See Jones v. United States*, 527 U.S. 373, 389 (1999) ("Statutory language must be read in context and a phrase gathers meaning from the words around it.") (internal quotation marks and citation omitted); *Philbrook v. Glodgett*, 421 U.S. 707, 713 (1975) ("In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."); *Kokoszka v. Bedford*, 417 U.S. 642, 650 (1974) ("When interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute … and the objects and policy of the law, as indicated by its various provisions."); *Smith v. Magras*, 124 F.3d 457, 462 (3d Cir. 1997) ("interpretation of a statute involves the examination of the statute as a whole").

An excessively literal reading of § 3595(a), which conditions appellate review on a defendant's decision to himself trigger it, would frustrate Congress's larger concern that death sentences under the Act be reliable. Moreover, such a requirement would also be in tension with § 3595(c), which appears to

contemplate review in all cases.  That subsection provides that the Courts of

Appeals "shall address all substantive and procedural issues raised on the appeal

of a sentence of death, *and* shall consider whether the sentence of death was

imposed under the influence of passion, prejudice, or any other arbitrary factor and

whether the evidence supports the special finding of the existence of an

aggravating factor." § 3595(c) (emphasis added).  Section 3595(c) thus draws a

distinction between issues raised by the defendant on appeal and those issues

automatically requiring review and accordingly establishes that Congress

contemplated that the Courts of Appeals would review the statutory considerations

even absent an appeal by the defendant – in sum, that there would be "review"

under § 3595(b) even where there had been no "appeal" under § 3595(a).

This interpretation is further supported by § 3595(c)(2), which requires the

Courts of Appeals to remand a death sentence for reconsideration or imposition of

a sentence less than death in two categories of cases: (1) where "the sentence of

death was imposed under the influence of passion, prejudice, or any other arbitrary

factor," or "the admissible evidence and information adduced does not support the

special finding of the existence of the required aggravating factor" (*i.e.*, the

situation in which the Courts of Appeals engage in the statutorily-prescribed

review of the sentence because the defendant fails to appeal); or (2) "the

proceedings involved any other legal error requiring reversal of the sentence that was properly preserved for appeal under the rules of criminal procedure" (*i.e.*, the situation in which the Courts of Appeals also consider additional arguments raised by the defendant who prosecutes his appeal).

These provisions are substantively indistinguishable from those set for in many of the states' mandatory statutory considerations set forth in the statutes cited above. *See e.g.*, *Geary v. State*, 977 P. 2d 344, 346-47 (Nev. 1999) (Nevada's death penalty statute requires court to review, regardless of defendant's waiver, "whether the evidence supports the aggravating circumstances [and] whether the death sentence was imposed under the influence of passion, prejudice, or any arbitrary factor"); *Cole v. Nevada*, 707 P.2d 545, 590 (Nev. 1985) (Nevada's death penalty statute "requires this court to review certain issues where a judgment of death has been entered, regardless of an attempted waiver of appellate review"); *State v. Dodd*, 838 P.2d at 95-96 (under Washington death penalty statute, capital defendant may waive "his right of general review, but may not waive statutory sentence review"); *Vandiver v. State*, 480 N.E.2d 910, 912 (Ind. 1985) (limiting consideration on automatic review to statutory factors, where defendant wished to waive appeal); *State v. Ivey*, 502 S.E.2d 92, 95 (S.C. 1998) (engaging in statutorily prescribed mandatory review of death sentence). The

similarity between these state statutes, which substantially predate the Federal

Death Penalty Act, and § 3595 of the Act, suggests that Congress intended to

adopt the mandatory review schemes well established in the states. *See Carolene*

*Products Co. v. United States*, 323 U.S. 18, 26 (1944) ("[T]he general rule that

adoption of the wording of a statute from another legislative jurisdiction, carries

with it the previous judicial interpretations of the wording … is a presumption of

legislative intention … which varies in strength with the similarity of the

language, the established character of the decisions in the jurisdiction from which

the language was adopted and the presence or lack of other indicia of

interpretation"); *Richerson v. Jones*, 551 F. 2d 918, 927 n.17 (3d Cir. 1977).

Here, the statute clearly contemplates, at a minimum, review by the Courts

of Appeals of the statutory concerns set forth in § 3595(c)(1) and § 3595(c)(2)(A)

and (B). However, it also may be read as requiring, even in the absence of the

defendant's participation at the appellate stage, review of "any other legal error

requiring reversal of the sentence that was properly preserved for appeal under the

rules of criminal procedure." § 3595(c)(2)(C). This last provision suggests that

any error which the defendant preserved in the district court may be reviewed by

the Court of Appeals, even where the defendant wishes to abandon his direct

appeal. Indeed, such an approach is consistent with the authority of a Court of

Appeals generally to reach any properly-preserved issue – in addition to plain error – as it deems necessary to decide a case. *See United States v. Miller*, 197 F.3d 644, 648 n. 1 (3d Cir. 1999) ("[W]e have discretion to consider issues not raised in the briefs, particularly where substantial public interests are involved.") (*quoting Hatley v. Lockhart*, 990 F.2d 1070, 1073 (8th Cir. 1993)).  Because of the substantial public interest involved in the imposition of a sentence of death, § 3595(c)(2)(C) should be construed as authorizing a Court of Appeals to consider any legal error preserved in the district court that the Court deems necessary to ensure that a death sentence is not imposed in violation of statutory or constitutional requirements, even absent a defendant's participation in the appeal.

In sum, should the Court's resolution of the other issues presented in this brief require it, the Court should interpret the FDPA as requiring direct appellate review of every federal death sentence, even where a capital defendant wishes to waive such review.  Any other interpretation would raise serious doubts about the Act's constitutionality.  Moreover, any other interpretation would be inconsistent with the Act's overall purpose of ensuring the reliability of death sentences. Accordingly, this Court should at a minimum construe 18 U.S.C. § 3595 as requiring review of Mr. Duncan's death sentence for consistency with the statutory concerns set forth at § 3595(c)(1) and § 3595(c)(2)(A) and (B), as well as any

other error the Court deems it appropriate to reach.

**E.    The Very Troubling Circumstances of this Proceeding Require that At a Minimum the Entire Case Be Reviewed In Connection With Deciding Jurisdiction**

A throng of extraordinary facts and circumstances converged in district court to make Mr. Duncan's trial little more than a farce and mockery.  Despite the case's exceptional complexity, the trial court gave the shattered defense only 12 months to prepare for trial.  The schedule, unusually prompt for a capital case, was based on the court's assumptions that an adequate defense investigation had taken place during the prior state-court proceedings and that Mr. Peven's prior participation in the state-court plea negotiations would substantially benefit the federal defense effort.  Both assumptions were false.  The state-court defense investigation was scant.  Within thirty days after Mr. Duncan's indictment in federal court, Mr. Peven began suffering a series of personal tragedies that prevented him from fulfilling his professional obligations.  Instead of timely notifying cocounsel so that alternate arrangements could be made, Mr. Peven covered up his failure to perform for six months, leaving the remainder of the defense team still at the starting gate with only five months left to prepare.

97

Then with four months left, Ms. Clarke, believing that she would be allowed time to prepare, agreed to take over the lead counsel role and was so appointed. Despite repeated efforts and an extraordinary showing of need, the court refused to allow any additional time to prepare for the guilt trial. The court continued to maintain that Mr. Peven was able to assist the defense in some capacity, even though his Board of Directors had removed him from his position at the Federal Defender office. The court also repeatedly invoked assurances made by Mr. Peven (or alternatively warnings given to him) during their private in-chambers meeting as grounds for denying continuances, even though there is no record of that conversation, Mr. Peven never suggested to the other trial participants that any such matters were discussed, and Ms. Clarke was not so advised.

In any event, the court was advised that funding for experts was unavailable until Ms. Clarke was appointed. Yet the court refused even to extend the deadline for providing the reports of designated defense experts, even though Ms. Clarke was appointed only seven weeks before the reports were due. The expert evaluations of Mr. Duncan did not occur until well after the due date had past.

Because defense counsel were so utterly unprepared, they allowed Mr. Duncan to plead guilty in the hopes of getting additional time to prepare for the sentencing phase. Mr. Duncan was first seen by experts retained for the federal

proceedings after the guilty plea, and they promptly concluded that Mr. Duncan was incompetent to represent himself due to an inability to think rationally about his case.

Using the defense's failure to raise the issue earlier as a way of discounting the experts' written opinions, the district court nonetheless allowed Mr. Duncan to "represent" himself, *i.e.*, by declining to present a defense case and doing nothing of any significance to challenge the prosecution's case. Finally, in the absence of a single rational reason not to appeal, the district court accepted equivocal, rambling, delusional statements as a knowing, intentional, and voluntary waiver of appeal.

The cumulative effect has been to eliminate any meaningful check on the Government's power to obtain a death judgment in this case. Even if this Court continues to harbor doubts about jurisdiction, the fair administration of justice demands a searching review of the proceedings. At a minimum, the panel should reconsider the order for bifurcated briefing and consider questions of jurisdiction together with the appeal on the merits. As this Court observed in another case involving a condemned prisoner's attempt to waive review, there is "a strong interest in the accuracy and fairness of all its criminal proceedings; this interest is most pronounced in a case such as this where a defendant pleaded guilty and was

99

sentenced to death without the assistance of counsel." *Massie v. Sumner*, 624 F.2d

72, 74 (9th Cir. 1980). The *Massie* court also quoted the Pennsylvania Supreme

Court's admonition that

> the waiver concept was never intended as a means of allowing a
> criminal defendant to choose his own sentence. Especially is this so
> where, as here, to do so would result in state aided suicide. The
> waiver rule cannot be exalted to a position so lofty as to require this
> Court to blind itself to the real issue the propriety of allowing the
> state to conduct an illegal execution of a citizen.

*Commonwealth v. McKenna*, 383 A.2d 174, 181 (Pa. 1978).

The multiple "waivers" of trial rights accepted by the district court leave

review by this Court as the only means to insure the accuracy and fairness of the

proceeding. Even if the Court believes that Mr. Duncan's appellate waiver was

likely valid, it should direct full appellate briefing in furtherance of those ends.

100

## CONCLUSION

For all of the foregoing reasons, the Court should: conclude that Mr.

Duncan has not competently waived appeal, and that the district court's statements

that appeal has been knowingly and voluntarily waived do not divest this Court of

appellate jurisdiction; and direct the parties to proceed to brief the appeal on the

merits.

DATED:  December 4, 2009

                                        Respectfully submitted,

                                        DANIEL J. BRODERICK
                                        Federal Defender

                                        MARK E. OLIVE
                                        Law Offices of Mark E. Olive, P.A.


                                        /s/Joseph Schlesinger
                                        JOSEPH SCHLESINGER
                                        Assistant Federal Defender

## STATEMENT OF RELATED CASES

This matter is related to two prior petitions for writs of mandamus filed in this Court during the pendency of trial court proceedings:  *Duncan v. United States District Court*, No. 08-73057, filed July 16, 2008 and voluntarily withdrawn July 18, 2008, and *Duncan v. United States District Court*, No. 08-73243, filed July 26, 2008 and denied July 27, 2008 (Schroeder, Hawkins, and Ikuda, C.J.J.).

DATED:  December 4, 2009

/s/   Joseph Schlesinger
Joseph Schlesinger
Assistant Federal Defender

## BRIEF FORMAT CERTIFICATION
## PURSUANT TO CIRCUIT RULE 32-1


Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, I

certify that this brief is proportionately spaced, has a type face of 14 points or

more and contains 24,613 words.

DATED:  December 4, 2009


/s/  Joseph Schlesinger
Joseph Schlesinger
Assistant Federal Defender


103

No. 08-99031

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CERTIFICATE OF SERVICE |
| | ) | |
| Plaintiff-Appellee, | ) | D.C. No. CR-07-023-N-EJL |
| | ) | District of Idaho |
| v. | ) | |
| | ) | |
| JOSEPH EDWARD DUNCAN, III, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

I CERTIFY that I am an employee of the Office of the Federal Defender for the Eastern District of California, and that the attached brief was filed via ECF, which provided an ECF Notice to counsel for appellee, Assistant United States Attorneys Wendy J. Olson and Traci J. Whelan, and by and by United States mail, postage prepaid to:

Joseph Edward Duncan, III
Indio Jail
46-057 Oasis Street
Indio, CA 92201

this 4th day of December, 2009.


/s/ Kathryn Thuong Nguyen

No. 08-99031

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | D.C. No. CR-07-023-N-EJL |
| Plaintiff-Appellee, | District of Idaho |
| v. | |
| JOSEPH EDWARD DUNCAN, III, | |
| Defendant-Appellant. | |

Appeal From the United States District Court
For the District of Idaho

---

## APPELLANT'S MOTION TO EXCEED TYPE VOLUME LIMITATIONS

---

MARK E. OLIVE, FL Bar #578533
Law Offices of Mark E. Olive, P.A.
320 West Jefferson Street
Tallahassee, Florida 32301
Telephone: (850) 224-0004

JOSEPH SCHLESINGER, CA Bar #87692
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: ( 916) 498-6666

Standby Counsel for Defendant-Appellant
JOSEPH E. DUNCAN, III

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 08-99031 |
| | D.C. No. CR-07-023-N-EJL |
| Plaintiff-Appellee, | District of Idaho |
| | |
| v. | APPELLANT'S MOTION TO |
| | EXCEED TYPE VOLUME |
| JOSEPH EDWARD DUNCAN, III, | LIMITATIONS |
| | |
| Defendant-Appellant. | |

Defendant-Appellant JOSEPH EDWARD DUNCAN, by and through appointed counsel, hereby moves for an order authorizing the filing of a brief exceeding the type volume limitations set by the Court's order of February 9, 2008. Specifically, appellant requests that he be allowed to file the opening brief submitted herewith, which consists of 24,613 words. Counsel have made a diligent effort to comply with that limitation, but are unable to do so. The reasons supporting the substantial need to file an oversized brief are set forth in the attached declaration of counsel.

/ / /

WHEREFORE, for all of the reasons set forth in the attached declaration,

appellant respectfully requests that this Court grant him leave to file a 24,613 word

opening brief.

DATED: December 4, 2009.

Respectfully submitted,

DANIEL J. BRODERICK
Federal Defender

MARK E. OLIVE
Law Offices of Mark E. Olive, P.A.


/s/Joseph Schlesinger
JOSEPH SCHLESINGER
Assistant Federal Defender

**DECLARATION OF JOSEPH SCHLESINGER**

I, Joseph Schlesinger, state the following:

1.      I am an attorney admitted to the bar of this Court and have been appointed to represent the Defendant-Appellant herein.  This declaration is made in support of the attached motion to exceed the type volume limitations governing appellant's opening brief on jurisdictional issues.

2.      On February 9, 2008, the Court imposed a 14,000 word limitation on appellant's opening brief regarding jurisdictional issues.  The brief submitted herewith consist of 24,613 words, and as such is approximately 75% longer than that contemplated by the court.

3.      This case has an extraordinarily complex procedural history involving the incapacitation of lead counsel, unreported conferences, numerous attempts of lead counsel to withdraw, appointment of additional and substitute counsel, repeated unsuccessful defense attempts to obtain sufficient time to prepare, and extensive problems regarding the funding and hiring of experts.  Although counsel have attempted to state the case as succinctly as possible, that section of the brief alone exceeds 4,400 words.

4.      When the type volume limitation was established, neither the Court nor counsel could have anticipated the relevance of that history.  However, as explained in the accompanying brief, that history is directly relevant to the jurisdictional issues of Mr.

Case: 08-99031, 12/04/2009, ID: 7152820, DktEntry: 47-2, Page 5 of 6

Duncan's competency.  As argued in the brief, the district court drew erroneous and improper inferences from the allegedly delayed assertions of counsel and their experts that Mr. Duncan was incompetent to proceed.  A thorough understanding of the procedural history is necessary to understand the reasons that counsel were unable to appreciate the competency issues without the assistance of experts and the reasons that counsel were not able to obtain expert assistance until shortly before the competency issue was raised.

5.     One of the arguments presented in the accompanying brief is that the district court erred in refusing to hold a competency hearing because the defense had presented the court with evidence sufficient to create a bona fide doubt as to competency. To adequately present this claim the evidence must be described in some detail; a conclusionary statement that the evidence was substantial would not suffice.  Counsel have attempted to present the evidence as concisely as possible, but description of the evidence of incompetency before the court alone consists of more than 3,300 words.

6.     The accompanying brief also presents an issue of first impression in this Circuit, *i.e.*, whether the Federal Death Penalty Act should be interpreted to require mandatory sentence review in every case in order to avoid general conflict with the Eighth Amendment or alternatively on the facts of this case given the clear jurisdictional basis of an appeal of the district court's competency determination, if not more.  That section of the brief, which was not contemplated by the Court's type volume limitation

order, but which counsel are ethically bound to present, consists of more than 5,300 words.

7.    The length of the three sections described above totals to more than 12,000 of the 14,000 words permitted by the Court's February 9, 2008 order.  The remainder of the brief presents substantial issues that cannot be presented in 2,000 words so as to keep the brief within the limit set.  Counsel have prepared the accompanying brief mindful of the burden that oversized briefs impose on the Court and do not make this request lightly. In counsel's professional judgment: they would be derelict in their duties if they were to delete any of the issues presented; and none of the issues presented could be significantly abbreviated without a substantial sacrifice of clarity,  persuasiveness, and thoroughness.

I swear under penalty of perjury that the foregoing is true and correct.  Executed this 4th day of December 2009 at Sacramento, California.

/s/ Joseph Schlesinger
JOSEPH SCHLESINGER