No. 13-99011

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff-Appellee,<br><br>v.<br><br>JOSEPH EDWARD DUNCAN, III,<br><br>Defendant-Appellant. | D.C. No. CR-07-023-N-EJL<br><br>Appeal From the United States District Court<br>For the District of Idaho<br><br>Hon. Edward J. Lodge, Presiding |

## APPELLANT'S OPENING BRIEF

MARK E. OLIVE, Fla. Bar #578533
Law Offices of Mark E. Olive, P.A.
320 West Jefferson Street
Tallahassee, Florida 32301
Telephone:   (850) 224-0004

HEATHER E. WILLIAMS
Federal Defender
JOSEPH SCHLESINGER, Cal. Bar #87692
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  (916) 498-6666

Counsel for Defendant-Appellant
JOSEPH E. DUNCAN, III

# CONTENTS

I. Statement of Jurisdiction..................................................................1

II. Issue Presented .............................................................................1

III. Statement of the Case....................................................................2

  A. Prior Proceedings .....................................................................2

  B. Proceedings on Remand ...........................................................3

    1. Preliminary Proceedings .......................................................3

    2. The Hearing – The "Thorny" Waiver Issue ..........................4

    3. The District Court's Ruling..................................................24

IV. Summary of Argument.................................................................28

V. Argument.....................................................................................30

  A. This Court Should Reject the District Court's Multiply Flawed
    Retrospective Competency Assessment...................................30

    1. Despite Ostensible Signs of Impartiality the District Court's Decision
    Was Clearly Pre-Ordained ...................................................32

    2. The "Finding" that Mr. Duncan's In Court Statements Are Indicative
    of Rational Thought, Which the District Court Necessarily Had To
    Have Concluded Pre-Remand, Ignores the Clear Weight of
    Uncontroverted Evidence On Remand....................................35

3. The Court's Failure to Consider or Even Acknowledge the Overwhelming Evidence Establishing that Mr. Duncan's Belief System is Anything But a Mere "A-Ha" Moment Infects the Findings With Clear Error ....................................................................46

4. The "A-Ha" Moment Theory Is Incredible on its Face ........................64

5. The District Court's Conclusion that Mr. Duncan's Mental Disorders Do Not Limit His Capacity For Rationally Deciding Whether to Appeal Is Both Clearly Erroneous and Infected By Legal Error ........67

6. Even the Supposed Assessments of Credibility Themselves Fail to Withstand Scrutiny ....................................................................83

7. The District Court Committed Legal Error By Relying on the Riverside County Proceedings In Assessing Credibility ..................107

B. Even Assuming Mr. Duncan Was Competent To Waive Appeal, The Waiver Based on a Delusional Belief as to Its Consequences Was Not Knowing, Intelligent, and Voluntary ..............................................109

1. Mr. Duncan Expressed No Clear and Unequivocal Desire That His Conviction and Sentence Not Be Appealed ....................................111

2. The Record Establishes that the Purported Waiver Was Anything But Knowing, Intelligent and Voluntary ..............................................114

3. Because The District Court Did Not to Inform Mr. Duncan that Refusal to Authorize an Appeal of the Conviction Constituted Legal Authorization for an Appeal of the Competency Decision, the Purported Waiver Was Not Knowing and Intelligent ......................115

C. The Federal Death Penalty Act of 1994 ("FDPA") Requires Sentence "Review" In Addition to Consideration of the Issues Raised on Appeal.........................................................................................117

1. The FDPA's Appellate Review Provisions.......................................118

2. The Eighth Amendment Requires Mandatory Appellate Review of a Federal Death Sentence ..................................................................123

      3. At a Minimum FDPA Should Be Interpreted to Avoid Constitutional Problems ........................................................................................131

  D.   The Very Troubling Circumstances of this Proceeding Require that At a Minimum the Entire Case Be Reviewed In Connection With Deciding Jurisdiction........................................................................137

      1. Facts Preceding the Remand Provide Additional Reasons for Rejecting the Purported Waiver ........................................................137

      2. The Nature of the Proceeding Undermines Any Reasonable Assurance of Proper Conviction and Sentence; An Appeal Should Be Heard ..152

VI.   Conclusion.......................................................................................155

**Federal Cases**

*Anderson v. City of Bessemer*, 470 U.S. 564 (1985). ...............................................31

*Boykin v. Alabama*, 395 U.S. 238 (1969) ...............................................................117

*Brewer v. Williams*, 430 U.S. 387 (1977)...............................................................112

*Calhoun v. State*, 297 Md. 563 (Md. 1983) ............................................................133

*Carolene Products Co. v. United States*, 323 U.S. 18 (1944) ................................138

*Clemens v. Mississippi*, 494 U.S. 738 (1990) .........................................................126

*Cole v. Nevada*, 707 P.2d 545 (Nev. 1985) ............................................................138

*Commonwealth v. McKenna*, 383 A.2d 174 (Pa. 1978) ............................... 133, 159

*Dennis v. Budge*, 378 F.3d 880 (9th Cir. 2004)........................................................76

*Dobbs v. Zant*, 506 U.S. 357 (1993) .......................................................................129

*Dusky v. United States*, 362 U.S. 402 (1960) ...........................................................73

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*,

　485 U.S. 568 (1988) .................................................................................... 134, 135

*Estate of Palmer v. Commissioner of Internal Revenue*, 839 F.2d 420

　(8th Cir. 1988) ........................................................................................................32

*Faretta v. California*, 422 U.S. 806 (1975) ............................................................112

*Geary v. State*, 977 P. 2d 344 (Nev. 1999) .............................................................137

*Gilmore v. Utah*, 429 U.S. 1012 (1976)......................................................... 130, 132

*Gilmore v. Utah*, 429 U.S. 1012 (1976)..................................................................114

*Godinez v. Moran*, 509 U.S. 389 (1993)....................................................112

*Godinez v. Moran*, *supra*, 509 U.S. at 401 n.12 .....................................120

*Gregg v. Georgia*, 428 U.S. 153 (1976) ...................................................126

*Guam Inv. Co. v. Central Bldg., Inc.*, 288 F.2d 19 (9th Cir. 1961)......................111

*Hatley v. Lockhart*, 990 F.2d 1070 (8th Cir. 1993) ...................................139

*Hodges v. Easton*, 106 U.S. 408 (1982)...................................................112

*International Star Class Yacht Racing Ass'n v Tommy Hilfiger U.S.A.*, 146 F.3d 66

  (2d Cir. 1998) .................................................................111

*Johnson v. Zerbst*, 304 U.S. 458 (1938) ........................................ 117, 119

*Jones v. United States*, 527 U.S. 373 (1999) ..........................................135

*Judy v. State*, 416 N.E.2d 95 (Ind. 1981)...............................................133

*Jurek v. Texas*, 428 U.S. 262 (1976)......................................................126

*Kokoszka v. Bedford*, 417 U.S. 642 (1974)...............................................136

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) .....................110

*Mason v. Vasquez*, 5 F.3d 1220 (9th Cir. 1993) ............................ 74, 113

*Massie v. Sumner*, 624 F.2d 72 (9th Cir. 1980).......................................114

*Massie v. Sumner*, 624 F.2d 72 (9th Cir. 1980).......................................158

*Massie v. Woodford*, 244 F.3d 1192 (9th Cir. 2001) ...............................76

*Miller v. Stewart*, 231 F.3d 1248 (9th Cir. 2000) .................................101

*National Union Fire Ins. Co. of Pittsburgh v.City Sav., F.S.B.*, 28 F. 3d 376

  (3d Cir. 1994) ................................................................................135

*NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979) ................................134

*Parke v. Raley*, 506 U.S. 20 (1992) ................................................................112

*Parker v. Dugger*, 498 U.S. 308 (1991)...................................... 121, 126, 128, 132

*Philbrook v. Glodgett*, 421 U.S. 707 (1975)............................................................136

*Porter v. McCollum*, 558 U.S. 30 (2009)........................................... 49, 100

*Proffitt v. Florida*, 428 U.S. 242 (1976) ................................................................126

*Pulley v. Harris*, 465 U.S. 37(1984) ...................................... 128, 129, 132

*Rappa v. New Castle County*, 18 F.3d 1043 (3d Cir. 1994) .................................135

*Rees v. Peyton*, 384 U.S. 312 (1966) ........................................................................74

*Richerson v. Jones*, 551 F. 2d 918 (3d Cir. 1977) ................................................138

*Ritter v. Morton*, 513 F.2d 942 (9th Cir. 1975) .............................................. 32, 73

*Rumbaugh v. Procunier*, 753 F.2d 395 (5th Cir. 1985)............................................74

*Sandoval v. Reno*, 166 F. 3d 225 (3d Cir. 1999)......................................................135

*Smallfield v. Home Ins. Co.*, 244 F2d 337 (9th Cir. 1957) .............................. 31, 73

*Smith v. Magras*, 124 F.3d 457 (3d Cir. 1997) ......................................................136

*State v. Brewer*, 826 P.2d 783 (1992) ................................................................134

*State v. Dodd*, 838 P.2d 86  (Wash. 1992)...................................... 122, 138

*State v. Ivey*, 502 S.E.2d 92 (S.C. 1998)............................................................138

*State v. Martini*, 677 A.2d 1106 (N.J. 1996) ...........................................132

*Summerlin v. Schriro*, 427 F.3d 623 (9th Cir. 2005) ...............................120

*Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004)......................................49

*United States ex rel. Attorney General v. Delaware & Hudson Co.*,

   213 U.S. 366 (1909) ...............................................................................134

*United States v. Arlt*, 41 F.3d 516 (9th Cir. 1994)...................................112

*United States v. Cazares*, 121 F.3d 1241 (9th Cir. 1997).........................31

*United States v. Cochran*, 770 F.2d 850 (9th Cir. 1985).........................119

*United States v. Duncan*, 643 F.3d 1242 (9th Cir. 2011) ...........................3

*United States v. Erskine*, 355 F.3d 1161 (9th Cir. 2004).........................112

*United States v. Farhad*, 190 F.3d 1097 (9th Cir. 1999).........................112

*United States v. George*, 56 F.3d 1078 (9th Cir. 1995)...........................113

*United States v. Hammer*, 226 F.3d 229 (3d Cir. 2000) .........................125

*United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009).........................32

*United States v. Jones*, 29 F.3d 1549 (11th Cir. 1994)...........................111

*United States v. Kienenberger*, 13 F.3d 1354 (9th Cir. 1994)...............114

*United States v. Lopez-Osuna*, 232 F.3d 657 (9th Cir. 2000)................112

*United States v. Miller*, 197 F.3d 644 (3d Cir. 1999) .............................139

*United States v. Murdoch*, 98 F.3d 472 (9th Cir. 1996) ...........................69

*United States v. Ruiz-Gaxiola*, 623 F.3d 684 (9th Cir. 2010)...................32

*Vandiver v. State*, 480 N.E.2d 910  (Ind. 1985)......................................................138

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ................................................ 130, 132

*Zant v. Stephens*, 462 U.S. 862 (1983) ...............................................................128

## Statutes

18 U.S.C. § 3231 ......................................................................................................1

18 U.S.C. § 3595 ..................................................................................................124

18 U.S.C. § 3595(c) (2012)...................................................................................120

28 U.S.C. § 1291 ......................................................................................................1

42 Pa. Cons. Stat. Ann. § 9711(h)(1) (2014) .......................................................122

Ala. Code § 12-22-150 (2014) ..............................................................................121

Ariz. Rev. Stat. Ann. § 13-756 (2014)..................................................................121

Cal. Penal Code Ann. § 1239(b) (2014) ...............................................................121

Conn. Gen. Stat. § 53a-46b(b) (2012) ..................................................................123

Conn. Gen. Stat. § 53a-46b(c) (2012)...................................................................122

Del. Code Ann. tit. 11 § 4209(g) (2014)...............................................................121

Del. Code Ann. tit. 11 § 4209(g)(2) (2014)..........................................................123

Fla. Stat. Ann. § 921.141(4) (2014)......................................................................121

Ga. Code Ann. § 17-10-35(a) (2014).....................................................................121

Ga. Code Ann. § 17-10-35(c) (2014).....................................................................123

Idaho Code Ann. § 19-2827(a) (2014)...................................................................121

Idaho Code Ann. § 19-2827(c) (2014)........................................................................123

Idaho Code Ann. § 19-2827(f) (2014) .......................................................................122

Ind. Code 35-50-2-9(j)(2014) ....................................................................................121

Ky. Rev. Stat. Ann. § 532.075(1) (2014)...................................................................121

Ky. Rev. Stat. Ann. § 532.075(3) (2014)...................................................................124

Ky. Rev. Stat. Ann. § 532.075(8) (2014)...................................................................122

Md. Crim. Law Code Ann. § 2-401(d) (repealed by Acts 2013, ch. 156, § 3,

    effective Oct. 1, 2013.) ........................................................................................123

Mo. Rev. Stat. § 565.035(1) (2014)...........................................................................121

Mo. Rev. Stat. § 565.035(3) (2014)...........................................................................124

Mo. Rev. Stat. § 565.035(7) (2014)...........................................................................122

N.C. Gen. Stat. § 15A-2000(d)(1) (2013)..................................................................121

N.H. Rev. Stat. Ann. § 630:5(X) (2013).....................................................................121

N.J. Stat. Ann. 2C:11-3(e) (2006)..............................................................................121

N.M. Stat. Ann. § 31-20A-4(A) (2008) .....................................................................121

Nev. Rev. Stat.  177.055(1) (2013)............................................................................122

Nev. Rev. Stat. § 177.055(2) (2013)..........................................................................124

S.C. Code Ann. § 16-3-25(A)(2013) .........................................................................122

S.C. Code Ann. § 16-3-25(C) (2013).........................................................................124

S.C. Code Ann. § 16-3-25(F) (2013) .........................................................................122

Tex. Code Crim. Proc. Ann. Art. 37.071(h) (2013)...................................................122

Utah Code Ann. § 76-3-206(2) (1978) ....................................................................130

Utah Code Ann. § 76-3-206(2)(a)(2013) .................................................................122

Utah Code Ann. § 77-35-26(10) (Supp. 1989) ......................................................130

Wash. Rev. Code Ann. § 10.95.100 (2013) ............................................................122

Wyo. Stat. Ann. § 6-2-103(a) (2014)......................................................................122

Wyo. Stat. Ann. § 6-2-103(d) (2014)......................................................................124

**Other Authorities**

G. Strafer, "*Volunteering for Execution: Competency, Voluntariness and the Propriety of Third Party Intervention,*" 74 J. Crim. L. & Criminology 860, 862 (1983)...................................................................................................................114

H.R. Conf. Rep. No. 103-711 (1994).......................................................................125

H.R. Rep. No. 103-324 (1994).................................................................................125

H.R. Rep. No. 103-467 (1994).................................................................................125

H.R. Rep. No. 104-23 (1995)...................................................................................125

**Rules**

Fed. R. Civ. P. 52(a)(6)..............................................................................................31

Fed.R.App.P. 4(b)(1)(A)(i) ..........................................................................................1

## I. STATEMENT OF JURISDICTION

The district court had jurisdiction over this case under 18 U.S.C. § 3231. The district court's order finding Mr. Duncan was competent to waive appeal is a final appealable order under 28 U.S.C. § 1291.[1] The retrospective competency order was entered on December 6, 2103. (Doc. 843) The notice of appeal was timely filed on December 19, 2013. (Doc. 844) Fed.R.App.P. 4(b)(1)(A)(i).

## II. ISSUE PRESENTED

Whether an appeal from the judgment and sentence in this Federal Death Penalty Act case should be heard as a result of any or all of the following:

1. The district court clearly erred in finding that Mr. Duncan's prior failure to endorse an appeal noticed on his behalf was unaffected by a mental disease, disorder or defect.

2. Even assuming that Mr. Duncan was competent to refuse to endorse an appeal the purported waiver was not clear and unequivocal, and/or knowing, intelligent and voluntary.

3. The Federal Death Penalty Act of 1994 ("FDPA") requires sentence "review" even where the alleged discretionary portion of an appeal has been withdrawn.

---

[1] On December 8, 2010, Mr. Duncan repudiated the purported waiver and since then has steadfastly asserted the desire to appeal. Dkt 76, No. 08-99031. Hence, he maintains that appellate jurisdiction extends to the conviction and sentence. Nonetheless in light nature of the remand, *United States v. Duncan*, 643 F.3d 1242 (9th Cir. 2011), this brief addresses only the issues involving the validity and implications of the purported former waiver, not broader issues of the propriety of the conviction and sentence.

1

4. The very troubling circumstances of this proceeding require that at a minimum the entire case be reviewed in connection with deciding jurisdiction.

## III. STATEMENT OF THE CASE

### A. *Prior Proceedings*

Mr. Duncan pled guilty to three capital charges and seven other charges in connection with the kidnapping, sexual abuse, and murder of D.G., and the kidnapping and sexual abuse of S.G. The district court allowed him to represent himself at his sentencing trial despite his lawyers' contention he was incompetent to do so. Based on competency evaluations conducted by local Boise psychologist Robert Engle and Bureau of Prisons psychologist Cyntha Low, the Court found no basis to question Mr. Duncan's competency. Mr. Duncan received a sentence of death.

Standby counsel filed a timely notice of appeal from the conviction and sentence. At a hearing on the Government's motion to strike the notice as unauthorized, Mr. Duncan stated, "I am neutral. I wish to allow you to do what you feel you need to do. ___*I will allow*___ the attorneys to do what they feel they need to do." (10/24/08 RT 11)(emphasis added) Pressed for a more definitive statement

Mr. Duncan ultimately said he did not want to appeal, which the district court treated as a waiver of appeal.[2]

On appeal from that order, this Court held that the district court was wrong about what the record revealed, that a competency hearing was required, and reversed the district court's waiver finding with instructions to conduct a retrospective competency hearing. *United States v. Duncan*, 643 F.3d 1242, 1250 (9th Cir. 2011).

### B. *Proceedings on Remand*

#### 1. Preliminary Proceedings

The district court appointed new counsel on remand. (Docs. 698, 703) On August 14, 2012, the Government filed a motion for an order authorizing psychologist Ronald Roesch to conduct an evaluation of Mr. Duncan. (Doc. 712 at 3-4 ("Dr. Roesch seeks to conduct an in-person examination to assist him in completing the most comprehensive retrospective competency evaluation he can.")) On August 27, 2012, the defense opposed the motion because *inter* alia, at trial the prosecution had withdrawn its request for an examination by Dr. Roesch.

---

[2] Prior to the federal case, Mr. Duncan pled guilty to related state charges in Idaho State court. During the pendency of the appeal to this Court Mr. Duncan pleaded guilty to unrelated California charges. Counsel in that case, the Riverside County, California, Public Defenders challenged his competency there, and he was found competent following a jury trial.

3

(Doc. 716) In reply, the prosecution stated: "Dr. Roesch has informed the United States that a current interview would aid him in forming his opinion regarding the defendant's competency on November 24, 2008 [the date of the purported appellate waiver]. Dr. Roesch wishes to meet with the defendant in person to explore with the defendant his reasoning and mental state at the time he waived his right to appeal." (Doc. 718 at 3) The court granted the motion (Doc. 719), and Dr. Roesch conducted a four-hour video recorded interview of Mr. Duncan on September 20, 2012.

### 2.  The Hearing – The "Thorny" Waiver Issue

The court conducted 23 days of hearings from January 8, 2013, to February 14, 2013. Both sides presented lay and expert testimony. In general, the evidence showed that Mr. Duncan's view of the world is at least "highly extreme," and in the unanimous opinion of all defense experts plainly delusional. No expert for either side contended that Mr. Duncan's views were insincere or his symptoms feigned, or that he was in any way malingering. Prosecution experts conceded that the issue of competency was very "thorny," that Mr. Duncan's presentation was "extreme," and whether his unusual beliefs were sufficient to "rise to the level" of delusions was critical.

All witnesses agreed that his views regarding appealing his conviction and sentence spring from an Epiphany he experienced that provided him a singular

4

understanding of the "Truth" and all sentient beings' relationship to it. According to his beliefs, the Truth cannot be described or taught, but can be discovered only experientially. Free choice is a delusion, but everyone nonetheless is faced with the fundamental – and singular – choice whether to pursue or forsake the Truth. Attempting to turn from Truth is the root cause of all evil and injustice and is a sin far worse than any crime defined by the "System," including murder.

Because Mr. Duncan believes that litigation – like words themselves -- obscures Truth, he formerly said he wanted to disengage from it to the extent possible. He adhered to that position during the evaluations on remand, with the exception of saying he wanted to appeal his conviction and sentence. Even at the earlier time of the purported waiver he wanted to allow others (lawyers, jurors, judges, prosecutors) to do as they choose because all efforts by him to dictate the actions of others – even actions he might not follow himself -- would ultimately only hinder their understanding of Truth. Thus even before he endorsed the appeal he had no objection to others engaging in litigation that they believe relates to him. He simply wanted not to affirmatively authorize such litigation because to do so would undermine his personal relationship to Truth.

The overwhelming weight of the evidence adduced at the hearing establishes that Mr. Duncan's beliefs are delusional, that his thought processes result from

psychosis, and that was incompetent when the district court construed his equivocations as an appellate waiver.

### a. Defense Experts

#### *1) Dr. James R. Merikangas*

Dr. James R. Merikangas is a board certified neurologist and psychiatrist. RT 2912. He has served on the faculty of the medical schools at the University of Pittsburgh, Yale University. Currently, he is a clinical professor of psychiatry and behavioral science at George Washington University School of Medicine. RT 2915. He met with Mr. Duncan on eight occasions from 2008 – 2012, for a total of twenty-one hours. Exs. I-37, I-34; RT 2990-91. He conducted a neurologic examination, a physical examination, and psychiatric interviews in order to evaluate Mr. Duncan's mental and neurological condition. RT 2930. Among the voluminous materials he reviewed was a transcript of a 2005 FBI interview of Mr. Duncan, RT 2932, the transcripts of his November 24, 2008, colloquy with the court, RT 3027-28, and the transcript of the four hour interview with Dr. Roesch. RT 3020.

Dr. Merikangas testified that Mr. Duncan suffers from a "mental disorder [that] substantially affects his capacity to make decisions in this case from his appeal, to his pleas, to dismissing his lawyers, to acting pro se…." RT 3139. Dr. Merikangas testified Mr. Duncan was "incompetent … from the beginning, from

6

2005 through when I saw him in this report in September of 2012." RT 3025. From the initial interviews, "the content of [Mr. Duncan's] speech and the content of his thinking, [and] the content of his writing" pretty well established that he was psychotic. RT 2964. The signs of a serious thought disorder and psychosis included poverty of content of speech, tangential and circumstantial speech, derailment of ideas, perseveration, pressured speech, and grandiose and paranoid ideation. RT 2991-92. Dr. Merikangas explained the same symptoms were exhibited during the FBI interviews, RT 2997, the interview by Dr. Roesch, RT 2994-95, 3144-45, and the transcripts of the federal proceedings. RT 3027-30.

Mr. Duncan's medical history included two reported and documented significant head injuries, including being hit in the head with a pick axe and being in a car accident, RT 3026. His social history included significant physical and sexual abuse. *Id*. Dr. Merikangas ordered an MRI and a PET scan to try to find a physical cause for Mr. Duncan's psychosis. RT 2964. The MRI and the PET revealed "functional and anatomical abnormalities" which are probably related to the psychosis. RT 3027. Mr. Duncan had too many insults to his brain development to pinpoint which accounted for the abnormalities. *Id*. Neuropsychological data provided by Drs. Gur and Beaver corroborated Dr. Merikangas's conclusions about a physical cause of Mr. Duncan's psychosis. RT 3136.

### 2) *Dr. Ruben Gur*

Dr. Ruben Gur has been a full professor of neuropsychology in the University of Pennsylvania medical school since 1986. RT 3481. He directs the Center for Neuroimaging in Psychiatry, RT 3491, where the study of psychosis is a major focus of his work. RT 3493. He has published 360 peer reviewed articles. RT 3696. He interviewed Mr. Duncan twice for a total of six-and-one-half hours. Exs. F-38, F-221-331; G; RT 3518, 3626.

In Dr. Gur's expert opinion Mr. Duncan's beliefs were "clearly" delusions. RT 3616. In his October 1, 2012, report, which was admitted into evidence, RT 3625, Dr. Gur "conclude[d] that Mr. Duncan could not competently have waived either his right to appeal or his right to counsel." Ex. F at 47.

During Dr. Gur's 2008 clinical interview, Mr. Duncan articulated an elaborate delusional system and manifested thought disorder. RT 3608-09. "He described his experiences in the mountain and the epiphany that he had and believes that, because of that epiphany, he is different from everybody else. And his role in life is to make everybody else have that epiphany, and that that epiphany cannot be communicated with words." RT 3609. According to Dr. Gur, Mr. Duncan "believes that all of us here are doing things that we are supposed to do, but they are really not very relevant to him," which is "not a good foundation to waive your right for appeal in a capital case." RT 3820.

8

Detailed and "remarkably accurate" notes of that 2008 interview were taken by members of the defense team. Ex. GG, RT 3773-75, 3785. Another interview Dr. Gur conducted in 2012 was recorded, RT 3606, and the content of the two interviews was "substantially the same." RT 3786. Dr. Gur had reviewed the recording of Mr. Duncan's interview with Dr. Roesch prior to testifying, and Mr. Duncan's disordered thinking was evident there as well. RT 3634-38.

Dr. Gur corroborated his findings with the results of sophisticated diagnostic studies. Dr. Gur explained that in his imaging center, he performs quantitative analyses of MRI's and PET scans. RT 3538. Almost all of the patients he evaluates have normal studies by clinical readings, but when they undergo quantitative analysis abnormalities that escaped visual detection are revealed. *Id*. Dr. Gur's quantitative analysis of the MRI, the PET, and neuropsychological testing conducted by Dr. Craig Beaver, consistently showed left temporal lobe damage, and reduced volume, and reduced metabolism, in Mr. Duncan's hippocampus. RT 3608. The bioimaging analysis helps locate areas of impairments, RT 3821, and addresses the cause of psychosis, not its existence. RT 3815. Clinical interviews are the "gold standard" for determining whether a patient is psychotic. *Id*.

Dr. Gur did a quantitative analysis of Dr. Beaver's neuropsychological data and the MRI results. RT 3569. Although Dr. Gur identified specific examples of Mr. Duncan's psychotic thinking in his 2012 recorded interview, *e.g.*, RT 3627-28

9

(showing that "the trial we are going through is what has to happen in order for his epiphany to be communicated with the rest of the world, and then we will all realize that we are not doing the right thing and not asking the right questions"), RT 3629-30 (showing "very good example of derailment, loose associations, and disordered thinking"), Dr. Gur repeatedly stated the full flavor of Mr. Duncan's insanity comes through only by listening to the entire interview. RT 3630-31, 3637. Dr. Gur explained Mr. Duncan's view is that "he basically lives in a different universe. He -- his universe interacts with ours, but what he's going through and what we are going through are somewhat tangentially related. In his mind, because of his role in the world is to have the epiphany and communicate it to the rest of the world. And that is very important so that the world changes." RT 3817.

### 3) Dr. George W. Woods

Psychiatrist George W. Woods, M.D., interviewed Mr. Duncan six times over seven years for more than fourteen hours. Ex. C-1356; RT 671-74. During the first interview, he saw signs of "philosophical ideas that may or may not have been just the thinking of a philosophical person, but [also] that his language processes were impaired." RT 5678. He was circumstantial, often adding irrelevant detail. *Id.* There were "certain recurring things that allowed me over time to realize that he had what we call a poverty of language content." *Id.* There were "recurring themes of being insane, of there being something wrong with his mind, of the system

10

being criminal, of there being a singular truth that he had a special privy to, a number of what I believe to be delusional precepts over time that began to populate his language." *Id.* Dr. Woods believed Mr. Duncan was not the type of individual who could be assessed in just a couple of hours. RT 5686.

In ensuing interviews, Dr. Woods was struck by the fact that when asked to explain his philosophical ideas, *e.g.*, "God requires that we love him according to our own free will," Mr. Duncan was unable to do so, stating that "words can't express what I mean." RT 5692. Dr. Woods began more strongly to suspect psychosis when Mr. Duncan insisted that he and S.G. "became the same" person. RT 5696, 5698. During the third interview, Mr. Duncan told Dr. Woods that he was the "instrument of the ultimate vehicle. God was driving," which Dr. Woods saw as a delusion of grandeur. RT 5701-02. By the fourth interview Mr. Duncan was more willing to talk about his psychotic thoughts and delusions due to the rapport they had developed. RT 5720.

In 2012, Dr. Woods reinterviewed Mr. Duncan about his apparent refusal to endorse an appeal. Mr. Duncan described it as a decision that was not a rational decision but came from the unconscious. RT 5778-79. Dr. Woods saw "psychotic ambivalence" in Mr. Duncan's statements that "I don't know I withdrew the appeal. I was convincing myself. I was believing in the delusion that I wanted to act. I was trusting in that ability that didn't exist." RT 5786. Mr. Duncan also

11

described his action of retracting the waiver as a "decision made beyond reason." RT 5786. Mr. Duncan told Dr. Woods that objecting to the notice of appeal and requesting to reinstate the notice of appeal both went against his "belief of noninterference." RT 5798.

Dr. Woods testified the testing of Drs. Merikangas, Gur and Beaver revealed brain damage that could account for Mr. Duncan's psychosis. RT 5811. Dr. Woods testified the neuropsychological deficits established by Dr. Beaver's test results were in the specific areas that are found to be impaired when someone has psychotic thoughts. RT 5814. He noted as possible contributing factors a family history of mental illness, a father that had past PTSD and a history of depression, a mother that appears to have had certain mental problems, and other family members' disabilities that range from intellectual disabilities to seizures. RT 5811-12. Dr. Woods reviewed the verbatim record of the interviews conducted by Drs. Roesch and Gur and found the symptoms Mr. Duncan displayed there were consistent with his own findings. RT 5814-15.

### 4) Dr. Ari Kalechstein

Dr. Ari Kalechstein evaluated Mr. Duncan in the California case, and updated his evaluation to take into account Dr. Roesch's recorded interview. RT 5067, 5076. He has worked on about 20 capital cases and 15-20 percent of his forensic work is done for the prosecution. RT 5068-69. He testified that in his

12

opinion "Mr. Duncan suffers from mental illness, and specifically he suffers from a thought disorder. And as a result of that condition, Mr. Duncan was unable to represent himself at the time of the hearing that was conducted in Riverside back in 2009." RT 5076. He also testified that "to a reasonable degree of psychological certainty, [Mr. Duncan] suffers from a thought disorder. And specifically the symptoms that were most present were delusions, including, but not limited to, paranoid delusions." RT 5077.

Dr. Kalechstein explained that Mr. Duncan's documented statements evidenced delusions of various types, including delusions of grandeur, in that

> he, Mr. Duncan has this special knowledge that he must spread to the world. And that somehow only he, he talks about, … cannot see what the Bible talks about, but he, as a result of his epiphany, he can see it. And he also wants to convey somehow that society in general is sick and he is the person alone who understands that.

RT 5084. Dr. Kalechstein described Mr. Duncan's bizarre delusions that "children are false gods or he talks about the idea that somehow -- he talks about the fact that the crimes that he perpetrated were somehow less severe or less meaningful than the way children are treated every day." RT 5115-16.

> He also believes the idea that the truth can be silently communicated. And this is a centerpiece of his bizarre delusional thinking, which is that somehow the idea that the truth of the epiphany demonstrate that people can communicate without actually sharing any words.

*Id.* Dr. Kalechstein also described how Mr. Duncan's superficial treatment of complex subjects shows disordered thinking.

13

And so what this really characterizes, as it relates to Mr. Duncan, is that when you talk to him about topics and you ask him initially what he thinks, I believe that he can provide a comment that sounds well reasoned. But when you probe more deeply into how he thinks, then his reasoning starts to break down and he either says things that are not true or he cannot actually articulate the reasons that underlie the decisions or comments that he makes.

\* \* \* \* \*

From my perspective, because Mr. Duncan is relatively verbal, I think his ability to provide initial comments serves to mask the level of anosognosia that he experiences. ..I think the problem is when you try to drill down into it and you get him to explain what the problems are, he can't do it. Not only with those issues, but again, as I said, with the truth or the epiphany. So what happens is if you only take his statements at face value and do not probe at greater depth, then it is not apparent just how lacking in insight he is.

RT 5122-23.

### 5) *Dr. Xavier Amador*

Dr. Xavier Amador, Ph.D., is an Adjunct Professor in Clinical Psychology, Columbia University, Teachers College. As a member of the incident review committee and medical review committee at Columbia's Department of Psychiatry, he has extensive experience evaluating whether psychiatric diagnoses rendered by others are reliable and valid. He has conducted more than 6,000 such reviews since 1990. RT 4004-05. As co-chair of the text revision of the DSM-IV, he made sure that all of the text in the DSM-IV was not just opinion, but reflected scientific consensus. His committee drafted the definitions of psychosis and

delusion, and revised the glossary for the DSM-IV-TR, which was then peer-reviewed by a panel of experts to determine whether those definitions reflected both clinical and scientific consensus. RT 4010-11. Dr. Amador was also the co-chair of the text revision of the "Schizophrenia and other Psychotic Disorders" section of the DSM-IV. RT 4044.

Recently, Dr. Amador wrote a section for the "associated features" section of the new DSM-V about the scientific consensus on "anosognosia," RT 4011-12, a "syndrome, a symptom of [a patient's] unawareness of illness that we see in psychotic disorders." RT 3999. Dr. Amador has published roughly 35 peer-reviewed papers on anosognosia. RT 4021-23.

Related to his research on anosognosia, Dr. Amador has training and experience in evaluating individuals of normal, above-normal, and high intelligence, for psychotic symptoms. Many intelligent individuals who do not believe they are ill can disguise their delusions as abstract, philosophical or even political positions. RT 4024-26. Intelligence, coupled with a desire to appear normal, results in abstract explanations of delusions that are highly intellectualized. If taken in short snippets instead of the broader context, these "explanations" may appear nondelusional or nonpsychotic. RT 4029-30.

In Dr. Amador's opinion it is unlikely that an evaluator who spends all of their time with a prison population would come across many high functioning

15

psychotics. RT 4027-28. In his experience, highly intelligent anosognosic psychotics may go undetected because they have the wherewithal to hide, normalize, and intellectualize, explaining away delusional thinking. Their evaluators will hear philosophy, political positions and miss the underlying psychotic thinking. RT 4033-34.

Dr. Amador opined that a lack of understanding of anosognosia was a significant problem in the opinions expressed by Dr. Low. RT 4021, which are discussed *infra*. Moreover, he found a number of statements in the reports of Dr. Low and others that were inconsistent with the conclusions stated therein. RT 4047. Among other things, Dr. Amador noted that Dr. Low purported to rely on Dr. Engle's MMPI profile, even though it contained elevated paranoia and schizophrenia scales. RT 4136. According to Dr. Amador, Dr. Low's opinion that there are no signs, symptoms, or records which show a psychosis or thought disorder, was an incorrect interpretation of the facts and of Dr. Engle's data. "She selectively quotes Dr. Engle and -- no, it is incorrect." RT 4136-37. Once Dr. Amador was informed that the elevations on the paranoia and schizophrenia scales were as high as 94 and 74, respectively, his opinion was even stronger. RT 4135-36.

### 6) **Dr. Michael First**

16

Dr. Michael First is a board certified psychiatrist and Professor of Clinical Psychiatry, Department of Psychiatry, Columbia University College and Physicians and Surgeons. In his forensic work, he is retained by both the defense and the Government. RT 3167. Dr. First is the editor of the DSM-IV, and the DSM-IV-TR. RT 3157-58. Dr. First is also the lead author on the Structured Clinical Interview for the DSM-IV ("SCID"), the most widely used diagnostic assessment tool in psychiatry. RT 3158.

Dr. First explained the importance of distinguishing a delusion from an "overvalued idea," and that the DSM provides guidelines for doing that. RT 3162-63. The SCID also provides guidance on how to distinguish between a delusion and an overvalued idea. RT 3163. The principal distinguishing feature is the strength of the person's conviction in his or her idea in the face of evidence to the contrary. Where the idea at issue is a religious one, a different analysis is required because a religious belief is not an evidence based belief, and one cannot actually produce evidence to the contrary. The DSM's guidelines provide that to assess whether religious ideas are delusions is to "figure out how the person came to [the religious] idea," and to "look at their cultural and religious background to see whether or not that idea is consistent with the belief system that [the] person has subscribed to as part of being part of a cultural group or subgroup." RT 3164-66.

*7)  **Dr. Craig Beaver***

17

Dr. Craig Beaver is a licensed psychologist who specializes in clinical neuropsychology and forensic psychology. Dr. Beaver met with Mr. Duncan ten times between July of 2005 and February of 2008, during which he interviewed the Mr. Duncan administered tests. The Government's objection to Dr. Beaver testifying about Mr. Duncan's mental status during the examination, based on an alleged defense discovery violation, was sustained, and the court limited Dr. Beaver's testimony to his neuropsychological testing. RT 3281. The testing indicated that although Mr. Duncan's IQ was well above average, he had "some core areas of difficulty that were consistent across several different types of tests." RT 3232. He had trouble with " higher level kind of abstract organizational skills, that kind of upper level of being able to deal with language and understand it." RT 3273. "[W]ith Mr. Duncan, we have a bright individual, but we have a consistent emerging pattern of difficulties in certain areas, primarily involving that left frontal temporal area" of the brain. RT 3279. Dr. Beaver recommended a neuroradiological study to follow up on the areas of impairment, but that was never done at the state court level. RT 3249-50.

### b. Prosecution Experts

The prosecution presented the testimony of five psychologists: Robert Engle, Cynthia Low, Craig Rath, Patricia Kirkish, and Ronald Roesch. Drs. Engle and Low had been involved at the *Faretta* stage of this case. Drs. Rath and Kirkish

18

had evaluated Mr. Duncan with respect to competency to stand trial in the California case. Dr. Roesch, a Canadian psychologist, was retained specifically for the retrospective competency hearing. The prosecution presented no experts in psychiatry or neurology, and none of the prosecution experts, with the possible except of Dr. Roesch, whose testimony was disregarded by the district court, had education, training and expertise on a par with the defense experts.

Dr. Kirkish also evaluated Mr. Duncan in connection with the California proceedings and not in the federal proceeding or on remand. She conducted one interview with him. RT 1116. She discussed his epiphany with him and concluded it was **_not_** just an "a-ha" moment as Dr. Rath believed (*see* below), but that it was something that transformed him fundamentally. RT 1256. "[H]e believed he had come to some realization, some truth with a capital T, that was -- that had freed him from this rampage of revenge, that if he could communicate that, if he could disengage with this judicial power struggle, which is how he characterized it, that somehow walking that walk -- those were his words, 'walking that walk' -- would be an example to others." RT 1137. He considered the system an independent entity capable of exercising power over him if he in any way were to fight it. RT 1257. At the heart of it was his belief that S.G. loved him. RT 1171. Dr. Kirkish found him to have a unique and "highly extreme," RT 1172, belief system, "amalgamating some aspects of psychology and philosophy and various religions

19

and the concept of love and oneness and cosmic consciousness." RT 1287, 1172. She considered it very difficult to decide whether his beliefs were delusional or merely idiosyncratic. RT 1168. She felt that reasonable minds could differ on the question. RT 1169. She testified that as to a number of things he reportedly said to other evaluators, "to the degree that those were accurate descriptions, I would certainly say, 'Well, that certainly looks delusional to me.'" RT 1170. He never talked about an appeal with Dr. Kirkish. RT 1267

Dr. Rath was appointed in March 2009 in the California case to evaluate Mr. Duncan for the purpose of determining his competency to represent himself. RT 839-40. He also did not evaluate Mr. Duncan during the federal case or on remand. His interview lasted only two hours, and he said this was enough time because the evaluation was "relatively focused." RT 854-55. The "main focus" of his evaluation "really had to do with his ability to cooperate with an attorney," RT 851, not the question on remand. Dr. Rath found Mr. Duncan's discourse "[a]bstract, complicated, metaphorical at times, but always goal-directed and illustrating a point." RT 856. Because Mr. Duncan's speech was "intellectualized," "individuals of low intelligence … wouldn't understand what he was saying." *Id*. From Mr. Duncan's description of his epiphany, Dr. Rath gleaned that "[h]e had basically been involved with the child. He, I suppose the best way to put it is, identified with her in the sense that she had been -- had a rough time in life and yet

20

seemed pure and innocent. And he had what psychologists refer to as an 'ah-ha moment' -- A-H, separate word, H-A -- ah-ha moment, where you have a sudden insight that he was wrong in doing this, and he had a problem." RT 864. Dr. Rath's understanding of Mr. Duncan's beliefs regarding "truth" was that he wanted the jury to have a truthful account of what he had done. RT 922. Dr. Rath was aware the Mr. Duncan wanted to be found competent. RT 924. Mr. Duncan told Dr. Rath that "he had curbed his delusional process when he was interviewed by Dr. Engle" and that was why Mr. Duncan believed Dr. Engle had found him competent. RT 943.

Dr. Engle met with Mr. Duncan on three occasions for a total of three and one half hours. RT 227, 324. He did not consider his evaluation "a comprehensive psychological evaluation" RT 326, but one focused on a "very specific question" of competency to stand trial. *Id*. He saw some symptoms associated with psychosis, *i.e.*, circumstantial and tangential speech, RT 240-41, 254, but not at a level he would expect to see with a "more severe psychosis individual." RT 242. Dr. Engle had difficulty following parts of what Mr. Duncan said. RT 254. As a subjective matter, RT 374, he felt that when Mr. Duncan talked about his epiphany the ideas did not rise to the level of a delusion. RT 255. Dr. Engle administered an MMPI-2, "the gold standard for psychologists in assessing personality," RT 265, and he wrote in his report that

21

> [m]any people with a similar profile manifest clearly psychotic behavior. Their thinking may be described as autistic, fragmented, tangential, and circumstantial; and thought content may be bizarre, difficulties in concentrating and attending, and deficits in memory are common. Affect may be blurred, and speech may be rapid and at times in incoherent.

RT 391. Dr. Engle testified that many people who are mentally ill attempt to mask their symptoms, RT 348, and one of Mr. Duncan's test results shows that he was not disclosing himself fully. *Id*.

Dr. Low met with Mr. Duncan on a single occasion for 75 minutes, RT 559, 561. Mr. Duncan was very hesitant during that meeting, "saying that he probably would not be cooperating because he felt as though our agenda was different from his." RT 573. She tried to meet with him again several times, but he refused, and she was unable to complete her interview protocol. RT 573-74. Dr. Low said Mr. Duncan had a good understanding of the purpose of the evaluation, RT 587, and he resented his attorneys for questioning his competency. RT 588. She did not see anything unusual about Mr. Duncan in any way. RT 578. Mr. Duncan told her about having "a connection with the girl, a unity, but that was really it. There was no mention of an epiphany, per se." RT 588. In her report to the court she stated her limited contact precluded asserting an expert opinion with any reasonable certainty, but in court she said despite that statement she had rendered an opinion with a reasonable degree of scientific certainty. RT 631, 633-34.

22

The prosecution's final expert was Dr. Roesch. He testified in part that although he had urged the prosecution to obtain authorization for him to examine Mr. Duncan, the examination was not nearly as useful as he had anticipated. RT 1951. During cross-examination the defense attempted to show that Mr. Duncan was demonstrably psychotic during the interview and that this was the reason Dr. Roesch disclaimed reliance on it.

### c. Lay Witnesses

The defense presented defendant's sister, Cheri Cox, who described the severe abuse suffered by Mr. Duncan as a child, prompting the District Court to comment that Mr. Duncan is "an individual who has endured great suffering in his life from an early age and is clearly disturbed by those events." Order at 33. The defense also presented the testimony of 17 investigators and attorneys who had been part of the defense teams in the Idaho case, the instant trial case, the Riverside case, and the prior federal appeal. Their testimony provided a remarkably consistent description of Defendant as obsessed with having a mission to silently communicate a universal Truth to society as a result of having achieved a unique and momentous sudden understanding that rape and murder are wrong, but not as wrong as turning away from the Truth. They described his long-winded, largely meaningless philosophical ramblings that were different if not impossible to understand. See discussion *infra*.

23

The prosecution presented a number of lay witnesses who described Mr. Duncan as polite, communicative, and intelligent. They testified that he acted and spoke appropriately for the specific situation of their encounters with him.

### 3.  The District Court's Ruling

The parties submitted post-trial briefs in July (Doc. 832), August (Doc. 838) and September (Doc. 840). In its post-hearing briefs, the Government treated the case as a battle of experts, *e.g.*, Doc. 832 at 22 (the court should credit the "four court-appointed mental health experts' opinions" over the "defense-retained" mental health experts), but the Government made no attempt to rely on Dr. Roesch's testimony.[3] In its brief, the defense argued that Dr. Roesch's testimony supported the case for incompetency. In its reply brief, the Government expressly disclaimed reliance on Dr. Roesch's testimony. Doc. 840 at 6 n. 2.

The district court issued its order retrospectively finding Mr. Duncan competent on December 6, 2013. (Doc. 843). In general, the court gave great weight to its personal impressions, all of which were formed prior to the court's erroneous decision not to conduct a competency hearing. The court wrote:

> This Court has observed first-hand the Defendant's demeanor and conduct and has itself interacted with the Defendant for quite some time throughout these entire proceedings; including the

---

[3] The Government's brief made only two passing non-testimonial references to Dr. Roesch. See Doc. 832 at 22 n1., 39 n. 6.

24

> particular time period in question. During this time, the Court personally engaged the Defendant in regards to his decision to waive his appeal as well as other matters and viewed his responses to the same. Having this first-hand, in-person view of the Defendant, the Court found him to be competent at the time and is now even more firmly convinced that the Defendant understood his legal options. This Court's own impressions of the Defendant are that he was clear in his thoughts, intelligent, had a complete understanding and knowledge of the proceedings and his options, and that he understood his legal position and the options available to him.

Order at 49. The court's own assessment of Mr. Duncan's mental health played a pivotal role even with regard to expert opinion testimony, finding the prosecution experts credible in that their testimony was "***consistent with this Court's own view*** of the record and evidence presented." *Id.* at 40 (emphasis added).[4]

The district court organized its specific findings around three questions: (1) Is Mr. Duncan suffering from a mental disease or defect? (2) If so, is it one that prevents him from understanding his legal position and his options? (3) If not, it is one that nevertheless prevents him from making a rational choice among his options? Order at 4-5.[5]

---

[4] *See also id.* at 65 ("The undersigned has presided over numerous competency hearings in my 50 years on the bench [and] .. the Court is firmly convinced that the conclusions stated in this Order are correct.")

[5] The district court claimed that the three-part formulation taken from *Rumbaugh v. Procunier*, 753 F.2d 395 (5th Cir. 1985) was approved by this Court in *Comer v. Schriro*, 463 F. 3d 934, 943 (9th Cir. 2006). The *Comer* court did not in fact apply *Rumbaugh*, but merely commented that the district court had applied it. 463 F.3d at 943 n.4. In *Dennis v. Budge*, 378 F.3d 880, 888 n. 4 (9th Cir. 2004), the court stated that "[w]e have never" followed the *Rumbaugh* restatement, "relying instead on the actual *Rees* formulation.")

As to the question of the existence of a mental illness, the court noted the testimony was "somewhat varied." Order at 8. The court identified the question of what Mr. Duncan means by "Truth" and oneness as central, "the most critical subject matter relating to Defendant's mental health," *id.* at 29, and credited Dr. Rath's opinion that the "Defendant's Ephiphany was not a delusion" but merely a "'sudden insight' or 'realization.'" Order at 33. The court found the "evidence regarding brain damage … to be interesting but, in the end, not determinative of the question of whether the Defendant suffered from a mental disease or defect." *Id.* at 35. Thus, the court found that "at most, the Defendant suffers from a mental disease or defect to the degree of a personality disorder as concluded by the court-appointed experts, but not a *major* mental disease or defect." *Id.* at 36 (emphasis added).

The court then turned to the question whether Mr. Duncan, notwithstanding any mental disease or disorder, had at the relevant time the capacity to understand his legal position and his options. The court noted that the expert witnesses on both sides agreed that Mr. Duncan was of higher than average intelligence and possessed a factual understanding of the nature of the proceedings. Order at 37-38, 48-49. The court credited the testimony of various jailers and law enforcement personnel that Mr. Duncan was "polite, communicative, intelligent, and

26

understanding of his circumstances" and that "he acted and spoke appropriately for the specific situation of their encounter with him." Order at 42.

As to the testimony of the "former attorneys, mitigation specialists, and defense investigators," *id*. at 42, the court found that "isolated comments in the notes about dreams, aliens, religion and the like, as relayed by the mitigation investigators, are not overly compelling because the drafters of the notes and their recollections are somewhat biased, incomplete, and without context." *Id*. at 42-43. The court did not doubt the "sincerity of the investigators or any of the defense team," Order at 44, but felt that they were less credible because their focus was on documenting the information that "would weigh in favor of mitigation and avoid the death penalty." Although there was contemporaneous documentation in the form of "notes [that] were taken for legitimate use by the defense attorneys," *id*. at 44, n. 27, "the notes are certainly not a full and complete record of what was said both by the Defendant as well as others present at the meetings." *Id*.

Finally the court turned to whether the mental issues "prevented" him from making rational choices. The court noted that Mr. Duncan's competency to enter a plea had not been questioned in the state court proceedings and he had been found competent to stand trial in the California case. Order at 49-51. The court wrote that the "best evidence" of Mr. Duncan's ability to make rational choices was his ability to plan and carry out the crimes to which he had pleaded guilty, *id*. at 51-52,

27

and that he displayed "perfect recall" during his interviews with the FBI. *Id*. at 54. Contrary to the testimony of all the defense experts, the court opined that Mr. Duncan's in-court statements regarding appeal were logical and coherent, *id*. at 55-60, a conclusion with which this Court disagreed. In a two-sentence discussion of the pivotal issue whether Mr. Duncan's beliefs substantially affected Mr. Duncan's prior actions regarding not appealing, the court wrote: "for the reasons previously stated, the Court does not find the testimony of these experts to be as credible as the court-appointed experts and views their testimony with great caution given their bias, particularly in regards to their testimony on this question." *Id*. at 60.

## IV.    SUMMARY OF ARGUMENT

The district court's conclusion that Mr. Duncan was competent to waive appeal under *Rees v. Peyton* is flawed by multiple clear factual and legal errors. A veneer of ostensible impartiality notwithstanding, the district court was moved not one iota by the testimony of more than two dozen defense witnesses. It adhered entirely to its *pre-remand* view, which was rejected by this Court in the prior appeal, that Mr. Duncan's crime, behavior in court, and statements regarding appeal established the rationality of his prior failure to endorse an appeal.

With the exception of Dr. Roesch, upon whose testimony the Government placed no reliance whatsoever, the district court credited every witness, expert or lay, called by the prosecution, even though *none* of the prosecution witnesses

28

evaluation Mr. Duncan with respect to the decision whether to endorse an appeal, the threshold question in the order of remand. The district court itself misapplied the *Rees* test for competency, by assessing not whether Mr. Duncan's capacity for rationally deciding whether to appeal was impacted by a mental disorder, disease or defect, but treating his ability to behave rationally in other contexts as the dispositive fact. The court did all of this against the palpably erroneous backdrop of Mr. Duncan's "Epiphany" consisting of a mere sudden recognition to the moral truism that homicide is wrong. The court committed multiple errors in assessing the weight of the evidence, including the legal error of taking judicial notice of the outcome of an unrelated proceeding on a similar issue.

The district court also erred in reaffirming that Mr. Duncan's "waiver" had been knowingly, intelligently, and voluntarily made.  Mr. Duncan's bizarre, equivocal responses during the trial preclude a finding of clear and unambiguous waiver.  To the extent any position ultimately emerged from Mr. Duncan's responses, it was merely an expression of his overall "non-resistance equals Truth enhancement" delusions:  his concern was not whether an appeal would be taken, but only whether he would need affirmatively to endorse it.  Once this became evident, the district court needed to inform him that an appeal of the competency determination and purported appellate waiver was available not *despite* his non-authorization, but *because of it*. Because Mr. Duncan's delusions drove him only to

29

avoid affirmatively dicating an appeal, the district court's failure to inform him that his non-authorization was itself a form of authorization precludes any finding that the purported waiver was knowing and intelligent.

Because there has been, and there continues to be, an appeal in this case, the Court is additionally required under the Federal Death Penalty Act of 1994, 18 U.S.C. § 3595, to undertake an independent "sentence review" to determine "whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of any aggravating factor." 18 U.S.C. § 3595(c)(1). This is especially true in light of the very troubling circumstances surrounding the trial and conviction, which give rise to various serious concerns that the conviction and sentence are the result of a fundamentally unfair and unreliable proceeding.

## V. **ARGUMENT**

### A. *This Court Should Reject the District Court's Multiply Flawed Retrospective Competency Assessment*

The district court's competency assessment in this case is based on a mixture of factual and legal determinations. The findings of pure fact are reviewed under the clearly erroneous standard. See Fed. R. Civ. P. 52(a)(6); *United States v.*

30

*Cazares*, 121 F.3d 1241, 1245 (9th Cir. 1997); *Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985).

The findings of the trial court induced by an error of the law are not binding. *Smallfield v. Home Ins. Co.*, 244 F2d 337 (9th Cir. 1957). This Court will treat a district court finding as clearly erroneous not only if it is without adequate evidentiary support, but also if it was induced by an erroneous view of law. *Ritter v. Morton*, 513 F.2d 942 (9th Cir. 1975). Moreover, district courts may not insulate findings from review by denominating them credibility determinations, "for factors other than demeanor and inflection go into the decision whether or not to believe a witness." *Id*. Thus, although deference to the district court is the rule, this does not render appellate review a "a mere rubber stamp." *Estate of Palmer v. Commissioner of Internal Revenue*, 839 F.2d 420, 423 (8th Cir. 1988).

In general a trial court's factual finding "is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Hinkson*, 585 F.3d 1247, 1260 (9th Cir. 2009) (en banc) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). "After sixty years of judicial experience with that [clearly erroneous] standard, it needs no further explication. We jurists know what it means." *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 693 (9th Cir. 2010).

**1. Despite Ostensible Signs of Impartiality the District Court's Decision Was Clearly Pre-Ordained**

In April 2008, during the original trial, the district court said it was firmly convinced, largely as a result of its own observations, that Mr. Duncan was competent. Mr. Duncan's "ideas, though 'uncommon,' showed 'a level of intelligence more than sufficient to evidence his understanding of [the] proceeding and his competency to proceed.'" *United States v. Duncan*, 643 F.3d at 1246, *quoting* (DC) Doc. 494. The district court noted "Defendant had not displayed irrational behavior in court [and] had stated that he understood the nature of the proceedings during his plea hearing." *Id*. This Court rejected this conclusion and reversed with instructions to afford Defendant an opportunity to adduce evidence of incompetency. *Id*. at 1250.

After 23 days of testimony, the district court moved not one iota from its prior views. In its findings, the court relied heavily on having "viewed the Defendant in person extensively" (Order at 63), and having "made direct inquires of the Defendant in this case on more than one occasion." *Id*. at 64. Invoking its experience with "numerous competency hearings in my 50 years on the bench," *id*. at 65, the court found "some of the best evidence of the Defendant's ability to make a rational choice among his options are his own words concerning his purpose, state of mind, and detailed/thorough planning of his actions." *Id*. at 51-52. After detailing its *pre-remand* opinion that Mr. Duncan was capable of rational

32

decision-making, *id.* at 57-59, the court stated its "conclusion remains the same." *Id.* at 59.

Within the corners of the order, the district court's analysis appears measured and thoughtful, awash with relevant detail. A witness-by-witness summary of evidence, punctuated with frequent credibility findings, accounts for much of its length. The prosecution experts' opinions are said to be "well supported in the record and credible." Avoiding harsh criticism, the court labeled defense testimony "quite interesting," albeit "somewhat questionable." Order at 25. Other defense expert testimony the court found merely "in the end, not determinative." *Id.* at 35. The court refused to "doubt the sincerity" of the defense lay witnesses, *id.* at 44, and in the end only comment only that their testimony was "somewhat skewed," *id.* at 31.

Much of the district court's order addresses issues of witness credibility. The court described in detail the importance of live testimony, Order at 7-8, and claimed to have considered all testimony carefully. *Id.* at 64-65. Ultimately there is, however, little indication that the court did anything other than decide to credit the side whose testimony fit its preexisting view of the case -- the one this Court previously rejected. It is no accident that, with one notable exception, the court found credible *every* witness whose testimony supported the court's pre-existing view. *All* testimony that in any way was inconsistent with that view was rejected *in*

33

*toto*. The court made explicit that one of its reasons for crediting prosecution

expert testimony was that their opinions mirrored the court's own pre-existing

view:

> As stated earlier in this Order, the Court finds the testimony of these
> experts to have been extremely ***credible and consistent with this
> Court's own view of the record*** and evidence presented.

*Id.* at 40 (emphasis added).

Past the surface of the order, and in the hearing record itself, lies the greater

story. Defense testimony that the court viewed as potentially somewhat "skewed"

was ignored in its entirety, simply "deskewed." The court never so much as

acknowledged vast swaths of the defense case, and paid only lip-service to

considering much of the rest. Instead, the court repeatedly suggested that the entire

case for incompetency is based on isolated statements, taken out of context. *See*,

*e.g.*, Order at 64 ("…the Court is compelled to state that if decisions such as that

stated in this Order are to mean anything, they must not be made in a vacuum

where isolated statements are taken out of context and twisted so as to appear

delusional, irrational, unreasonable, and thus form an argument for

incompetency.")[6] As the ensuing discussion will reveal, the stunning inaccuracy of

---

[6] *See also* Order at 16 (claiming that Dr. Amador's critique of Dr. Low was based
on "isolated phrases as evidence of delusions and thought disorders not recognized by Dr.
Low as such."); *id.* at 42 ("As the expert witnesses for both sides made clear, however,
isolated statements do not, in and of themselves, show a person's mental state. The

34

that statement alone should be enough to establish a firm and abiding conviction that clear error has resulted.

In accepting the prosecution experts' ultimate conclusions, the district court entirely ignored that the defense's experts were the only ones who had ever evaluated Mr. Duncan on the relevant question, his capacity for rational decision-making regarding whether or not to appeal. The court made multiple, related errors regarding the supposed timely, thorough and exhaustive evaluations of the prosecution experts, without reference to the uncontroverted confounding effects of Mr. Duncan's high IQ, desire to appear competent, and "anosognosia."

Because the district court treated as paramount the supposed lucidity of Mr. Duncan's in-court communications and behaviors, we begin there.

> **2. The "Finding" that Mr. Duncan's In Court Statements Are Indicative of Rational Thought, Which the District Court Necessarily Had To Have Concluded Pre-Remand, Ignores the Clear Weight of Uncontroverted Evidence On Remand**

An entire section of the court's order is devoted to "Defendant's Conduct in Court in November 2008," Order at 55-60, in which the court quoted portions of the November 24, 2008 waiver hearing and the "Post-Conviction Affidavit." (Doc. 613) From an analysis of these, the court concluded that:

---

experts agreed that context is important when determining whether a particular statement by an individual may be a delusion or other evidence of a mental disease or defect. Here,

> The Defendant understood his legal position and the options available to him and he was not prevented by any mental disease or defect from making a rational choice among his options. The Defendant's ideology and choice to not participate in the system as expressed in his Post-Conviction Affidavits is consistent with the discussions he had with his counsel, mitigation investigators, FBI agents, and the various mental health experts who interviewed him.

*Id.* at 59-60 (footnote omitted). *See also* Order at 49 ("This Court's own impressions of the Defendant are that he was clear in his thoughts, intelligent, had a complete understanding and knowledge of the proceedings and his options, and that he understood his legal position and the options available to him.").

The conclusion that Mr. Duncan's interactions were not symptomatic of a thought disorder contravenes the overwhelming weight of evidence. The district court's hollow paraphrase of the pro se affidavit and the excerpts of the waiver hearing, carefully chosen to convey a semblance of rationality, do not do justice to Mr. Duncan's actual recitals. The pro se affidavit and in-court colloquy are too long and rambling to quote herein, but they are relevant in their entirety and close examination is warranted, an examination this Court conducted and concluding a hearing was necessary. As the examples provided below amply show, most lay persons with a modicum of orientation would consider the speaker suffering from a serious thought disorder. The defense experts' testimony referencing specific on-

---

isolated comments in the notes about dreams, aliens, religion and the like, as relayed by the mitigation investigators, are not overly compelling…").

36

the-record verbatim accounts, as well as the lengthy recorded forensic interviews, which the district court refused even to discuss, handily dispel any remaining doubts.

### a. Within The Four Corners of the Materials Lies Conclusive Evidence of Psychosis

The district court attempted to distill the pro se affidavit into a single paragraph of supposedly lucid expression. Order at 9. What Mr. Duncan _actually said_ is quite different. Extracting _any_ logical explanation from his tangential and circumstantial flight of ideas is challenging at best. Mr. Duncan stated _inter alia:_

> Not attempting to influence society's choice is important to me since I have realized that the choices we make are our own, and no one outside of ourselves under any circumstance (or delusion) is responsible for the choices we make. Nobody and no circumstance can "make us" choose anything, though we can allow ourselves to be deceived (i.e. deceive ourselves).

\* \* \* \* \*

> As a matter of clarification, I should establish that I did in fact bring [S.G.] home and deliberately surrender myself to the police. The reason that I did so is not entirely clear even to myself and is certainly beyond my own ability to rationally explain. But I can say that I came to realize that there is an active intelligence far greater than my own intelligence that is not just involved but in full control of our lives. I have tried to explain this realization with words over and over and have repeatedly failed to satisfy what I now recognize to be the Living Truth within my being.

\* \* \* \* \*

> I woke up to the miracle of life and died to the deception of death. But these are merely words that do not truly even begin to

37

reflect the experience that caused me to give up my quest for what society now calls "justice" (when it is officially sanctioned) but what I knew even then to be vengeance, no matter what other names it may go by (i.e. "justice," "punishment," "retribution," "retaliation," etc ... )

* * * * *

I focus my energy and attention on my inner self, because I know that as a limited being I am a reflection of this world, and this society. And as a reflection the only power I have to change the world is the power to change myself-if the reflection changes, then what is reflected must also change. What the "Church of American Justice" (or the so called "Criminal Justice System") does to fight "evil" is trivial by comparison to this task, and most of the time even contrary to it. This is why I pay little heed to the plethora of documents and proceedings that use my name in their attempts to further justify the system's own delusional murderous rampage (i.e. "insanity").

* * * * *

Rape and murder are no more than symptoms of the one true crime; the crime of denying the truth within ourselves. * * * Capital punishment-what society calls justice-is nothing more than the result of the same delusional thinking-and just another reflection of the greater crime-only much worse than even murdering children, because it affects the conscience of so many more people, not to mention ultimately resulting in more children being raped and murdered, or even worse ... led away from the Living Truth within their own being! (The very crime that I believe the legendary man/god Jesus was referring to when he spoke of leading children to harm).

Mr. Duncan's disordered thinking was manifested during the November 24, 2008, hearing, which was also excerpted by the district court, despite the court's unsuccessful effort to keep Mr. Duncan on topic. Responding to the court's questioning of his understanding of appeal, Mr. Duncan stated:

I understand it I think as it was meant to be understood. In other words, Your Honor, I have – I don't know what the word for it is, but

38

philosophical reservations about my understanding that extend beyond the intended understanding. In other words, my understanding goes beyond the intended understanding rather than below.

\* \* \* \* \*

The affidavit that I wrote that I intended to file that is only missing a cover page right now, it states in there, I don't know, I was talking to the attorneys about it earlier, I don't know if it is clear or not, but to me it seemed clear that what I was trying to say is that in my opinion this whole proceeding is criminal, and as a criminal proceeding, any appeal doesn't make any sense.

And so I understand the intention and I understand the criminal mind you might say of society. But in that regard I understand the intention of the appeal, the philosophy behind the appeal, the theory behind the appeal. You know, I know a lot. I am an educated person— well, I'm not saying I know everything, but I know enough to have an opinion about, you know, what the appeal means, which it goes beyond the normal opinion of what the appeal means.

Not surprisingly, the court needed clarification of this, and Mr. Duncan

responded:

I want to be as clear as possible. You have to excuse me if I am not being clear. But I don't believe that this Court has the authority to grant such a right or a right as that. And so on the surface I can say honestly that I understand your intention of granting me that, what you call a right, but—and I accept your intention. I'm not opposed to your intention. I accept that. That is your view, that is your world, that is your law, but it is not mine and I don't accept it.

But at the same time I don't reject it. I am neutral. I wish to allow you to do what you feel you need to do. I will allow the attorneys to do what they feel they need to do.

Now, to answer your question, I want to get back to it, I am not avoiding your question or evading it. I will answer your question. And my answer is in that context my answer is I certainly understand my

right, my right in quotes, and I have no desire, as I mentioned in the letter I wrote to you, to invoke it.

RT (11/24/08) at 10-11. He soon followed up with:

I consider the system criminal, but at the same time I'm not in a position to judge the system. So in other words, that is why I must allow the system to do what it needs to do, that it feels is the correct thing to do, without judging it.

In other words, what I am saying is that my view is that— well, I'm not going to say what my view is because that is not what is important. What I am saying now is my view is my view and I recognize it as my view, and my view is limited and has a clear history of being in error. Therefore, I have to acknowledge that my view is not the end all, my view is not, you know, but at the same time I have to take responsibility for my view. I have to own my view. I have to be—that is all I have is my view and that is what I am saying.

But at the same time what I am trying to say is I respect your view, and I respect my attorneys' view, and I respect the prosecutors' view, and I respect society's view. That doesn't mean I agree with it, you know, but I respect it and I allow you to have that view. I think that is important to understand also.

*Id*. at 13-14. He continued:

I understand the process, I understand the law, I understand the history of the law, where it comes from going all the way back to Rome and before that, the beginning of mankind. I'm not saying my understanding is perfect, but in other words, I have an extensive understanding of the whole process.

But the reason I chose to represent myself, the reason why I asked my counsel to step down and allow me to make some decisions in this case is not because I wanted to participate, but because I didn't want to participate.

I want you, I want the Court, I want society, I want the prosecutors, I want my attorneys, I want everyone to do this without

40

me. I want you to make your choices. I don't want to be a part of that decision-making process.

That is why I defended myself the way I defended myself, by not defending myself. My answer to the Court was my argument is no argument, Your Honor. I don't want to argue. I don't want to get involved in the rationalization process of killing again. And so it becomes philosophical and I apologize for that.

My position is that the system has a choice to make. I've made my choices and now you have to make yours as a system, as society or whatever you want to call it. And I want to allow and I want to accept that choice, but I don't want to participate in it.

*Id*. at 16-17.

To be sure, Mr. Duncan's statement touches on some reasonably identifiable themes about process, non-interference, and the like. But to cherry-pick a few such statements and to rearrange them into an ostensibly coherent narrative suppresses the otherwise unmistakable evidence of psychosis.

### b. Expert Analysis of the Statements Quoted Above and Similar Verbatim Examples Provides Additional Irrefutable Evidence of Psychotic Thinking

As stated elsewhere in this brief, the defense experts presented detailed testimony regarding the signs and symptoms of disordered thinking in Mr. Duncan's speech and writings, including circumstantiality, tangentiality, flight of ideas, derailment and poverty of content. They also explained that the fact that Mr. Duncan's thinking is disordered needs to be taken into account in assessing whether his world view is delusional or merely idiosyncratic. The question has to

41

be answered in the context of a person with a thought disorder expressing the

views he holds, not the context of an otherwise normal person expressing some

unusual ideas. The examples they discussed included the same in-court statements

the district court cited to support of its claim of Mr. Duncan's rationality. The

district court failed to consider the expert testimony, including the specific

instances described below.

Dr. Kalechstein was asked on cross-examination to consider the quality of

Mr. Duncan's responses to judicial inquiries, and he responded:

> [W]hen I look at that snippet compared to the transcript from 11/24/08, and I did have that transcript, and from my perspective it shows that when you look at how he reasons overall beyond just saying "yes" or "no," from my perspective, it is not just whether he makes the decision, it is how he arrives at the decision.
>
> And I think that the transcript that I did look at from 11/24/2008 was crucial in that regard because it shows that he can answer the question, but when he tries to elaborate the rationale for his decisions, well, then you can see the illogical thinking and incoherence there. So the point being, he offered the opinion in 11/24/08 just like he offered a decision right there. And I'm not disagreeing that he did offer an answer in response to the question, but I am saying if you look at 11/24/08, it offers you more of a window into how he comes  to making those sorts of decisions.

RT 5270-71.

Dr. Merikangas discussed the November hearing and the pro se affidavit at

length during his testimony. *See* RT 3028-36. When asked about Mr. Duncan's

statement that he understood an appeal, but that his "understanding goes beyond

the intended understanding rather than below," Dr. Merikangas explained that this

was "consistent with his psychosis and thought disorder" because "it doesn't make

sense." RT 3028-29.

> [I]t is incoherent and it is relating to his delusion about his
> understanding that goes beyond the attendant understanding. In other
> words, he is referring to his knowledge of the universe, and the will
> that is the universe, and his particular idiosyncratic delusions of the
> universe, and what it means. He is not able to just answer this with
> "yes" or "no."

RT 3029. "[A]fter talking to him for 15 to 18 hours and hearing the same kinds of

things being stated all along, and understanding the elements of his psychosis with

his rambling, flight of ideas, tangentiality, circumstantiality, and his paranoia, and

his hallucinations, his delusions, that this is all part of the same thing." RT 3030.

With regard to Mr. Duncan's statement that he knows "enough to have an opinion

about, you know, what the appeal means, which it goes beyond a normal opinion

of what the appeal means," RT (11/24/08) at 9-10, Dr. Merikangas explained:

> It is symptomatic of his psychotic thought process and shows
> he doesn't understand what is going on. He thinks his role is to help
> the Court make a decision when he is simply being asked what his
> decision is.

RT 3031-32. As to the pro se affidavit and the statement that "I'm not attempting

to influence society's choice...no one outside of ourselves under circumstance or

delusion is responsible for the choices we make," Dr. Merikangas testified: "It is

43

symptomatic of his psychotic thought process, it is irrational, and it is based upon his delusional system." RT 3035-36.

Dr. Woods also reviewed these portions of the record. Like Dr. Merikangas, he noted that Mr. Duncan believed that it was for the court and the attorneys to decide whether there would be an appeal in a "convoluted [and] very disjointed way of thinking." RT 5806. As to Mr. Duncan's statement, "I don't want to argue. I don't want to get involved in the rationalization process of killing again. And so it becomes philosophical, and I apologize for that," Dr. Woods explained:

> Mr. Duncan has the ability to see his language become derailed. And you see in numerous interviews, as well as in this one, when his language starts to get somewhat derailed, he'll say, "All right. I know that I'm going too far." Or there will be times he will say, "What was I talking about?" And that could be anybody. We all kind of, from time to time, forget what we were discussing; some of us more frequently than others. And so we see that with him. But what has happened also is in the court records he uses this term "philosophical" as a way to basically say: Here I go again. Here I go off into this other discussion. He is aware of it, and he uses that term; and over time, he uses it more frequently.

RT 5810.

A detailed analysis of many of Mr. Duncan's in-court statements is set forth in Dr. Woods' 10/01/12 report (Exh.J at 81-106). In his forensic summary, he stated:

> Mr. Duncan's language impairment reflects his deep psychosis and its delusional cover. He admits that he didn't have the words during the hearing to waive his appeals. "I didn't have the words. Was filtered through our delusions. Supplied by our national structures that

44

> aren't real. .. What's important is that people acknowledge this reality." Dr. Merikangas and Dr. Gur both describe derailment of thought and language when interviewing Mr. Duncan. Mr. Duncan described his difficulty discussing his beliefs with Judge Lodge, and describes the interaction as "futile conversation." This difficulty, in Mr. Duncan's mind, stemmed from " ... infinite course equals infinite consequences ... I believed the appeal interferes with society's innocence ... I do not buy into this reality that I subscribed to .. .if you bring me another reality, I am willing to adjust my perspective.

*Id*. at 103.

The experts also analyzed the recorded interviews with Dr. Roesch and Dr. Gur. The recorded interviews are discussed in some detail in Section V.A.3.c., *infra*, but they are relevant here, too. For example, Dr. Gur played portions of his interview and then commented on how

> Well, it sounds [like] what it is; loose associations. It is basically trying to explain that this other medium that you can communicate with is sort of lost through the socialization process. Children learn to not use it; and at the end, we are -- we have real difficulty understanding those kinds of communications because we only believe in rational language.

RT 3629.

In contrast with these specific analytical references to verbatim statements, the prosecution experts simply testified to a subjective conclusion that they did not detect signs of "telling speech" (or in those instances where they did detect tangentiality and circumstantiality, not to an extent that would cause concern). Why that testimony does not reliably establish that such symptoms were in fact absent – as opposed to simply not observed -- is discussed, *infra*.

45

**3. The Court's Failure to Consider or Even Acknowledge the Overwhelming Evidence Establishing that Mr. Duncan's Belief System is Anything But a Mere "A-Ha" Moment Infects the Findings With Clear Error**

Throughout its discussion the district court repeatedly emphasized the singular importance of context.[7] Ironically, the court purported to decide the question whether or not Mr. Duncan's beliefs were delusional without putting the question into the context of what it is he believes. As even the prosecution's case acknowledged, it is impossible to assess whether Mr. Duncan's beliefs are delusional without first determining what he believes. *See*, *e.g.*, RT 1170 (Dr. Kirkish as to the importance of determining "exactly what" Mr. Duncan has said). The court's view that the beliefs do not "rise to the level" of delusion is based predicated on a wholly inaccurate, and fundamentally hollow, paraphrase of the belief system that is contrary to the overwhelming body of irrefutable evidence of truly bizarre nature of Mr. Duncan's world view.

In the introductory portion of the order the district court provides a single paragraph statement of the belief system, citing Mr. Duncan's "Post Conviction

---

[7] *See, e.g.,* Order at 16 (Dr. Amador's critique of Dr. Low "lacked appropriate context"); at 29 (finding Dr. Kalechstein's conclusions "to be lacking in context"); at 33 (noting although "Defendant made some strange statements at times" when "viewed in context, [his] statements .. generally were coherent"); at 41 (faulting Dr. Gur for "not tak[ing] into account the entire context of the Defendant's conduct, behavior, and statements in light of all the circumstances"); at 42 (testimony of investigators and others regarding Mr. Duncan's statements were "without context"); at 64 (remarking that

46

Affidavit of Pro Se Defendant" (Doc. 613) as its sole source, despite voluminous

testimony and other documentary sources. Doc. 613 is a rambling 8-page

document, which as described *infra* bears little resemblance to the court's hollow

paraphrase, either in clarity, brevity or content. In the district court's view, that

document establishes:

> Generally, to the Defendant, the Truth is something that can only be
> found by silence when one reaches their own epiphany or
> enlightenment without any interference. The Defendant stated that
> words and his participation in the court system would impede the path
> to the Truth. (Dkt. 613.) The Truth was more important to the
> Defendant than the outcome of this case. The Epiphany is what the
> Defendant experienced while he was on the mountain with the
> surviving victim. (Dkt. 613.) While at the campsite, the Defendant
> intended to kill the lone remaining victim. Mere seconds before he
> was about to deliver the fatal blow with a large rock, the Defendant
> stated he had the Epiphany and realized what he was doing was
> wrong. As a result of this awareness, the Defendant decided to return
> the victim to her home and turn himself in. The Defendant stated his
> hope or belief is that everyone, including the jurors, would experience
> their own epiphany during the trial and, thereby, attain the Truth.

Order at 9.

Despite the manifest need for further exploration, the district court displayed

a remarkable reluctance to conduct it. According to the court,

> [t]he Defendant's Epiphany was not a delusion but was instead, as Dr.
> Rath testified, a "sudden insight" or "realization." In making this
> statement, Dr. Rath recognized that "[n]obody who was reasonable

---

competency decisions cannot be made "in a vacuum where isolated statements are taken
out of context and twisted so as to appear delusional").

would disagree that the Defendant has problems." The Court finds this
statement to be accurate in describing the Defendant in this case.

Order at 33 (record citations omitted). In crediting this erroneous view – which

indisputably says nothing about what it is that Mr. Duncan actually believes – the

district court improperly ignored a mountain of contrary evidence. *Cf. Taylor v.*

*Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) (state court's plain misapprehension

or misstatement of record in connection with findings may render findings not only

erroneous but unreasonable); *see also Porter v. McCollum*, 558 U.S. 30, 42-43

(2009) (state court unreasonably failed to give "any consideration" to petitioner's

expert testimony).

Multiple unimpeachable sources of information clearly belie the view that

Mr. Duncan merely came to recognize that to kill S.G. would be wrong. The record

of Mr. Duncan's own statements to the trial court that existed before the matter

was remanded strongly undermines this simplistic view. The record that was

amassed on remand, including the consistent detailed accounts of numerous

members of consecutive defense teams, the recorded interviews with experts, hired

by both the prosecution and the defense, and the detailed notes of interviews by

defense experts overwhelmingly refutes it.

48

### a. The Statements Exhibit Facial Signs of Bizarrely Delusional Beliefs

Reading Doc. 613 reveals the inaccuracy of the district court's attempt to distill a rational narrative. Whereas the district court says that Mr. Duncan stated that "[m]ere seconds before he was about to deliver the fatal blow with a large rock, the Defendant … had the Epiphany and realized what he was doing was wrong. As a result of this awareness, the Defendant decided to turn himself in." Order at 9. This is an *interpretation* of document 613, but one that lends it a level of coherence and rationality it plainly lacks. As to the act of bringing S.G. back, Mr. Duncan wrote:

> For the sake of those who are still incapable of perception beyond tangible human language, I will say that while on the mountain with [S.G.] I "realized" that what I was doing was "insane," … so I stopped doing it. Or if you prefer more philosophical terminology, I could also say that I woke up to the miracle of life and died to the deception of death. But these are merely words that do not truly even begin to reflect the experience that caused me to give up my quest for what society now calls "justice" (when it is officially sanctioned) but what I knew even then to be vengeance, no matter what other names it may go by (i.e. "justice," "punishment," "retribution," "retaliation," etc ... ).

As to representing himself, which Mr. Duncan implied was why he would not try to "prolong[] the process by appealing," *id*. at 2, the district court characterized Mr. Duncan as saying that "words and participation in the court system would impede the path to the Truth." Order at 9. The only sentence in Doc. 613 that bears any resemblance to this simple declarative statement is: "I have

pleaded guilty unconditionally to all charges, and have chosen to represent myself

in the Federal case against me in order to minimize my participation in society's

decision to continue murdering, and also to minimize other people's involvement

as well." (Doc. 613 at 1.) The rest of the document relates in some way to the path

to Truth, but plainly not with the logical goal-directed coherence of the district

court's distillation.

> Nobody and no circumstance can "make us" choose anything,
> though we can allow ourselves to be deceived (i.e. deceive ourselves).
> The true consequences of the choices we make fall back upon the ones
> making the choice, always, without exception. So society must be
> allowed to choose for itself, so it, as a whole, can learn this valuable
> truth.

> \* \* \* \* \*

> So this is why I focus my energy and attention on my inner self,
> because I know that as a limited being I am a reflection of this world,
> and this society. And as a reflection the only power I have to change
> the world is the power to change myself-if the reflection changes, then
> what is reflected must also change. What the "Church of American
> Justice" (or the so called "Criminal Justice System") does to fight
> "evil" is trivial by comparison to this task, and most of the time even
> contrary to it. This is why I pay little heed to the plethora of
> documents and proceedings that use my name in their attempts to
> further justify the system's own delusional murderous rampage (i.e.
> "insanity").

> \* \* \* \* \*

> Rape and murder are no more than symptoms of the one true
> crime; the crime of denying the truth within ourselves. And this is
> why (or at least the best simile of why that my words can represent)
> that I have objected to nearly every piece of litigation filed in this case
> by the people who have been appointed to represent me. They are
> caught up in the illusion that the Truth is something that exists outside

50

of themselves and that it can be manipulated to represent their own view of how things should be. Capital punishment-what society calls justice-is nothing more than the result of the same delusional thinking-and just another reflection of the greater crime-only much worse than even murdering children, because it affects the conscience of so many more people, not to mention ultimately resulting in more children being raped and murdered, or even worse ....

So clearly, I view the system's desire to kill me as a crime far worse than my own, yet stemming from the same root cause. I understand what brings such "evil" into this world (I generally equate the word "evil" with the word "deception"), and I know that it cannot be overcome by fighting it on its terms. So I refuse to "defend" myself in the public arena called a courtroom (where deception ("evil") has the advantage) much as early Roman Christian's refused to defend themselves in the public arenas of their day (which were also thought of as perfectly reasonable "Criminal Justice Systems").

\* \* \* \* \*

I will no longer condemn society even as it condemns me. No man, no church, and no government has the authority to judge another living being. We are each given only the authority to judge ourselves (if we so choose), and when we seek to judge others it is only ourselves that we are judging. Someday all people will understand and cherish this Truth. And I know in my own heart that even if my words are mocked today, someday they will be heard by people who know and honor this Truth. These people will be (and already are) my brothers and sisters, and no amount of time, or space, or even death can separate me from them.

### b. The Testimony of Multiple Lay Witnesses With Substantial and Repeated Contacts With Mr. Duncan Provide Credible, Overwhelming Evidence of Delusions

In contrast to the hollow descriptions of the brief, guarded version of the

belief system that was revealed to the experts called by the prosecution, a parade of

lay witnesses who had engaged in repeated, prolonged discussions with Mr.

51

Duncan provided vivid accounts of a floridly psychotic Epiphany that were remarkably consistent from witness to witness. Size limitations require Appellant to confine himself to a few representative samples of the extensive evidence provided my member after member of the defense teams from the Idaho state case, the federal case, and the California case.

Lead federal trial counsel **Judy Clarke** testified that Mr. Duncan's predominant theme

> was the discussion of the truth. And I say the truth with a capital T that had some special meaning. It was an entity or it was a thing or it was something that came to people.
>
> He was just further along the path to understanding the truth. But the truth was a big thing. It was not the truth in terms of accuracy of fact necessarily; it was a being, a source. There was a lot of defaulting to or discussion of being one, we were all one. We were not separate individuals, there was a oneness quality to us.
>
> There was -- the epiphany was a rather consistent discussion, the epiphany on the mountain. And [S.G.] was a constant topic. The pure love that came from this enlightened child who taught Jet so many things by her purity.

RT 5453-54. She explained that

> our ultimate problem [was] that the legal process was an impediment to the truth in Jet's world. The words impeded the path to the truth. That people were to come to their own epiphany. That in the courtroom the jurors would have this epiphany. That, in fact, it would be an epiphany for mankind. It was large. But we would destroy that by words and the court process.

RT 5454-55.

52

Cocounsel **Mark Larranaga** testified that "the major epiphany happened on the mountain....Mr. Duncan believed he found the truth, a higher purpose in which we all become one was from the mountain, from the returning of the young girl." RT 3949. "The epiphany and the truth would be hindered or thwarted by words. So lawyers, for example, or this process may be thwarted if we were to continue to represent him for example." RT 3949-50. He did not use truth in the normal sense. "It was a truth of a oneness, of a -- of a super being, a super understanding that each and every one of us should try to strive for, according to Mr. Duncan. Yet we have to get there on our own." RT 3950. It was not a simple awakening to the fact that killing was wrong, "but, really, it was a realization that his thought process and thought patterns were shattered, and he had now come to a different revelation, a different understanding of truth and oneness." RT 4459-60.

**Tom Monaghan** testified that Mr. Duncan's epiphany "was that he had learned the living truth of existence. He described that as the fact that we were all part of a living singular consciousness that binds us all together. He would refer to that as oneness or connectedness." RT 4786-87.

> The system he described as the antithesis of the world of truth. The system was based on fear and deception and reason. It was basically something that obscures or hides the truth. It was the situation of people who are not enlightened as to the truth such as him were part of that system.
>
> In fact, his position was that I and others involved in the case, because we were not enlightened to the truth, were part of that system.

53

And in fact, at times he would remind us or tell us that he had to remind himself that we were part of the system and, therefore, his enemy.

He would talk about how the system cannot be fought directly because it strengthens the system.

RT 4787.

Members of the California trial team had similar experiences. **Mark Johnson**, who represented Mr. Duncan prior to being appointed to the Riverside County superior court, testified that Mr. Duncan:

impressed me as somebody who had some huge religious experience that had totally influenced everything he believed and wanted to talk about. All he wanted to talk about was this epiphany. And, at least in talking with him, he impressed me as someone who, at least how he acted, who had an awakening spiritual experience that was all-consuming with him. That's all he wanted to talk about with me. And he didn't want me to do anything, because my -- I was corrupt because I was part of the system and I was going to get in the way of delivering this.

RT 2319.

It was something that I -- everyone had to get this message on their own. And if you didn't somehow get it on your own, you weren't going to get it ever. So they had -- we had to just sit there at the defense table, do nothing, and allow the jury to soak this in.

He seemed to -- when I talked to him, he made comments, he made comments that, like he was anointed by God or somehow to present this message. So it wasn't like me sitting there trying to give out the message. This was going to be Joseph Duncan who had had this spiritual experience who would be sitting there and had some heightened ability to deliver this to a jury through some type of osmosis. So that, that was it.

54

But the bottom line, what was I supposed to do? I wasn't supposed to do anything, because that would get in the way of the message because I was corrupt.

RT 2320-21

**Richard Verlato**, who took over from Johnson, testified that Mr. Duncan

believed that S.G.

had shown him love, the love of God. At various times he described her as a perfect Buddha or symbol of purity. These are his words, not mine.

The interesting thing is, I know I am describing all these different things. You have to remember, In the terms of thought derailment, he slips from topic to topic in a way that can be illogical and nonsensical, depending on the topic upon which he touches his description of this sometimes had changes and kind of subtle differences, but it always was a very, according to him, profound experience that led him to have an understanding of the, quote, truth, this very important set of principles to him that he believed were revealed to him at that moment, a moment where he was about to kill Shasta, and revealed to him that, no, he should not kill [S.G.], he should bring her home.

RT 2163. Verlato further explained

He told me he was the only person that understood this truth, that knew this truth, and could convey his truth. Nobody else could do it for him, and really nobody else had this knowledge that he had received during this epiphany, and to the exclusion, basically, of even his attorneys couldn't exercise or explain this in court....[T]he system was evil, and in the courtroom the process of court did not lead to the truth and could not lead to the truth. Again, his definition of the truth.

Because of this, no attorney could ever get to the truth in a court of law. And the way that he described it was, as a lawyer I was deluded, I didn't know the truth, only he did, and any effort that I made for him in court would not lead to the truth.

55

RT 2168-69. Defense investigator **Debra Garvey** testified:

> The epiphany was on the mountaintop when he was able to decide --
> to recognize that Shasta had forgiven him, and he was able to decide
> not to kill her. And that brought him to a higher truth, to a different
> spiritual plane where truth could be found in all kinds of life
> experiences if people would just get out of the way of their judgments
> of things, of their preconceived notions about people, and let the truth
> come in.

RT 4667. Defense investigator **David Freedman** testified that Mr. Duncan's

> motivation was to open -- to allow humanity to gain what he had
> gained. He thought it was his mission and his task to bring the
> epiphany to others; that he was given a huge responsibility to allow
> others to experience the epiphany that he had experienced.
>
> And all of the -- I would put it in quotes, but decision-making
> that he was engaged in, all of the things that he talked about during
> the preparation of the case, were about how to allow humanity to have
> the epiphany. That was the motivation. That was the fundamental
> piece of his behavior as far as the case was concerned, was to act in a
> way that allowed the epiphany to occur for others. And that was his --
> he was especially chosen to do that, and he had a responsibility to do
> that.

RT 1698-99. Defense investigator **Jennifer Davis** explained that Mr. Duncan:

> would incorporate thoughts he had about books he was reading,
> television programs that he saw, things other people had told him
> about or just had read in the paper. And he would weave them all into
> an epiphany that occurred on the mountain and with one of the child
> victims in this case. And each time an element or elements of the
> weaving in of the stories could change, but they all led to the same
> epiphany.
>
> And it was a stream of consciousness on Joseph Campbell, Carl
> Sagan. It could be any number of things that he had read or seen. I
> have to admit, they didn't make a lot of sense to me.

RT 3375.

With the mere suggestion that the defense attorneys, investigators and

paralegals, while well meaning, might be disposed to exaggeration, the district

court refused even to acknowledge that such detailed and mutually consistent and

corroborative testimony was given.[8] The district court failed even to acknowledge,

much less consider, that this wealth of evidence was additionally corroborated by

the verbatim record and reliably-documented unrecorded statements.

### c. The Statements to Experts Are Consistent With Lay Accounts and Also Establish The Existence of Delusions and Psychosis

Defense experts spent dozens of hours talking with Mr. Duncan, and they

analyzed what he said to them. They also analyzed what he said to others where

those accounts were supported either by a verbatim record or reliable

documentation. Issues of the district court's attempt to discount their testimony on

the basis of supposed bias will be address in subsequent sections. For present

purposes, the discussion of what Mr. Duncan said he believes is limited to

---

[8] Speaking of all the defense team witnesses, the court wrote that "As the expert witnesses for both sides made clear, however, isolated statements do not, in and of themselves, show a person's mental state. The experts agreed that context is important when determining whether a particular statement by an individual may be a delusion or other evidence of a mental disease or defect. Here, isolated comments in the notes about dreams, aliens, religion and the like, as relayed by the mitigation investigators, are not overly compelling…" Order at 42.

As shown by the lay witness quotes and summaries of lay witness testimony in the accompanying text, this fundamentally misrepresents the evidence and alone should suffice to create a definite and firm conviction that a mistake has been committed.

statements documented by contemporaneous notes, and more importantly, the verbatim accounts.

### 1) Documented Statements Demonstrate Psychotic Thinking

From contemporaneous notes, Dr. Woods explained the delusional content of Mr. Duncan's epiphany. He saw an erotomanic delusion, defined as a delusion of love, in Mr. Duncan's statement to him: "And I loved, but I had to kill her." RT 5693. In referring to S.G., Mr. Duncan said to Dr. Woods, "She and I were the same. Nirvana." RT 5696.

> He then goes on to talking about S.G. "I saw that she was me." "My importance is through others." He then goes on -- so, again, we see this kind of both erotomanic, but this kind of loss of boundaries where "she is me," "we are one." We see these kind of psychotic collapsing of boundaries.

RT 5727. As an example of both a delusion of grandeur and a delusion concerning lack of volition, Dr. Woods pointed to Mr. Duncan's statement, "I was the instrument of the ultimate vehicle. God was driving." RT 5701.

Contemporaneous notes of Dr. Gur's interview reveal that Mr. Duncan told Dr. Gur, "It would make no sense to execute him because he has so much to offer as a result of his epiphany and special experiences that the world could learn from." RT 3772. The accuracy of the notes were confirmed on cross-examination, RT 3769-76, and they reveal that Mr. Duncan also said:

> On the mountain he had his epiphany - he saw things in a light that he had never seen them before and that made things clear to him

58

even though he can't articulate it - when he tried right after being arrested to articulate what the epiphany was, it was all gibberish - he could not articulate the wonderful things that happened on the mountain or what he saw and how it changed everything.

For instance, when be read the Bible before the epiphany, he saw it as just stories with many contradictions in it - where Jesus says one thing in one part but something contradictory in another. But after the epiphany, he realized that there are no contradictions and he began to understand the truth - when he meditates, first emptying his mind and then letting things come back into his mind after, he sees the answers more clearly and he has answers - for instance he has found references to evolution in the Bible - Jesus talks about evolution - so despite what many Christians think about what the Bible says, it actually describes evolution - the epiphany is also described in the Bible and the theory of relativity (which is in John) but he has also read the Koran and Jung and John Lennon songs and it is an the same, it is the epiphany described before and after - it is even in the song "shock the monkey" - he also was knocked out of a tree on the mountain and the tree was the delusional world he was living in, the constructs that society made got cleared away and the base of the very complex structure that he held was broken down - it is very hard for him to describe - but it was a sophisticated raise model of god which he no longer has.

Exh. GG at 1.

### 2)  *The Verbatim Record Also Reveals Psychosis*

Dr. Gur testified that on the basis of **recorded interview he conducted** with

Mr. Duncan that Mr. Duncan's belief is that

he basically lives in a different universe. He -- his universe interacts with ours, but what he's going through and what we are going through are somewhat tangentially related. In his mind, because of his role in the world is to have the epiphany and communicate it to the rest of the world. And that is very important so that the world changes.

59

And whatever happens to him in this trial is some sort of a -- he characterizes it as a farce. It is some sort of procedures or proceedings that really have not, not -- they have no important relevance to him.

* * * * *

[T]hat no matter what happens, he's too important to be executed. And that even if they sentence him to death, this is only one death and there are other deaths.

And that in reality, in his reality, he cannot be -- he cannot be -- he cannot be really dead since he has that connection with the upper intelligence that loves him and will protect him.

RT 3817-18. At the beginning of the recorded interview Mr. Duncan

articulated his delusion that the question of competency is not important. He conceded that the question of why he did what he did is more important, but he didn't think that even that question was the most important question. And it all relates to the epiphany.

From his angle, the trial we are going through is what has to happen in order for his epiphany to be communicated with the rest of the world, and then we will all realize that we are not doing the right thing and not asking the right questions.

That was, as he explained to me, the main question; and that was, from his angle, the whole purpose of this trial.

RT 3628-29. This was similar to a passage of the recorded interview with Dr.

Roesch, which Dr. Gur explained as follows:

If you go to page 79, he explains what would be the kind of rational decision he will make. And he says, "It's something that the world let me know through the way the world communicates, which is not, obviously not with words." And then he said, "I said, you know, it just said, 'Hey, it's time.'" And further down, "I recognize reason and rationale as a valuable tool, but it definitely is not useful for making decisions that are important."

60

> So if there is a question, can he make rational decisions, his response will be this, this, this is not how I make my decisions, this is the least important aspect of the decision-making process.
>
> He says, "The whole system is ludicrous because it's trying to apply reason to justice, to morality. You can't. That's one thing that reason doesn't care about and cannot do." So in his world view, reason has nothing to do with the proceedings here.

RT 3636-37.

While testifying, Dr. Kalechstein reviewed the verbatim record of Mr. Duncan's interview with Dr. Roesch and explained how his statements regarding his decisions reflected nothing like the rational judgment that killing is reprehensible and acceptance of responsibility admirable. Dr. Kalechstein pointed to Mr. Duncan's statement to Dr. Roesch that

> "The choice to return [S.G.] came from someplace other than myself. And I recognized fully that it wasn't my choice." That would be an example of a control-type delusion. … [H]e talks about not taking credit for the decision. It was something that was prearranged.
>
> Something better that as a society we decided. So the idea, once again, is that his behavior is in the control of a powerful entity rather than himself.

RT 5207. *See also* RT 5205-06 (statements to Dr. Roesch that the system "is a living being and entity that has intelligence of its own"). As to S.G. herself, Dr. Kalechstein relied on the statements to Dr. Roesch that in particular,

> "With her the barriers broke down and it became much, much more immediate. Where suddenly everything I knew, she knew."

61

And it goes to his general thing that somehow people can communicate without words and that somehow he communicated with [S.G.] without words ever having been exchanged

\* \* \* \* \*

He talked about his belief that, quote, [S.G.] had not been, quote, "passed through that fire," end quote. And quote, "not been taught to deceive," end quote. And then, quote, "was a natural child," end quote.

RT 5211.

As to the effects of the trial, Dr. Kalechstein pointed to the Mr. Duncan's

interview with Dr. Roesch:

> "I had hoped that the trial might be a platform that the truth would use through me. But in order for that to happen, I would have to clear the way in myself, my mental blocks that I have alluded to several times in this conversation, that prevent me from being Jesus."

RT 5210.

### 3) *Even the Statements to the F.B.I., Contrary to the District Court's Characterization, Reveal Psychotic Thinking*

Even Mr. Duncan's statements to the F.B.I, support this view. During his

FBI interviews he said the follow:

> My only responsibility, this is my responsibility in trial , my responsibility throughout all this and what I have come to understand, is simply honoring the truth and then letting the truth take care of everything else.

Exh. 2 at 4034.

> And that's, and that's kind of my, my thing is that, why I try to, my lawyers keep saying, "Well, how are people going to know?" And I'm, I'm like, "Well, how are they not going to know?" Ya know, it's

62

like, it's like, it's like what they're saying to me is like, I guess one way to try to put it to 'em, and I told them this too. I said it's like, it's like I'm explaining to you about gravity, I'm, I'm Newton, and I'm telling you about gravity and your first question is, - Oh my God we've gotta tell the world, everybody's gotta know or else it's gonna fall apart. "No, it's not." It's already there and it works and it does a beautiful job and it does what it's supposed to do.

Exh. 2 at 4249-50.

It's not gonna learn it by me fighting in trial. It's not gonna learn it by me appealing my case. It's not gonna learn it by me standing up and preaching to people about it. The only way that society is going to learn it is if I step back and say, I'm sorry. That's what Shasta did for me. You know, I attacked her. I wanted her to fight me. Dylan fought me.

Exh. 12 at 4361.

J.D .... the thing that, the context that's missing, in, in, in both cases, you know, whether it's me being convinced by my experience or you being convinced by yours, is, uh, is what's outside of our experience. And that is where you have to go to really be able to understand what deception, what self-deception is about. You know, because if you don't go outside your own experience you will never get past your own self-deception. Because, uh, almost invariably, all deception is supported by a person's experience. But unconsciously, and this is where the mind is a, is a, is a really, a devil, you know, is, uh, is we unconsciously, uh, our, uh, create our experiences. And, uh, to support ...... our release. And this is a very well known phenomenon. But it's a very under-estimated power. It's a very underestimated, uh, phenomena also, about how much it prevents us from being able to see things in a truer light. In a, in a, in a more, uh, uh, meaningful, uh, way of looking at things. And anyway, um, what, so what I'm tryin', and it's hard to say, it's hard to really kind of, that's generally what I'm, general terms that I'm using right now. I, like to try to, to, to try to get as specific as I can, even if it doesn't make any sense right now, maybe someday later on it might make some sense to you. Um, or maybe it's just total b.s. and I, and I can admit that too. I'm just

63

saying that based my experience, which is limited, you know, I, I acknowledge that.

Exh. 12 at 4421

### 4. The "A-Ha" Moment Theory Is Incredible on its Face

The "a-ha moment" theory is unsustainable in light of all the evidence. But even if that were not the case, it is inherently incredible. The district court and Dr. Rath would treat Mr. Duncan's self-proclaimed epiphany as if it were simply the morally correct decision, emerging from a final round of premeditation and deliberation, to withdraw from the previously-conceived murderous course of action. There is, however, nothing in Mr. Duncan's account that suggested an appreciation that it is and was at all times self-evident that murder is wrong, or that somehow he had regrettably lost sight of that moral truism. Quite the contrary. In determining that it would be wrong to kill S.G., Mr. Duncan came upon some unique knowledge that if only the rest of humanity could come to understand – and understand only if Mr. Duncan chose not to lead humanity to that understanding with words – an utter transformation of society might emerge.

On top of that, all of his repeated attempts to describe a precept so easily grasped that most kindergartners could state it plainly, *i.e.*, murder is wrong, are fundamentally vacuous. That Mr. Duncan's change of heart was not borne from a moment of clarity is obvious from the fact that there is nothing clear about it. As Dr. Kalechstein explained:

64

The other issue or another factor that reflects delusional thinking rather than an elaborate rationalization [sic: realization] is the fact that the things Mr. Duncan says really don't make sense. Once again, no one really knows what the epiphany is; no one really knows what the truth is.

And when you look at the illogical thinking, his inability to explain these concepts, along with the evidence of different kinds of thought-disordered thinking, it makes it more, from my perspective, more reasonable to interpret Mr. Duncan's statements from the perspective of that of an individual who is experiencing a thought disorder rather than a person who is just creating an elaborate rationalization [sic: realization]

RT 5226-27.

Similarly, Mr. Duncan told Dr. Roesch: "I had hoped that the trial might be a platform that the truth would use through me. But in order for that to happen, I would have to clear the way in myself, my mental blocks that I have alluded to several times in this conversation, that prevent me from being Jesus." *See* RT 5210 (Dr. Kalechstein quoting interview).

As to the supposed realization that his prior criminal behavior was wrong – a realization that the "moment of clarity" theory presupposes – he told Dr. Roesch,

The system is deluded. The reason I went and did the crimes I did is because I suffer from the same delusions. But the delusions that I was given were given to me to cause me to do what I did, and the delusions that are given to you to cause you to do what you do. You know, but we work together. You know, you can't have one without the other. There has to be criminals in order for there to be good people.

RT 5217 (Dr. Kalechstein quoting Dr. Roesch interview)

It was not only the defense witnesses who disagreed with Dr. Rath's characterization, but one of the prosecution witnesses as well. Dr. Kirkish conceded that the epiphany was not an ah-ha moment but something that transformed Mr. Duncan in a very fundamental sense. RT 1256. At the heart of it was the girl who he believed loved him. *Id*. By bringing her back, he was trying to learn to love the System the way she loved him. RT 1257. During the recorded interview with Dr. Roesch, Mr. Duncan talked in detail about the epiphany without prompting. Mr. Duncan came back to it in response to almost every topic Roesch asked about, referring to it obsessively. RT 2110-11.

The evidence summarized above demonstrates the utter unreasonableness of treating Mr. Duncan's belief system as a sudden insight akin to finally understanding (apparently for the first time at age 42) that murder is a sin and honesty is the best policy. Not only is it disingenuous to try to peel away every florid detail (*e.g.*, S.G. and he became one, the greatest sin is turning away from Truth, Truth cannot be communicated with words, but only demonstrated) but even this hollow shell bespeaks utter irrationality.

Appellant has no quarrel with the notion that a person experiencing second thoughts and remorse might rationally chose to surrender and accept responsibility. Try as Dr. Rath and the court might, that is not the experience Mr. Duncan described. What the rest of us see as self-evident moral axioms, he sees as his own

66

discovery, note experienced or yet learned by others and imbued with a level of meaning and paramount significance that only those at his level could comprehend. He believes that rape and murder pale in comparison to the deification of children as false gods, and even more so in comparison to the failure to pursue Truth. Only by attempting to take no action that might tend to lead society toward Truth can he help society attain it. He believes the only way he can help society discover truth is to do nothing intended to provide that help. This is insane.

No one could—and at the hearing no one did--disagree with the observation that Mr. Duncan's decision to abandon his plan to murder S.G. was a good thing. See Order at 34. The evidence shows that Mr. Duncan's morally correct action resulted from a completely irrational thought process. More importantly, it is not the conviction to bring S.G. back that is in question. It is the conviction that society's fate hangs in the balance of his decision whether or not to endorse an appeal.

### 5. The District Court's Conclusion that Mr. Duncan's Mental Disorders Do Not Limit His Capacity For Rationally Deciding Whether to Appeal Is Both Clearly Erroneous and Infected By Legal Error

The court began its analysis with the question whether Mr. Duncan has a mental disease, defect or disorder. While "acknowledg[ing] that the Defendant made some strange statements at times," Order at 33, court ultimately finds that

67

Mr. Duncan had a "major" mental disease or defect. Order at 32, 35; *see also id.* at

64 ("The Defendant is likely suffering from a mental disease or defect to the extent

discussed in this Order.") The court explained that "there exists a broad spectrum

of possible mental diseases or defects ranging from minor personality disorders to

more severe and extreme major mental illnesses and brain defects. Individuals may

fall anywhere within that spectrum and experts may disagree as to where on the

spectrum a person's mental condition falls." *Id.* at 31-32.[9] In fact, the court later

stated that all of the testifying experts in the case "offered varying diagnoses, with

*each testifying that the Defendant may very well have had a mental disease or*

*defect*." Order at 48 (emphasis added).  Indeed, three times in the order, the district

court characterized the defense expert testimony that Mr. Duncan's disorders were

more severe than the prosecution's experts considered them as "interesting." Order

at 25, 35, 48.

The testimony suggests the absence of any clear line dividing major mental

illness from mere personality disorder. Dr. Engle saw symptoms in Mr. Duncan

that are typically associated with psychosis, *i.e.*, circumstantial and tangential

---

[9] What the court meant by "major" mental illness is not entirely clear, as that
phrase was never defined by any of the witnesses. It appears that the court was likely
referring to an "Axis I" diagnosis, which Dr. Rath – but none of the other experts –
contended was a necessary predicate for an incompetency finding. RT 884-85. That,
however, is not a correct statement of applicable law. *See United States v. Murdoch*, 98
F.3d 472 (9th Cir. 1996).

68

speech, RT 240-41, 254, but not at a level he would expect to see with a "more severe psychosis individual." RT 242. Dr. Engle had difficulty following parts of what Mr. Duncan had to say. RT 254. As a subjective matter, RT 374, he felt that when Mr. Duncan talked about his epiphany the ideas did not rise to the level of a delusion. RT 255. Dr. Engle administered an MMPI-2, "the gold standard for psychologists in assessing personality," RT 265, and he wrote in his report that "[m]any people with a similar profile manifest clearly psychotic behavior. Their thinking may be described as autistic, fragmented, tangential, and circumstantial; and thought content may be bizarre, difficulties in concentrating and attending, and deficits in memory are common. Affect may be blurred, and speech may be rapid and at times in incoherent." RT 391.

Dr. Low testified that at age 19 Mr. Duncan was diagnosed with sexual sadism and passive-aggressive personality, with schizoid features, RT 597, and that schizoid personality is "considered to be along [the] spectrum" of delusional disorder or schizophrenia. RT 661. She wrote in her report to the court that Mr. Duncan's refusal to cooperate with her precluded an opinion to a reasonable degree of scientific certainty, but in court she nonetheless opined that Mr. Duncan had been competent to stand trial. RT 631, 633-34.

Dr. Kirkish found Mr. Duncan to have a unique and "highly extreme" belief system, RT 1172, "amalgamating some aspects of psychology and philosophy and

69

various religions and the concept of love and oneness and cosmic consciousness." RT 1287, 1172. She considered it very difficult to decide whether his beliefs were delusional or merely idiosyncratic. RT 1168. She felt that reasonable minds could differ on the question. RT 1169. Dr. Kirkish testified that "there are aspects of his personality that are certainly problematic features" with regard to symptoms of a mental disorder. RT 1133. She testified that "there certainly are features that I found consistent" with "schizotypal personality disorder." RT 1177-78. Reading from the DSM definition, she indicated that such "individuals may be superstitious or preoccupied with paranormal phenomena that are outside the norms of their subculture," and they have "ideas of reference," incorrectly interpreting "casual incidents and external events as having a particular and unusual meaning specifically for that person." RT 1175-76. Individuals with schizotypal personality disorder are often suspicious and may have paranoid ideation, which, Dr. Kirkish agreed, are at the very heart of a competency determination. RT 1181.

Dr. Rath did not make a formal diagnosis because "the psychotic condition and exact diagnosis underlying a finding of incompetence would not be as important as how any mental illness reflects upon his functioning." RT 910. Significantly the court's lack-of-psychosis conclusion was expressly tied to Dr. Rath's plainly defective view of Mr. Duncan's belief system: the mere "a-ha moment." In rejecting the expert opinion testimony that Mr. Duncan was

delusional, the court expressly found that "[t]he Defendant's Epiphany was not a delusion but was instead, as Dr. Rath testified, a 'sudden insight' or 'realization.'" Order at 33. Similarly, with regard to testimony regarding organic brain dysfunction, which the court termed "interesting," Order at 35, the court rejected the hard science of its existence in favor of the circumstantial evidence that if he possessed such deficits the prosecution experts would have seen the signs and symptoms of it, *id.*, *i.e.*, they would have found him delusional.

Since the district court made the opinion – and the entire finding about mental disorder -- stand or fall with the opinion regarding delusion, it is appropriate to start there.

### a. The Court Misapplied *Rees* Standard

The findings of the trial court induced by an error of the law are not binding. *Smallfield v. Home Ins. Co.*, 244 F2d 337 (9th Cir. 1957). This court will treat a district court finding as clearly erroneous not only if it is without adequate evidentiary support, but also if it was induced by erroneous view of law. *Ritter v. Morton*, 513 F.2d 942 (9th Cir. 1975).

In considering whether Mr. Duncan was competent to waive appeal, the district court erroneously required a much greater incapacity than that required by the governing Supreme Court standard. Instead of finding him incompetent due to a substantially impaired capacity for rationality with regard to deciding whether to

71

appeal, the district court required a total incapacity not only with regard to appeal but to other matters as well.

It is well established that at all times before his conviction, a defendant must have "a rational as well as factual understanding of the proceedings against him" and "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *Dusky v. United States*, 362 U.S. 402, 403 (1960) (per curiam). It is also clear that a condemned prisoner contemplating abandonment of post-conviction review must have the additional "capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation," free from "mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Rees v. Peyton*, 384 U.S. 312, 314 (1966) (per curiam). *Accord*, *Mason v. Vasquez*, 5 F.3d 1220 (9th Cir. 1993).

The parties agreed that *Rees* was the correct standard. Doc. 735, 832. In both its opening and reply briefs, the Government expressly stated that a mental disease, disorder, or defect substantially affecting the capacity for a rational choice would satisfy *Rees*. Doc. 735 at 2; Doc. 832 at 2.

Borrowing from *Rumbaugh v. Procunier*, 753 F.2d 395, 398 (5th Cir. 1985), the district court imposed a different, more stringent requirement – whether any disease or disorder from which Mr. Duncan suffers is such as to "*prevent* him from making a rational choice." Order at 5 (emphasis added); *see also id*. at 36, 49. At

72

least four times the court stated the test and its conclusion in accord with

*Rumbaugh*'s test of absolute incapacity. *See* Order at 46 ("The Defendant

understood his legal position and the options available to him and he was *not*

*prevented* by any mental disease or defect from making a rational choice among

his options."); at 59 ("The Court finds the Defendant is *not prevented* by any

mental disease or defect from making a rational choice among his options."); at 64

("[T]he Court finds by a preponderance of the evidence that ….[t]he mental

disease or defect [from which Defendant suffers] *did not prevent* him from making

a rational choice among his options."); at 65 ("Any symptoms of a mental disease

or defect that were exhibited by the Defendant *did not ...prevent* him from making

a rational choice among his options.") (all emphasis added).

Only in the final two sentences of a 12 ½ page section of the order captioned

"If the person is suffering from a mental disease or defect which does not prevent

him from understanding his legal position and the options available to him, does

the disease or defect, nevertheless, *prevent him* from making a rational choice

among his options?," Order at 5 (emphasis added), does the district court approach

the correct question of impaired capacity: "The decision was not motivated, driven,

or caused as a result of any mental disease or defect on the part of the Defendant.

The decision was a rational choice based on his acknowledgment of his guilt for

the crimes charged and his decision to no longer participate in the process." Order

73

at 63. The entirety of the preceding 12 pages was devoted to the reasons the court

believed that despite Mr. Duncan's mental problems he still possessed some

rational capacities. The statement that his decision not to endorse appeal was not

"motivated, driven, or caused" by mental illness does not follow from any of the

preceding discussion. Read in the context of a concluding, summarizing statement,

it is difficult to treat it as a legitimate alternative finding.

As the district court suggests, a decision not to endorse appeal in some cases

would undoubtedly be a rational way to implement a decision not to participate in

the process. But on the facts of this case, that analysis stops short. As shown

throughout this brief, the decision not to participate in the process is the result of

mental problems. The question whether Mr. Duncan's mental problems

substantially affect his capacity to rationally to decide whether or not to participate

in appeal is not seriously addressed in the order.

*Rumbaugh*, which plays a central role in the district court's decision, did not

involve an issue of substantially impaired capacity. The next friends in *Rumbaugh*

contended that Mr. Rumbaugh was incompetent to waive review because suffering

from severe depression. 753 F.3d at 358. The Fifth Circuit rejected this claim of

incompetency based on its conclusion that suicide is not an irrational or even

unusual response to a "person who finds his life situation intolerable and who

welcomes an end to the life experience." *Id*. at 403. Cases in this circuit are in

74

accord. *See*, *e.g.*, *Dennis v. Budge*, 378 F.3d 880, 889 (9th Cir. 2004); *Massie v. Woodford*, 244 F.3d 1192 (9th Cir. 2001). That analysis has no application to a case where the defendant will not endorse an appeal because any hope of society being enlightened – with the realization that turning away from the Truth is a crime immeasurably greater than rape and murder – will be lost if he attempts to interfere with the free choice of the intelligent entity that we, the unenlightened, know as the criminal justice system.

The overwhelming weight of uncontradicted evidence is that Mr. Duncan's belief that his noninterference will result in a transformation of society's awareness is at the root of his prior refusal to endorse an appeal. It leaps from the pages of his Pro-se Affidavit, summarized above. It is the predominant theme of his responses to the court's inquiry at the waiver hearing. *See* Section V.A.3.a, *supra*. The district court ignored all this evidence and more.

The defense experts described how Mr. Duncan's prior refusal to endorse the appeal was based on his beliefs that it could help advance civilization. In the recorded interview with Dr. Gur, Mr. Duncan describes his realization that he and S.G. "were he same person." Exh. F (unredacted) at 284. Describing how his words (e.g., an appeal in his name) would lead Society off the path to understanding, he "explained":

> You have to come to that understanding through your own
> means. And unless you come to that understanding by your own

75

means, it's meaningless, which is the problem with modern religions in the world is you have all these people who think they know about heaven and god and Jesus because of what they were told. But not a single one of them have ever experienced it directly. I have. I know what the Bible talks about. I know what Buddha means. I know what Ghandi meant. [¶] I know what John Lennon meant in his songs, and all these other people and this book I'm reading by the Gopi Krishna character about the Kundalini and about Carl Jung when he wrote about it in scientific terms. I know what they're talking about. They knew what they were talking about because they experienced it. I know what I'm talking about because I experienced it. My problem is that I have a hard time putting it into words, which is why I think about it and read about it and try to study it so that I can better put it into words so that other people might be able to understand that they don't know.

*Id.* at 30.

In conversation with Dr. Woods, Mr. Duncan explained his doctrine of

noninterference:

I believe the appeal interferes with society's innocence. It allows everybody involved to do what they are doing. The appeal process allows the individual," which is what he is against. "The real reason is infinite. Infinite cause with infinite consequences."

RT 5797.

Even the prosecution experts acknowledged the connection between the

belief system and his desire not to affect the course of proceedings. *See*, *e.g.*, RT

1128 (Dr. Kirkish testifying that "he would not participate in a defense where he

would couch or obscure things that he had done in order simply to save himself.

The higher order for him at this point was to share these insights.") Indeed, Mr.

Duncan told Dr. Kirkish that his plan for non-participation was predetermined by

76

the epiphany. RT 1269. He said, "I don't fight the system, and so it is childish and I won't fight it. If I fight it, it will give it power. Trying to forgive this entity. Tried to love it the way she [the little girl] loved me." "If I can bring this to the world's attention, I can change the world."[10] Mr. Duncan said told her it was his mandate to share this epiphany." RT 1274.

Dr. Roesch agreed that there was a connection between Duncan's views and the decisions he made in this case, including whether to represent himself and whether to appeal, and said that the basic dispute is whether Mr. Duncan's belief system is delusional, which even he concluded was a fairly difficult distinction to make. RT 1903-04.[11]

### b. The *Rees* Error Led the District Court to Overstate the Importance of Areas of Strength

The district court's failure to recognize that the *Rees* test of incompetency is satisfied by a mental illness that substantially impacts, but does not completely eliminate, rational decision, spills over into other areas of the court's analysis. The court erroneously concluded that rational or goal-directed behavior with regard to decisions other than whether or not to appeal precludes a finding of incompetency.

---

[10] At that point in the interview, Dr. Kirkish wrote in her notes "1368," the California Penal Code section regarding incompetency. RT 1251.

[11] Elsewhere Dr. Roesch testified that there was no causal link between Mr. Duncan's belief system and his decision, RT 1857, but his testimony was rejected by the district court.

See Order at 37-49. The court similarly concluded that evaluations for questions

other than competency to waive appeal, *e.g.*, competency to stand trial or represent

himself, have some bearing on the *Rees* question, apparently because they bore on

the issue whether or not Mr. Duncan suffers from total incapacity.[12]

   Notwithstanding the district court's extreme emphasis on particular

examples of seemingly rational goal-directed behavior, their bearing on the issue

of impaired rationality as to the particular question whether to appeal is marginal at

best. The defense never contended that all of Mr. Duncan's actions bore the

hallmarks of psychosis.

   *Rees* makes clear that the question is not global incapacity, but the capacity

for rationality "in the premises," 384 U.S. at 314, *i.e.*, with regard to the decision

whether to appeal. Dr. Kalechstein explained that Mr. Duncan's

> thought processes and thought content were] variable…. [W]hen he
> discussed relatively neutral topics, they were logical and goal—
> oriented. In contrast, when discussing his offenses, formative sexual
> experiences, and his epiphany, his thought processes were disjointed
> and his thought content was bizarre

---

[12] Even the court's struggle with the question whether Mr. Duncan has any mental disease, disorder or defect is emblematic of the problem. *See, e.g.*, Order at 8 ("On the question of whether the Defendant suffered from a mental disease or defect, the conclusions or diagnosis of the experts were somewhat varied."); *id.* at 11-12 (quoting Dr. Engle's opinion that Mr. Duncan was not "suffering from a mental disease or defect *rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings* against him or to assist properly in his defense." Order at 11-12, (quoting Gov. Ex. 22 at 9-10) (emphasis added)).

Exh. H at 27. Even Dr. Low admitted that there are people with paranoid delusions "who can maintain functional intelligence in kind of a circumscribed way" and that she had even "seen some of those people." RT 1244. Similarly, Dr. Engle testified that there is no real connection between mental illness and IQ. RT 343.

The district court repeatedly referred to Mr. Duncan's above-average intelligence to counter the claim of incompetency. *See, e.g.*, Order at 13, 15, 37-38, 39, 42, 49. At the same time, the court barely mentioned the testimony of Dr. Amador at all, let alone his detailed explanation of the ability of high functioning, intelligent psychotic patients to appear normal.

Dr. Amador explained that patients who are intelligent and do not believe they are ill can explain away delusional thinking as abstract, philosophical or even political positions. RT 4024-25. Intelligence, coupled with a desire to appear normal, results in abstract explanations of delusions that are highly intellectualized. If taken in short snippets instead of the broader context, they may appear nondelusional or nonpsychotic. A person presently suffering from a thought disorder is not necessarily incapable of clear and intelligent articulation. Psychosis is not mental retardation or developmental disability. RT 4029-30. Some individuals have not only the ability to hide psychiatric symptomatology but also to exhibit exceptional functioning in some domains, despite the mental illness. Dr. Amador gave the example of John Nash, the schizophrenic professor at Princeton

79

who won the Nobel Prize in mathematics. He is the subject of the book and the movie "A Beautiful Mind." RT 4063-64. Dr. Amador has seen similar patients in his own practice but could not provide details due to doctor-patient privilege.

Dr. Merikangas similarly testified that one can be psychotic and have a high IQ. RT 3012-13 (testifying that saying "he is intelligent, sounds intelligent, is [not] a rule-out for a diagnosis of psychosis or psychotic symptoms") Dr. Engle agreed. RT 342-43 (stating that he was unaware of any relationship between mental illness and intelligence, other than extreme mental illness tending to cause intelligence to deteriorate.)

Once the *Rees* standard is properly understood, much of the Order is seen as simply irrelevant. It is clear time and again that what is most critical to the district court is Mr. Duncan's ability to function well in some environs. *See, e.g.*, Order at 37 ("lengthy discussions with the Defendant reveals he was well read and intellectual in his ability to think, plan, communicate, and write"); *id.* ("the Court finds the fact that the Defendant was remarkably consistent in the ideology he expressed to others to be demonstrative of his intelligence and the amount of thought he gave to the subject. This coupled with the amount of detail and thought the Defendant put into planning and executing his crimes, as evidenced in his interviews with law enforcement, the Court finds, reveals the Defendant's acute ability to prepare, plan, think, react, and reason within at least a normal/average

80

level of rationality"); *id.* at 41 (viewing Dr. Gur's opinion "carefully and find[ing] it does not take into account the entire context of the Defendant's conduct, behavior, and statements in light of all the circumstances in this case – *particularly when the Defendant was in court*.") (emphasis added); *id.* (Dr. Gur "did not actually observe the Defendant's conduct at the trial and hearings in this case."); *id.* at 42 ("These [lay] witnesses, the Court finds, were credible in their testimony and generally described the Defendant during the relevant time period consistently as polite, communicative, intelligent, and understanding of his circumstances. All of these witnesses testified that the Defendant acted and spoke appropriately for the specific situation of their encounter with him."); *id.* at 43 ("The staff where the Defendant was housed in 2008 all consistently described the Defendant as behaving rationally, being cooperative, and able to respond appropriately to their questions. Although brief, the prison staff interacted with the Defendant face to face and on a regular basis."); *id.* at 45 ("The Court itself has observed the Defendant throughout these proceedings and finds his behavior evidences his understanding and ability to assist and confer with counsel. The Defendant was attentive and participated throughout the proceedings."); *id.* at 48 ("The record shows that the Defendant understands the legal process involved in charging a person with a crime, the Government's burden of proof, and his constitutional rights in the process - including his right to counsel, his right to represent himself,

81

and his right to appeal. The Defendant demonstrated time and time again in this

case that he had a firm understanding of his legal options and the impact of

waiving his appeal.")

> This Court has observed first-hand the Defendant's demeanor and conduct and has itself interacted with the Defendant for quite some time throughout these entire proceedings; including the particular time period in question. During this time, the Court personally engaged the Defendant in regards to his decision to waive his appeal as well as other matters and viewed his responses to the same. Having this first-hand, in-person view of the Defendant, the Court found him to be competent at the time and is now even more firmly convinced that the Defendant understood his legal options. This Court's own impressions of the Defendant are that he was clear in his thoughts, intelligent, had a complete understanding and knowledge of the proceedings and his options, and that he understood his legal position and the options available to him. Based on the foregoing, the Court concludes that any mental diseases and/or defects suffered by the Defendant did not prevent him from understanding his legal position and the options available to him in 2008 when he waived his right to appeal. The Defendant had both a factual and rational understanding of the legal proceedings against him as well as the options available to him.

*Id.* at 49.

> The Court finds some of the best evidence of the Defendant's ability to make a rational choice among his options are his own words concerning his purpose, state of mind, and detailed/thorough planning of his actions; all of which he was able to skillfully carry out in committing these grizzly crimes. The Defendant himself stated his motivation for choosing to commit these crimes was the abuse he received in prison and his desire to seek revenge against society for his having suffered that abuse. (RCHT, Day 1 at 73.) He carefully planned in intricate detail the crimes he would commit to seek his revenge so as to avoid detection by law enforcement and not be apprehended. (RCHT, Day 1 at 94-102, 136-138, 143-144.)

*Id.* at 50-51.

All that is thoroughly beside the point. Under *Rees*, it is not whether a defendant lacks the capacity to do any or all of the above, or even to plan a crime, see Order at 29, 52-53, or to describe his crimes to the FBI, *id*. at 54, but whether his capacity to decide whether to appeal is free from any substantial influence of a mental defect, disease or disorder. That Mr. Duncan suffers from such a disorder with such an effect is conclusively established by the overwhelming weight of evidence adduced at the hearing.

### 6. Even the Supposed Assessments of Credibility Themselves Fail to Withstand Scrutiny

As noted previously, the district court put great emphasis on its personal assessment of witness demeanor. The court emphasized the importance of hearing testimony live testimony, Order at 7-8, but in the final analysis admitted to learning nothing of value in the process despite hearing from more than *two dozen* defense witnesses. In the court's view, none of what *any* of these witnesses said was anything more than "interesting."

The court wrote that the Government's lay witnesses "law enforcement officers, jail deputies, prison intake personnel, and [prison] mental health clinicians" gave an "accurate and unbiased view of the Defendant." *Id*. at 41-42. In the court's view these prison and law enforcement officials "had no motivation one way or another in regards to their interactions with and observations of the

83

Defendant." *Id.* at 44. As to the Government's experts, the court noted that "[t]hey were not hired by either party in this case but were instead independent experienced court-appointed competency evaluators." *Id.* at 32.

On the other hand, the court credited *none* of the witnesses called by the defense. The court found Dr. Gur's testimony "interesting, but his conclusions somewhat questionable." Order at 25. Dr. Woods' testimony was "perhaps less reliable than other witnesses" because he "clearly was a part of the defense team from early on." *Id.* at 31. Although the court did not "doubt the sincerity of the mitigation investigators or any of the defense team," it rejected, or at least discounted, their testimony because they were working "to detail and record anything that would weigh in favor of mitigation and avoid the death penalty," *id.* at 44, *i.e.*, doing the work they had been appointed to do. Their contemporaneous notes were deemed "skewed" even though they were not made "primarily anticipation of them becoming evidence in the case" but "were written as summaries of the defense team's discussions with the Defendant as they perceived them to be." *Id.* at 45 n. 28.

As described below, the district court clearly erred by not simply taking the defense experts' testimony with a grain of salt – as it was clearly entitled to do – but by ultimately rejecting ***everything*** they said under the guise of needing to handicap their opinions for potential exaggeration. Quite disingenuously, the court

attempted to sweep it all away with the observation that "isolated statements [can

be] taken out of context and twisted so as to appear delusional, irrational,

unreasonable, and thus form an argument for incompetency." Order at 64. We have

already shown that the defense case was built on solid evidence: the proof that the

Epiphany is far more than a mere "a-ha" moment is overwhelming, and the Mr.

Duncan's disordered thinking is manifested in the verbatim record.

In general terms, the district court summed up its credibility findings as

follows:

> [T]he Court finds the testimony of Dr. Engle, Dr. Low, Dr. Rath, and
> Dr. Kirkish to have been unbiased and the most credible. Those
> experts concluded that the Defendant did not suffer from a mental
> disease or defect aside from a possible personality disorder. Most
> notable was the compelling testimony of these witnesses' on cross
> examination where they provided reasoned and sound basis for their
> analysis and conclusions regarding the Defendant. The testimony and
> reports of these court-appointed experts demonstrated that they had
> interviewed the Defendant, considered a voluminous amount of
> material from both sides, and had sufficient time to complete their
> evaluations. They were not hired by either party in this case but were
> instead independent experienced court-appointed competency
> evaluators. Furthermore, their reports and interactions with the
> Defendant occurred closest to the time period in question on this
> retrospective competency hearing.

Order at 32 (record citations omitted).

The reasons this analysis cannot withstand scrutiny are discussed below.

85

### a. The "Compelling" and "Sound" Opinion Defended On Cross-Examination Presuppose An Objectively Erroneous View of the Facts

Even assuming a district court analysis free of confirmation bias, it is clear that what was "compelling" to the court and backed by "reasoned and sound" analysis were the opinions that: (1) Mr. Duncan's Epiphany was nothing more than an a-ha moment of recognition; and (2) the abnormal thought processes evidenced by his tangential and circumstantial speech does not rise to the level of a thought disorder. *See*, *e.g.*, Order at 32 (finding the testimony of Dr. Engle, Dr. Low, Dr. Rath, and Dr. Kirkish "that the Defendant did not suffer from a mental disease or defect aside from a possible personality disorder" to have been "the most credible.").

> The Court also finds the conclusions of these experts that the Defendant was not suffering from delusions, hallucinations, telling speech patter[n]s, or other symptoms of a major mental disease or illness to be well supported in the record and credible. In particular, the Court agrees with their conclusions as to the Defendant's ideology and beliefs. The Defendant's Epiphany was not a delusion but was instead, as Dr. Rath testified, a "sudden insight" or "realization." In making this statement, Dr. Rath recognized that "[n]obody who was reasonable would disagree that the Defendant has problems." The Court finds this statement to be accurate in describing the Defendant in this case.

Order at 33 (footnote and record citations omitted).

Thus, the prosecution's expert opinion evidence, and the court's reliance thereon, depends on the validity of the underlying premises – that the Epiphany

86

Case: 13-99011 08/04/2014, ID: 9193081, DktEntry: 17-1 Page: 96 of 170

involves no distorted fantastical world view and that Mr. Duncan's speech patterns reveal no disordered thinking. The invalidity of the premises has already been discussed in detail, and the district court's additional attempts to bolster the prosecution experts' testimony are all unavailing.

### 1) *The Prosecution Experts Conceded the Issue was "Thorny"*

Curiously absent from the district court's order is any substantive discussion of how close many of the prosecution's experts considered the questions presented. Dr. Engle conceded that Mr. Duncan's speech pattern "could be" indicative of a mental disorder. RT 241. In response to a series of hypotheticals, Dr. Engle agreed that many of the things Mr. Duncan is reported to have said to others would be consistent with a variety of types of delusions. RT 375-80.

Dr. Low initially contended that Mr. Duncan's refusal to be interviewed precluded her from rendering an opinion to a reasonable degree of medical certainty, but ultimately recanted that statement – rather unconvincingly – on the stand. As the district court noted, Dr. Low was questioned about whether particular statements Mr. Duncan was reported to have made to others evidenced delusionality, and "she responded repeatedly that more context and/or questioning would be needed to determine whether the statement was a delusion or not," Order at 17, acknowledging thereby that the statements could be delusional.

Dr. Kirkish testified that the case presented a close question, saying that "it's very difficult" and "very thorny" to decide whether Mr. Duncan's highly idiosyncratic belief system was delusional or not. RT 1168-69. She said that although Mr. Duncan's ideas "occur in some pretty mainstream religions and philosophies, the way he had put them together and what he had done, the behavior that had manifested was highly extreme." RT 1171-72. Dr. Kirkish did not disagree that Mr. Duncan's reported statements to the defense experts were delusional, RT 1169-71, but because Mr. Duncan did not say similar things to her, she disregarded what he told everyone else, including doctors and law enforcement personnel, in forming her opinions. RT 1228. When Dr. Kirkish reviewed the printout of Mr. Duncan's MMPI just before she testified she saw the paranoia elevation and said to herself "Oh, my gosh. This is almost 100 T-score. *This is very high.*" RT 1204-05, emphasis added.) She testified in Riverside that her notes "are quite -- are a bit jumbled because he would bring things in that were relevant to him at that moment but were not perhaps restricted to the specific focus of the question." He would raise topics that were not necessarily relevant to her question. RT 1219-20.

Dr. Roesch gave similar testimony. *See, e.g.*, RT 1904-05 (Dr. Roesch agreeing that determining whether a belief system is delusional or not can be difficult and reasonable minds can differ whether an idiosyncratic belief system is delusional or not.) He said that there are "gray-area cases" in which a clear

88

decision about competency or incompetency could not be made. That would

possibly include a case like Duncan's, given the symptom presentation. RT 2114-

15.

### 2) *The Court's Comments Regarding Cross-Examination Lack Substance*

The district court repeatedly claimed that the prosecution experts' handling

of cross-examination added to the force of their opinions. *See* Order at 32 ("Most

notable was the compelling testimony of these witnesses' on cross examination

where they provided reasoned and sound basis for their analysis and conclusions

regarding the Defendant."), at 12 ("Having viewed this cross examination in

person and having considered the points raised by the defense, the Court finds Dr.

Engle's report and testimony to be credible and valuable in resolving the question

presented here."); and at 18 ("Both of these witnesses were heavily cross examined

concerning their reports and conclusions. The Court found both witnesses'

testimony to be credible, particularly in light of their responses to the cross

examination by the defense."). The court also stated the converse -- it was not

persuaded by the defense experts due in part to a few isolated an unspecific aspects

of their cross examination.[13] *See, e.g.*, Order at 20 ("When asked on cross

examination for specifics about his findings and opinions in this case, Dr.

---

[13] Issues of alleged bias and other matters will be discussed in succeeding sections.

89

Merikangas was unable to recall particulars and generally offered little that would support his conclusions.")(footnote omitted); *see also id.* at 21 ("Dr. Merikangas' evasive manner and tone while testifying, particularly on cross examination, made his bias evident and drew into question the credibility of his testimony and conclusions."); *id.* at 31 (noting that Dr. Wood's "description of his interviews with the Defendant were generally similar to those of other similar witnesses" but "when asked about the specifics of the interviews and his notes, Dr. Woods' testimony was strained and unpersuasive," which "[gave] the Court pause….").[14]

For the most part, the court failed to provide any specific details regarding what made the prosecution experts' cross-examination so persuasive. One of the few substantive discussions about expert testimony in which the court engaged involved an isolated areas of cross examination of Drs. Engle and Low, and even that discussion thoroughly misrepresented the thrust of the cross. In his report Dr. Engle stated that the results of the MMPI he had administered to Mr. Duncan were consistent with his clinical interview, when in fact they were inconsistent. The defense attempted to impugn Dr. Engle's credibility by suggesting that he had

---

[14] That the defense experts and other defense witnesses were unable to recall certain details without using their notes to refresh their memories is one of the Order's recurring themes. *See*, *e.g.*, Order at 20, 42-43. These witnesses, however, spent dozens of hours over many visits with Mr. Duncan in contrast to as little as a single visit by the prosecution experts and were extensively questioned about particular statements during

intentionally misrepresented or suppressed the MMPI results. The district court

labeled Dr. Engle's performance on cross a success by stating that his opinion was

valid notwithstanding the discrepancy with the MMPI, ***rather than*** commenting on

the allegations of suppression.

> During cross examination, Dr. Engle acknowledged the existence of the Defendant's high MMPI-II test scores and the fact that his report did not specifically address the inconsistency between the scores and his conclusions that the Defendant was competent. Dr. Engle explained, however, that although the scores were high, the scores are just tools and he relied more on his clinical observations in arriving at his conclusion. The Court finds Dr. Engle's explanation to be credible and reliable. The experts from both sides acknowledge that the clinical interviews/observations are truly the "gold standard" for diagnosis of mental disease or defects and that the test scores are only tools.

Order at 12-13.

Similarly, with Dr. Low the defense on cross-examination explored the

inconsistency between her written report and her direct testimony. In her report she

had stated that Mr. Duncan's refusal to be interviewed prevented her from

rendering an expert opinion, but on direct examination she did so nonetheless. Yet,

the district court recast and disingenuously resolved the challenge as follows:

> The defense was also critical of the fact that the Defendant refused to cooperate further with Dr. Low after the first interview and of a comment in her report regarding the "limited contact" with the Defendant. Dr. Low clarified that when reading the entire report in

---

particular visits. Everyone admits, and the record unequivocally establishes, that Mr. Duncan is extremely verbose and his verbalizations are extremely hard to follow.

91

> context the comment about "limited contact" is explained. Dr. Low
> went on to testify that she had enough time and material upon which
> to reach a conclusion as to the question before her. The Court finds
> Dr. Low's responses to this line of questioning to have been
> appropriate in addressing the issue raised by the defense and that Dr.
> Low fully explained the issue to the Court's satisfaction.

Order at 17 (record citations omitted).

Thus, in proclaiming Drs. Engle and Low the cross-examination victors, the

district court skirted the issue raised by the defense entirely. While that alone may

not be sufficient to render the findings clearly erroneous, the approach raising false

issues and ignoring the evidence is endemic to the entire analysis, which is a

principal reason that the findings are clearly erroneous.

### b. In Clear Contrast to the Defense Experts, the Prosecution Experts Testified as to Subjective, Unverifiable Conclusions Not in accord with Prevailing professional norms.

According to Dr. Engle the reason Mr. Duncan's very unusual beliefs should

not be deemed a delusion is because they simply did not "rise" to the level of

delusions. RT 256 (" I didn't think that the parts of what he said and the way he

said it rose to the level of a delusion. It is somewhat difficult to understand…");

458 ("There were parts of what he said about [his Epiphany] that I did not -- that I

did not fully understand, but I didn't think it rose -- I didn't think that what the

Defendant said rose to the level of a delusion.") 373 ("I didn't think that his

narcissism rose to the level of a delusion, no."); 373-74 ( his inflated sense of

worth was "Not to the level that would constitute a delusion.")

Dr. Low's testimony was similar. She too contended that determining whether a belief system is delusional is essentially a subjective call. RT 716 ("There are no step-by-step cookbooks, so to speak, to guide us towards what is a delusion and what is simply narcissism… I wouldn't say it is a completely subjective type of process. But definitely in the field of psychology there are going to be different opinions. And there is a lot of overlap between different diagnoses, and that is what makes it difficult.") *Accord* RT 718 (stating that the is no objective way for one evaluator to be right compared to another evaluator when they look at the same records and guidelines).

Drs. Amador and First, who literally wrote the book on delusions, established that this testimony was flat out wrong. Dr. Amador testified that the standards are not subjective, but instead are "objective, clearly defined standards." RT 4042. Dr. First testified that if an expert subjectively comes to the opinion that a patient has extreme and somewhat idiosyncratic beliefs, but it cannot reach the level of a true delusion because some other people have similar views, he would say that under the objective criteria, "there is a question of some faulty [expert] judgment there." RT 3205.

Dr. First explained that the question of religious beliefs

comes up all the time. The DSM is used internationally and an individual clinician or psychiatrist is going to be confronted with a patient who has a different religious belief than their own. Most psychiatrists are at least somewhat familiar with the religious beliefs

93

Case: 20-99001, 01/15/2021, ID: 11965948, DktEntry: 30-7, Page 105 of 170

in the United States, but if you had a patient from an African country that had a very unusual religion and they say, I have been possessed by the devil, whether or not that is a delusion requires you to understand where that person came from, what their religious background of their cultural subgroup is to allow you to evaluate whether or not that belief is considered to be a delusion or not.

So that is the basic process. It is something we teach all the time. For any type of belief that can't be proven true or false, you need to use a methodology like this to be able to see whether or not it is a delusion or merely a strongly-held religious idea.

RT 3165-66.

Drs. Kirkish and Rath took slightly different approaches, but also with a non-standardized way of purporting to rule out delusions. According to Dr. Kirkish because Mr. Duncan was able to say that people might not believe him he was not suffering from a delusion. RT 1137-38 ("He was able to detach himself, put himself in another person's shoes and reflect on what was going on. My experience with delusions is that a person is not able to do that. A person who is actually experiencing a delusion, it is a held fast, immutable. No matter what, this is the way it is."). Dr. Rath thought the ability to suppress thoughts or "turn off" delusions would mean a person is not mentally ill, or at least not incompetent. RT 1002 ("[I]n terms of competency …[i]f a person -- if a defendant has symptoms but can control them, then that, again, is volitional.").

Dr. Amador described in detail how high functioning psychotics are commonly fully aware that their beliefs may seem odd to others and will adjust

94

their behaviors accordingly so as to not to be though mentally ill. *See* Section III.B.2.a.5, *supra*. Although the district court wrote that "[t]his testimony by Dr. Amador, however, was not effective or persuasive," Order at 16, its reasoning was specious. The court conceded that "Dr. Amador undoubtedly is well educated in the field of psychology," but took issue with the fact that he never examined Mr. Duncan and "his review of the record and materials relevant to the Defendant was not as comprehensive or unbiased" as the prosecution experts. *Id*. Dr. Amador, however, was not retained to evaluate Mr. Duncan, but rather to examine the prosecution experts' evaluations and to explain their failure to adhere to professional norms. That is one of his main areas of specialization, RT 4002-05, and evaluating the methodology of another expert does not require an evaluation of the patient himself. *See* RT 4004 (describing his experience in assessing whether "recognized procedures in our field that ensure reliability and validity of a diagnosis have been followed. I don't evaluate evaluators; I evaluate the process.")

### c. Notwithstanding the Alleged Pro-Defense Bias, the Defense Experts' Opinions Were Based on Reliable, Objectively Verified Data

The district court repeatedly wrote that there was reason to view the defense expert testimony with skepticism, in light of evidence that they worked primarily for the defense in general.

On cross examination the Government also revealed that Dr. Merikangas' work involves a fair amount of lectures to the defense bar since at least 1999, most of his testimony in murder/death penalty proceedings were for the defense, and he has consulted on the subject of prosecutorial misconduct in death penalty cases. Dr. Merikangas estimated having testified in approximately 100 murder proceedings since 1998, most of which were death penalty cases. In all but two of those cases, Dr. Merikangas testified for the defense.

Order at 21 (record citations omitted).

On cross examination, the Government elicited testimony that Dr. Woods was a part of the defense team, or at least a consultant to the team, in 2005 when he was initially hired. The Government also pointed out other factors showing Dr. Woods' work has been mainly defense-oriented. For instance, he has, on occasion, spoken on behalf of the defense bar since 1993, and he shares office space with the defense counsel appointed in this retrospective competency hearing. Dr. Woods estimated that 85-90 percent of his criminal work is on capital cases, but that he has never been retained by the Government in a capital case or in any criminal case.

Order at 30-31 (record citations omitted).

The Court views Dr. Woods' testimony as somewhat skewed and perhaps less reliable than other witnesses. Dr. Woods was clearly a part of the defense team from early on who's [sic] mission was to keep the Defendant from receiving a death sentence. The defense's purpose for employing Dr. Woods in this matter evolved over time from a consultant early on, to a role more akin to a competency expert later on in 2008.

Order at 31.

At the same time, the court ascribed no potential pro prosecution bias to Dr. Low, a full time employee of the U.S. Bureau of Prisons. Nonetheless, Mr. Duncan does not deny that the defense witnesses' prior employment is a relevant inquiry.

96

The court's inclination to view their testimony critically is legitimate and appellant welcomes that scrutiny.

What that scrutiny requires, however, is an examination for the possible exaggerating effects of pro-defense bias, not a wholesale disregard of all testimony that could be labeled as "somewhat skewed" and "possibly less reliable" than other testimony. As we have already shown, the basic building blocks of the defense expert testimony – that Mr. Duncan's thought processes are disordered and his view of his Epiphany and its relationship to societal transformation delusional – is thoroughly supported by multiple sources of reliable, verifiable data including numerous verbatim records of his thought and expression. Yet the court made no effort to compensate for the exaggerating effects of the alleged bias by considering what was objectively reasonable and verifiable.

Instead the district court said next to nothing about the substantive testimony given by Drs. Gur, Woods and Merkiangas. This was clear error *Cf. Porter v. McCollum*, 558 U.S. 30, 42-43 (2009) (the Florida Supreme Court unreasonably failed to give "any consideration" to petitioner's expert testimony in its *Strickland* prejudice analysis; while "the State's experts … perceived problems with the tests [the defense expert] used and the conclusions that he drew from them, it was not reasonable to discount entirely the effect that his testimony might have had on the jury or the sentencing judge").

97

#### d. Considerations of Thoroughness and Timeliness Weigh Heavily In Favor of the Defense Evaluations

The court stated repeatedly that it was crediting the prosecution experts and other witnesses because their evaluations and observations were "closest to the time period in question" in the case. Order at 32; *accord id*. at 12, 13, 18, 42, 54. Even as a purely factual matter this is misleading. The defense team members were in close, constant contact with Mr. Duncan at all relevant times throughout the proceedings, including the time of the waiver hearing. The defense experts had repeated contacts with Mr. Duncan over a span of years, including during the Riverside County proceedings, which was when he was evaluated by Drs. Rath and Kirkish. And there was no contention that Mr. Duncan's mental status had waned at or around the time that the district court concluded that he was waiving appeal. To the contrary, the court specifically found that Mr. Duncan's belief system remained constant over time. Order at 38.

Additional reasons the district court's attempt to credit the prosecution expert testimony as "well founded, timely, and correct," Order at 13, follow.

> #### 1) *The Prosecution Experts' Opinions Lacked Proper Context in that They Did Not Evaluate Mr. Duncan on the Relevant Question*

With the exception of Dr. Roesch, whose testimony was disregarded by the district court, none of the Government's experts evaluated Mr. Duncan's capacity to make a rational decision with respect to his refusal to endorse the appeal filed by

standby counsel. Under *Rees v. Peyton*, when there is a question about a prisoner's

mental competency to forego judicial proceedings, courts determine whether the

prisoner "*in the present posture of things* … has capacity to appreciate his position

and make a rational choice with respect to continuing or abandoning further

litigation or on the other hand whether he is suffering from a mental disease,

disorder, or defect which may substantially affect his capacity in the premises."

*Rees*, 384 U.S. at 314 (emphasis added). The prosecution experts applied a

different test — whether Mr. Duncan had a rational and factual understanding of

the proceedings, *see*, *e.g.*, RT 631-32 (testimony of Dr. Low that Mr. Duncan had

"a very good ability to understand the nature and the consequences of the court

proceedings against him") — to a different decision, the decision to represent

himself. In *Miller v. Stewart*, 231 F.3d 1248 (9th Cir. 2000), *cited with approval*

*United States v. Duncan*, 643 F.3d at 1248, this Court explained how the two

decisions are different and why a state court finding on competency to represent

oneself is not entitled to deference on the question of competency to abandon

litigation:

> [I]ndividuals have a constitutional right to represent themselves. In
> Miller's case, all the state court determined was that he was able to
> meet the minimal standard necessary to exercise that constitutional
> right. A far different question, however, is raised when the issue posed
> is whether an individual is competent to choose to be executed - in
> short, to choose death, and whether he has made *that* choice
> voluntarily, knowingly, and intelligently. Whether someone is
> competent to waive counsel, and whether he has done so voluntarily,

99

knowingly and intelligently, raises different questions and requires different findings than whether someone is competent to elect to die. Because here the state court determination of competency and voluntariness stemmed from a different inquiry, in this case …there is no competency determination to which federal courts must give deference.

*Id*. at 1250-51 (citations and footnotes omitted).

The district court repeatedly emphasized the importance of context in assessing competency. *See*, *e.g.*, Order at 29 ("All of the experts …, stated context is important in determining a diagnosis), 42 ("The experts agreed that context is important when determining whether a particular statement by an individual may be a delusion or other evidence of a mental disease or defect."). Drs. Engle, Low, Kirkish and Rath did not evaluate Mr. Duncan with regard to the rationale for his decision not to endorse the notice of appeal filed on his behalf. Their opinions, as credible as they may be in the district court's view, provide no direct evidence on the competency issue presented. As relevant circumstantial evidence, their probative value is limited for the reasons discussed in succeeding sections.

Dr. Roesch did assess Mr. Duncan in the proper context. Although the Government disclaimed him, the defense asked the court to consider the verbatim record of his interview, which provides a picture that stands in stark contrast to the district court's view of a rational decision to accept the jury's judgment. In response to Dr. Roesch's statement that Mr. Duncan had "objected" to an appeal, Mr. Duncan launched into a seven-page monolog that began:

100

Case: 20-99001, 01/15/2021, ID: 11965948, DktEntry: 30-7, Page: 112 of 170

Not an objection. I just wanted, as a courtesy to the judge -- again, I was interested in the same thing that the jury -- when I was selecting tbe jury, I was concerned about -- you know, I wanted to – I wanted -- I wanted -- I wanted -- this game that was being played was causing -- had real consequences that the players weren't aware of.

And the consequences were not my death. They were not prison. They were not all of the things that it [the System] thinks the consequences are.

The consequence is separation from the truth; separation from God; you know, this tearing away from the source of our being. You know? That, to me, is a very serious consequence. So the things that I did were geared toward trying to lessen those consequences. One of the ways you get torn away from God is by being manipulated.

You know, when I manipulate you, I am tearing you -- I am trying to tear you away from God. If you allow me to manipulate you, that means you are letting me tear you away. That's how it all works. So, in my mind, what my attorneys were doing was they were manipulating the judge by filing this document implying that I was consenting to this appeal.

Exh. II at 174-75. When Dr. Roesch asked about his renewed desire to appeal, Mr.

Duncan gave an eight-page answer, in which he stated:

It's difficult to say why because it wasn't really a decision that I made in the normal sense of a decision. In other words, I didn't think about it. I wasn't thinking about it when I changed my mind.

It was just, all of the sudden, I realized that this is what I had do. It was the same way that, all of the sudden, I realized that I had to bring the little girl home.

It was the same way that, all of the sudden, I realized that I had to represent myself. All of these decisions aren't really decisions. These are just things that I knew I had to do. And I was talking to some investigators and –and I was -- along with -- when I told my attorneys -actually, when I first told my attorneys that I couldn't agree

Case: 20-99001, 01/15/2021, ID: 11965948, DktEntry: 30-7, Page: 113 of 170

with the appeal, I remember saying to Judy – I think she was the lead attorney.

     I remember saying to her once, "You know what? I might have changed my mind and decided to allow the appeal. But if I do, it will be for some reason that I cannot say, that I cannot put my finger on."

*Id*. at 75-76. Minutes later he said:

     But it wasn't my decision. It was a decision that came from outside of me. It was a decision that came from this living consciousness, this living truth that I avow to, that I try to -- that I try to avow to. I don't always succeed.

     I'm - you know, I'm still a very confused and flawed person, but I no longer -- I think -- like I said a moment ago, I know I'm confused; and I accept it. I accept that I probably will be until the day I die.

     And that's okay. I can deal with it. I'm okay with that. I don't need to know anymore. I don't need to understand this universe anymore because I know something about it that most people in their entire lives don't get to know. You know?

     And that is that -- I don't know how to say this because it sounds corny -- but that it loves me. You know?

*Id*. at 81.

None of the prosecution experts whose testimony was credited by the district court considered Mr. Duncan's "explanation" of his decision not to endorse an appeal. ***All of them evaluated Mr. Duncan well before any issue whether or not to appeal arose***. Dr. Kirkish, who evaluated him in the California case, never even talked to him about an appeal there. RT 1267. Her opinion, like the other prosecution experts' opinions that he suffered from no mental illness sufficient to

prevent a rational understanding of the trial proceedings, have little probative value on the very different question regarding appeal—whether he suffers from a substantially impaired capacity to make a rational decision whether or not to appeal. As the district court repeatedly remarked as to the defense witnesses, the prosecution experts' opinions lack the necessary context.

### 2) *Because the Prosecution Experts Spent Little Time Together With Mr. Duncan Their Failure to Observe Signs of Psychosis is of Limited Probative Value*

All experts agree that Mr. Duncan is high functioning and intelligent, but believes that society, not he, is mentally ill, and he does not want to be labeled incompetent. He has the wherewithal and motivation to mask the signs and symptoms of his disorder, so to accurately assess his functioning requires time and special expertise. It is not surprising that the prosecution experts missed his psychotic symptomatology during their relatively brief interactions with him.

Dr. Amador described the difficulties in evaluating intelligent, high functioning psychotic subjects.

> If they are motivated to appear normal, it will keep them from disclosing, unless their guard is down, thoughts that they recognize other people will think are, quote, "crazy." ...The clinician needs to understand that person then, especially if they are highly intelligent, is likely to hide evidence of their mental disease or defect because they really do not believe there is anything wrong with them.

RT 4016. "[W]hen someone is intelligent, what can be delusional thinking, especially if they ... they don't believe they are ill, can be articulated and explained

103

away as abstract, philosophical or even political positions." RT 4026. That this was true of Mr. Duncan was suggested by Dr. Engle's testing showing that Mr. Duncan was not fully disclosing his symptoms. RT 349, 409. One of the tests he administered showed a tendency of avoiding self-disclosure. RT 409.

All of the experts agreed that Mr. Duncan attempts to appear more intelligent than he is by using complicated language and making abstract, albeit hard to follow or nonsensical philosophical and literary references. The experts similarly agreed that developing rapport is important in trying to overcome these defense mechanisms. *See*, *e.g.*, RT 230 (Dr. Engle); RT 1106 (Dr. Kirkish); RT 4105 (Dr. Amador); RT 5687 (Dr. Woods).

The defense experts spent the time they needed to establish the amount of rapport necessary to allow Mr. Duncan to reveal himself. Dr. Merikangas interviewed Mr. Duncan eight times for a total of 21 hours. Exhs. I-37, I-34; RT 2990-91. Dr. Woods interviewed Mr. Duncan six times over a seven year period for more than 14 hours. Exh. C-1356; RT 5671-74. Dr. Gur interviewed Mr. Duncan twice for a total of six-and-one-half hours. Exhs. F-38, F-221-331, G; RT 3518, 3626. Dr. Kalechstein interviewed Mr. Duncan twice for a total of six hours. Exh. H-23; RT 5074.

The prosecution experts spent much less time with Mr. Duncan. Dr. Engle met with Mr. Duncan on three occasions for a total of three and one half hours. RT

227, 324. Dr. Low was able to interview Mr. Duncan on a single occasion in 75 minutes before he refused to cooperate further. RT 559, 561. Dr. Kirkish interviewed Duncan once for four hours. RT 1149. Dr. Rath met with Duncan just once for two hours. RT 909. He considered that amount of time adequate due to the "narrow" scope of his evaluation.

The purported failure of the prosecution experts to observe signs of psychosis must be viewed in this context. No one saw signs of malingering or a complete absence of psychiatric symptoms. Despite the relatively limited contact, much of what they saw was indicative of mental problems. Dr. Engle observed tangential and circumstantial speech indicative of psychotic thought processes, although only to a "very mild" degree. RT 242. Dr. Kirkish thought Mr. Duncan had issues consistent with a "schizotypal personality disorder," RT 1177, and noted his unique belief system, which depending upon how you looked at it could either be delusional or merely idiosyncratic. RT 1287.[15]

Moreover, the prosecution experts lacked experience assessing high functioning psychotics. Dr. Kirkish has no experience with high IQ schizophrenics. RT 1243. Dr. Amador testified that in his experience evaluators in the criminal justice system do not frequently see highly intelligent subjects, RT4028, and that

---

[15] That Dr. Low did not see signs of psychosis is hardly surprising in that Mr. Duncan did not even discuss his epiphany with her. RT 588.

"intelligent, articulate, rational communication is common in patients with delusions and, of course, does not rule out delusions." RT 4031. Dr. Kirkish agreed that one way for an evaluator to overcome this tendency is to spend more time with the person. She felt that Mr. Duncan was not guarded with her, but admitted it was possible that she had not spent enough time with Duncan. RT 1223-27.

Dr. Amador described in detail Dr. Low's failure to discern the diagnostic significance of facts contained in her report. RT 4118-23. Dr. Kirkish was candid that her problem was the Mr. Duncan did not say to her what the defense doctors claimed he said to them. "I can't remember which doctor gave quotations from him. But to the degree that those were accurate descriptions, I would certainly say, 'Well, that certainly looks delusional to me.'" RT 1170. *See also* RT 375-79 (Dr. Engle indicating in response to a series of hypothetical questions that Mr. Duncan's reported statements were suggestive of delusions).

With their education, training and experience, as detailed in in their C.V.s, Exhibits I-1-28, F-1-34, and J-1-16, Drs. Merikangas, Gur and Woods, are preeminent in their field, as this Court acknowledged in the prior appeal. *United States v. Duncan*, 643 F. 3d at 1249 (describing the three defense experts as "all well established and highly regarded in the field of neuropsychiatry."). They had the training, experience and expertise not to be fooled by his effort to appear philosophical.

106

Simply stated, the testimony of the prosecution experts was thoroughly unreliable because it was based on a watered-down, normalized view of Mr. Duncan's belief system that bore little resemblance to what he actually believes.)

### 7. The District Court Committed Legal Error By Relying on the Riverside County Proceedings In Assessing Credibility

In the course of expressing a preference for the testimony of the prosecution experts over the defense experts, the district court repeatedly relied on the outcome of the Riverside County case. *See* Order at 18,[16] 30,[17] and 50.[18] In so doing, the district court committed legal error tainting the entirety of its credibility analysis.

While a federal court may take judicial notice of documents from, or an opinion of, another court it may do so only to establish the existence of such litigation and related filings, not to establish the truth of the disputed matters asserted in the other litigation. *Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir.

---

[16] "Furthermore, Drs. Rath and Kirkish testified concerning the Defendant's competency in the Riverside case where the jury found the Defendant to be competent. While the time period of the Riverside proceeding was some months later than the time the Defendant waived his right to appeal in November of 2008, the mental issue in question at that proceeding encompassed the time period relevant to this case."

[17] "Dr. Woods testified in the Riverside case that the Defendant was not competent to represent himself in those proceedings; the jury in Riverside, however, found otherwise."

[18] "All of the courts who have considered the question of this Defendant's competency have uniformly concluded that he is, in fact, competent. Moreover, in the Riverside case against the Defendant, both a jury and a judge found him to be competent after hearing the medical and factual evidence. That case began approximately five months after the sentence was imposed in this case."

107

Case: 20-99001, 01/15/2021, ID: 11965948, DktEntry: 30-7, Page: 119 of 170

1991). "[W]hen a court takes judicial notice of another court's opinion, it may do so 'not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (*quoting Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 426-27 (3d Cir. 1999). "If it were permissible for a court to take judicial notice of a fact merely because it has been found to be true in some other action, the doctrine of collateral estoppel would be superfluous." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994). The underlying facts adjudicated in another case do not meet the test of indisputability contained in Rule 201. *International Star Class Yacht Racing Ass'n v Tommy Hilfiger U.S.A.*, 146 F.3d 66 (2d Cir. 1998); *M/V American Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983). As this Court has noted:

> The reason for the rule above referred to is that the decision of a cause must depend upon the evidence introduced. If the courts should recognize judicially facts adjudicated in another case, it makes those facts, though unsupported by evidence in the case in hand, conclusive against the opposing party; while if they had been properly introduced they might have been met and overcome by him. So, on a plea of res adjudicata, a court cannot judicially notice that the matters in issue are the same as those in a former suit.

*Guam Inv. Co. v. Central Bldg., Inc.*, 288 F.2d 19, 23 (9th Cir. 1961) (*quoting Paridy v. Caterpillar Tractor Co.*, 48 F.2d 166, 169 (7th Cir. 1931)).

B. ***Even Assuming Mr. Duncan Was Competent To Waive Appeal, The Waiver Based on a Delusional Belief as to Its Consequences Was Not Knowing, Intelligent, and Voluntary***

Even if Mr. Duncan were competent to waive appeal, that alone would not be sufficient for a valid waiver. "A finding that a defendant is competent … is not all that is necessary before he may be permitted to plead guilty or waive his right[s]. … In addition to determining that a defendant is competent …, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." *Godinez v. Moran*, 509 U.S. 389, 400-401 (1993) (*citing Parke v. Raley*, 506 U.S. 20 517 (1992); *Faretta v. California*, 422 U.S. 806 (1975). The federal courts are required to indulge every reasonable presumption against waiver of fundamental constitutional rights. *See Hodges v. Easton*, 106 U.S. 408 (1982); *United States v. Arlt*, 41 F.3d 516, 520 (9th Cir. 1994) (*citing Brewer v. Williams*, 430 U.S. 387 (1977)). Because of this, only clear and unequivocal waivers may be accepted. *See United States v. Farhad*, 190 F.3d 1097, 1099 (9th Cir. 1999) (waiver of right to counsel). A district court's finding that a waiver was knowing, intelligent and voluntary is a mixed question of law and fact reviewed de novo. *See*

*United States v. Erskine*, 355 F.3d 1161, 1166 (9th Cir. 2004); *United States v. Lopez-Osuna*, 232 F.3d 657, 663-64 (9th Cir. 2000).[19]

The record establishes none of the above. Mr. Duncan's equivocal and ambiguous responses to the district court's questions whether he wished to appeal his conviction and sentence are described in detail *supra*. The proceeding brought out no clear, unequivocal and voluntary relinquishment of a known right. Despite the district court's considerable effort to squelch discussion of Mr. Duncan's irrational, deluded thought process, his disordered ruminations pervade the record. To the extent that Mr. Duncan made anything clear it was simply that he wished not to do anything to facilitate an appeal in order to leave it solely up to the "System" whether there would be an appeal. Neither the district court nor anyone else ever advised Mr. Duncan that his failing to participate in an appeal of the conviction and sentence is precisely what would authorize an appeal of the competency and purported appeal waiver proceedings. *See Mason ex rel. Marson*, *supra*, 5 F.3d 1220. Thus, Mr. Duncan's "choice" not to authorize an appeal that he attempted to exercise at the hearing was uninformed and unintelligently made.

---

[19] Factual findings supporting the district court's decision are reviewed for clear error. *See United States v. George*, 56 F.3d 1078, 1084 (9th Cir. 1995) ; *United States v. Kienenberger*, 13 F.3d 1354, 1356 (9th Cir. 1994) ).

Case: 20-99001, 01/15/2021, ID: 11965948, DktEntry: 30-7, Page: 122 of 170

### 1.  Mr. Duncan Expressed No Clear and Unequivocal Desire That His Conviction and Sentence Not Be Appealed

Mr. Duncan's prior now-rescinded statement of desire not to endorse an appeal is atypical not only because it was the result of a psychotic thought process, but also because of his stance in general. He is not one of those individuals to which the literature refers as a "volunteer" for execution. Such individuals usually fall into one of two categories: "(1) those suffering from psychological illnesses characterized by suicidal impulses who, for whatever reasons, are unable to commit the act themselves and seek the State's assistance through the death penalty; and (2) those suffering, both physically and psychologically, from the combined stress of being condemned to die at some indefinite point in the future while being confined for prolonged periods in brutalizing and dehumanizing conditions on 'death rows' across the country." G. Strafer, "*Volunteering for Execution: Competency, Voluntariness and the Propriety of Third Party Intervention*," 74 J. Crim. L. & Criminology 860, 862 (1983); *see e.g.*, *Gilmore v. Utah*, 429 U.S. 1012, 1015 (1976) (quoting Mr. Gilmore's statement that "he did not 'care to languish in prison for another day'"); *Massie v. Sumner*, 624 F.2d 72, 73 (9th Cir. 1980) (noting that Mr. Massie found "execution preferable to spending a lengthy period incarcerated on death row"). Mr. Duncan has been incarcerated for most of his life, and his stated goal is neither to escape confinement nor to die.

Case: 20-99001, 01/15/2021, ID: 1965948, DktEntry: 30-7, Page: 123 of 170

In the FBI interviews that were used to support the Government's motion to strike

the notice of appeal, he specifically stated:

> It's like I said, it's not that I want to die. I don't want to die, so if my attorneys want to file an appeal, and I told them this too, just to be honest. You know I told them, "If you want to file an appeal, if you can find some way to file an appeal without my permission, then I'm not going to try to stop you. Go right ahead."

(Doc. 606) Gneckow affidavit at 4. Little else about the "waiver" or its reasons is

as clear.

This equivocal and unreliable shift pervades the entire proceeding. "[M]y

words [regarding the appeal] should have no bearing on the choice that society has

made in this matter." (Doc. 613.) "I want the Court, I want society, I want the

prosecutors, I want my attorneys, I want everyone to do this without me. I want

you to make your choices. I don't want to be a part of that decision-making

process." 11/24/08 RT 17. "I've made my choices and now you have to make

yours as a system, as society or whatever you want to call it. And I want to allow

and I want to accept that choice, but I don't want to participate in it." *Id*. "I am

neutral [regarding an appeal]. I wish to allow you to do what you feel you need to

do. I will allow the attorneys to do what they feel they need to do." *Id*. at 11. "I told

[the attorneys], 'If you want to file an appeal, if you can find some way to file an

appeal without my permission, then I'm not going to try to stop you. Go right

ahead.'" (Doc. 606.)

Mr. Duncan is at best agnostic about an appeal until he is cornered. It is true that he ultimately stated that it was his desire that there not be an appeal. This was only the result, however, of the district court's insistence that he not elaborate, confer with counsel, or answer anything but "yes" or "no." The district court's error of attempting to isolate Mr. Duncan's final response from "the philosophical arguments you have been making," 11/24/08 RT 20, or from "how you view it in your mind," *id*. at 11, was fundamental. Having repeatedly stated that the lawyers were free to do as they chose provided he did not have to give his personal authorization, the only possible answer—whether truthful or not—to the follow-up question of whether that statement should be construed as his personal authorization was "no."

This philosophical view of the act of *authorizing* an appeal, as opposed to merely *having* an appeal, makes this case unlike any other of which counsel is aware. Even before he decided to authorize an appeal, Mr. Duncan did not express a wish to be put to death, did not accept the appropriateness of the punishment, and appeared not to object to there being an appeal. His position was simply philosophical, a refusal to give affirmative authorization. This refusal was based on an entirely delusional belief that his such refusal will bring about a worldwide epiphany of Truth, including truth that all killing, even state-sanctioned killing, is wrong. He has a grandiose delusion that he is on a higher plane of understanding

113

which he wants the rest of the world to attain, but it could do so only if he declined
to interfere with the world's spiritual evolution.

### 2.  The Record Establishes that the Purported Waiver Was Anything But Knowing, Intelligent and Voluntary

The record is replete with statements indicating that Mr. Duncan's view of
an appeal bears little resemblance to reality. *See e.g.*, 11/24/08 RT at 10 ("... I
don't believe that this Court has the authority to grant such a right [to appeal] or a
right as that. And so on the surface I can say honestly that I understand your
intention of granting me that, what you call a right, but -- and I accept your
intention. I'm not opposed to your intention. I accept that. That is your view, that is
your world, that is your law, but it is not mine and I don't accept it."); *id.* at 9 ("I
don't know if it is clear or not, but to me it seemed clear that what I was trying to
say is that in my opinion this whole proceeding is criminal, and as a criminal
proceeding, any appeal doesn't make any sense.") A waiver "cannot be truly
voluntary unless the defendant possesses an understanding of the law in relation to
the facts." *Boykin v. Alabama*, 395 U.S. 238, 243 (1969) (*citing Johnson v. Zerbst*,
304 U.S. 458, 466 (1938).) Mr. Duncan's statements revealed an insufficient
rational and factual understanding of the consequences of waiving review. The
record on remand makes clear that he did not understand that death would be the
likely outcome of a decision not to authorize an appeal, and, unlike the majority of

114

inmates involved in waiving review, he provided no reassuring statement that death was his ultimate goal.

Instead, he said that what he sought was the world's enlightenment, an event dependent not on whether he lives or dies but only on his steadfast adherence to a principle of non-interference, *i.e.*, his belief that we can only reach a state of enlightenment if he refuses to lead the way. As such, his actions could not be based on a knowing and intelligent choice made voluntarily, but only one entirely dictated by his delusional belief system in the service of a delusional goal. In the parlance of *Rees v. Peyton*, *supra*, 384 U.S. at 314, rather than making a knowing, intelligent and voluntary choice, he was reacting to "a mental disease, disorder, or defect which [was] substantially affect[ing] his [decisional] capacity."

### 3. Because The District Court Did Not to Inform Mr. Duncan that Refusal to Authorize an Appeal of the Conviction Constituted Legal Authorization for an Appeal of the Competency Decision, the Purported Waiver Was Not Knowing and Intelligent

To the extent that any clear position eventually emerged from the record and the court's jousting with Mr. Duncan, it was one of indifference to whether an appeal would be prosecuted on his behalf. All that mattered to him, he indicated, was that he personally take no action to endorse or facilitate such an appeal, because to him all litigation was antithetical to Truth. Having received enlightenment, he no longer concerned himself with attempting to influence the

115

actions of others. In his view others should be free to do as they chose, even if it leads them to turn from Truth in a deluded belief that any of this matters.

Neither the court nor counsel ever advised Mr. Duncan that his choices were limited to: (1) authorizing an appeal of the conviction and sentence on the one hand by endorsing counsel's notice of appeal; or (2) authorizing an appeal of the flawed competency proceeding and purported appellate waiver by disavowing counsel's notice of appeal. Mr. Duncan clearly expressed a willingness to have counsel appeal if they could do so despite his desire not to participate. He was never properly advised that under *Mason ex rel. Marson*, counsel's entitlement to appeal was not *in spite of* his non-authorization, but *because of* his non-authorization. Mr. Duncan was therefore unaware that the consequences of his "choice" not to participate in appeal were the exact opposite of what he supposedly hoped to accomplish.

Thus, the purported waiver is invalid, assuming *arguendo* that it was not separately and independent invalid under *Rees*. "Because a waiver is an 'intentional relinquishment or abandonment of a known right,' a trial court should make sure that a defendant knows what the right guarantees before waiving it." *United States v. Cochran*, 770 F.2d 850, 852 (9th Cir. 1985) (*quoting Johnson v. Zerbst*, *supra*, 304 U.S. at 464.). As explained by the Supreme Court, the purpose of the "'knowing and voluntary' inquiry … is to determine whether the defendant

Case: 20-99001, 01/15/2021, ID: 11965948, DktEntry: 30-7, Page: 128 of 170

actually *does* understand the significance and consequences of a particular decision." *Godinez v. Moran*, *supra*, 509 U.S. at 401 n.12 (emphasis in original). An uninformed waiver decision is not knowing and intelligent. *See Summerlin v. Schriro*, 427 F.3d 623, 639 (9th Cir. 2005).

Mr. Duncan's purported waiver of appeal was invalid and fails to deprive the Court of jurisdiction to entertain an appeal of the conviction and death sentence.

C. ***The Federal Death Penalty Act of 1994 ("FDPA") Requires Sentence "Review" In Addition to Consideration of the Issues Raised on Appeal***

The Federal Death Penalty Act of 1994 ("FDPA") expressly provides that in addition to any appeal taken by a defendant, the Court of Appeals must undertake a statutory review of the sentence to ensure that "the sentence of death was [not] imposed under the influence of passion, prejudice, or any other arbitrary factor and [that] the evidence supports the special finding of the existence of an aggravating factor." 18 U.S.C. § 3595(c) (2012). Even if the Court disagrees with all of the preceded arguments why a waiver of appeal cannot be accepted, the Court should nonetheless undertake FDPA sentence review in order to avoid conflict with the Eighth Amendment's prohibition against the arbitrary or capricious application of the death penalty.

## 1.  The FDPA's Appellate Review Provisions

As explained in more detail below, Supreme Court jurisprudence

emphasizes the importance of appellate sentencing review in complying with the

Eighth Amendment's ban on the arbitrary and capricious imposition of the death

penalty. *See e.g.*, *Parker v. Dugger*, 498 U.S. 308, 321 (1991). Accordingly, the

vast majority of states having the death penalty provide for an automatic,

nonwaivable appeal in all cases appellate review of cases in which a death

judgment has been imposed. *See e.g.*, Ala. Code § 12-22-150 (2014) ("In all cases

wherein … the death sentence is imposed, it shall be the duty of the trial judge,

immediately after the imposition of sentence, to enter of record, with or without the

direction or election of the defendant, that the defendant appeals from said

judgment of conviction."); Cal. Penal Code Ann. § 1239(b) (2014) ("When upon

any plea a judgment of death is rendered, an appeal is automatically taken by the

defendant without any action by him or her or his or her counsel."); Fla. Stat. Ann.

§ 921.141(4) (2014) ("The judgment of conviction and sentence of death shall be

subject to automatic review by the Supreme Court of Florida.").[20] A significant

---

[20] *See also* Ariz. Rev. Stat. Ann. § 13-756 (2014); Del. Code Ann. tit. 11 § 4209(g) (2014); Ga. Code Ann. § 17-10-35(a) (2014); Idaho Code Ann. § 19-2827(a) (2014); Ind. Code 35-50-2-9(j)(2014); Ky. Rev. Stat. Ann. § 532.075(1) (2014); Mo. Rev. Stat. § 565.035(1) (2014); N.C. Gen. Stat. § 15A-2000(d)(1) (2013); N.H. Rev. Stat. Ann. § 630:5(X) (2013); (former) N.J. Stat. Ann. 2C:11-3(e) (2006) (New Jersey abolished the death penalty in 2007); (former) N.M. Stat. Ann. § 31-20A-4(A) (2008) (New Mexico abolished the death penalty in 2009); Nev. Rev. Stat.  177.055(1) (2013); 42 Pa. Cons.

number of jurisdictions differentiate the process of mandatory sentence "review"

and from "appeal," and in many of those on the review is mandatory; the plenary

appeal may be waived. *See e.g.*, Conn. Gen. Stat. § 53a-46b(c) (2012) ("The

sentence review shall be in addition to direct appeal and, if an appeal is taken, the

review and appeal shall be consolidated for consideration"); Idaho Code Ann. §

19-2827(f) (2014) ("The sentence review shall be in addition to direct appeal, if

taken, and the review and appeal shall be consolidated for consideration"); Ky.

Rev. Stat. Ann. § 532.075(8) (2014) (similarly providing for consolidation of

automatic review of death sentence with any appeal, if taken); Mo. Rev. Stat. §

565.035(7) (2014) ("In addition to the mandatory sentence review, there shall be a

right of direct appeal of the conviction to the supreme court of Missouri. This right

of appeal may be waived by the defendant. If the appeal is taken, the appeal and

the sentence review shall be consolidated for consideration."); S.C. Code Ann. §

16-3-25(F) (2013) ("The sentence review shall be in addition to direct appeal, if

taken").[21] Before Maryland abolished the death penalty, review there was also

---

Stat. Ann. § 9711(h)(1) (2014); Tex. Code Crim. Proc. Ann. Art. 37.071(h) (2013); S.C. Code Ann. § 16-3-25(A)(2013); Utah Code Ann. § 76-3-206(2)(a)(2013); Wash. Rev. Code Ann. § 10.95.100 (2013); Wyo. Stat. Ann. § 6-2-103(a) (2014)

[21] *See also State v. Dodd*, 838 P.2d 86, 93 (Wash. 1992) (discussing Rev. Code Wash 10.95 requirement of mandatory review of a death sentence, and explaining that "the Legislature distinguished between 'sentence review' and general 'appellate review'. ... [I]t requires sentence review, but indicates general review is not required, as evidenced by the phrase 'if any', referring to general appellate review. The directive that sentence

mandatory. *See* former Md. Crim. Law Code Ann. § 2-401(d) (repealed by Acts 2013, ch. 156, § 3, effective Oct. 1, 2013.) Typically, the mandatory sentence review is limited to and guided by statutory factors intended to enhance sentence reliability. *See e.g.*, Conn. Gen. Stat. § 53a-46b(b) (2012) (on automatic review, the high court shall consider whether "(1) the sentence was the product of passion, prejudice or any other arbitrary factor; or (2) the evidence fails to support the finding of an aggravating factor"); Del. Code Ann. tit. 11 § 4209(g)(2) (2014) (on automatic review, the high court "shall limit its review" to consideration of whether "the death penalty was either arbitrarily or capriciously imposed or recommended"); Ga. Code Ann. § 17-10-35(c) (2014) (on automatic review, high court shall consider "whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor" and whether "the evidence supports the jury's or judge's finding of a statutory aggravating circumstance"); Idaho Code Ann. § 19-2827(c) (2014) (on automatic review, high court shall consider "whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor," and "whether the evidence supports the judge's finding of a statutory aggravating circumstance"). *See also* Ky. Rev. Stat. Ann. § 532.075(3) (2014); Mo. Rev. Stat. § 565.035(3)

---

review is 'in addition to any [general] appeal' also suggests general review must be available, but may be waived.")

(2014); Nev. Rev. Stat. § 177.055(2) (2013); S.C. Code Ann. § 16-3-25(C) (2013);

Wyo. Stat. Ann. § 6-2-103(d) (2014).

The FDPA, 18 U.S.C. § 3595, is patterned on a review/appeal model.

Section 3595(a), entitled "Appeal," provides:

> In a case in which a sentence of death is imposed, the sentence shall be subject to review by the court of appeals upon appeal by the defendant. Notice of appeal must be filed within the time specified for the filing of a notice of appeal. An appeal under this section may be consolidated with an appeal of the judgment of conviction and shall have priority over all other cases.

Section 3595(b) is entitled "Review," and it provides

> The court of appeals shall review the entire record in the case, including — (1) the evidence submitted during the trial; (2) the information submitted during the sentencing hearing; (3) the procedures employed in the sentencing hearing; and (4) the special findings returned under section 3593(d).

Section 3595(c), "Decision and disposition" describes the appellate court's dual

role in assessing issues a defendant raises on appeal and reviewing the sentence for

compliance with certain criteria, whether or not appellant assigns them as error:

> (1) The court of appeals shall address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of any aggravating factor required to be considered under section 3592.

> (2) Whenever the court of appeals finds that – (A) the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (B) the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor; or (C) the proceedings involved any other

121

> legal error requiring reversal of the sentence that was properly preserved for appeal under the rules of criminal procedure, the court shall remand the case for reconsideration under section 3593 or imposition of a sentence other than death.

Unlike its appeal/review statutory predecessors, despite requiring extraordinary review extending beyond normal appellate issues, § 3595 has no express provision requiring such review in the absence of an appeal by the defendant. The legislative history appears to shed no light on whether Congress specifically intended to deviate from the model, or if so why. *See e.g.*, H.R. Rep. No. 103-324 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1801, 1815; H.R. Rep. No. 103-467 (1994), 1994 WL 107578; H.R. Rep. No. 104-23 (1995), 1995 WL 56412; H.R. Conf. Rep. No. 103-711 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1839, 1856.

The Third Circuit is the only federal court of appeals to have addressed the question. In *United States v. Hammer*, 226 F.3d 229 (3d Cir. 2000), the court held that because § 3595(a) refers to "review ... upon appeal by the defendant," the court's statutory review obligations are outside the normal appeal obligations are triggered only in the event that the defendant opts to file an appeal.[22] For the reasons previously stated, Appellant believes the issue decided by *Hammer* is not presented in this case. In the event that the Court may find the notice of appeal

---

[22] On the other hand, § 3595(b) provides that "the court of appeals shall review" the sentence, without qualification such as "in any case in which the defendant has filed an appeal."

insufficient to vest this Court with jurisdiction, Appellate argues below that this Court should disagree with *Hammer* and interpret FDPA to require sentence review even in the absence of an appeal.

### 2. The Eighth Amendment Requires Mandatory Appellate Review of a Federal Death Sentence

The Eighth Amendment requires capital sentencing schemes to provide mechanisms for ensuring that only those as to whom death is the legally appropriate penalty are in fact executed. The United States Supreme Court has articulated this requirement, in part, through its consistent holdings that the Eighth Amendment requires a capital sentencing scheme to provide for meaningful appellate review. The Court has "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321 (1991). *See also Clemens v. Mississippi*, 494 U.S. 738, 749 (1990); *Gregg v. Georgia*, 428 U.S. 153, 204-06 (1976); *Proffitt v. Florida*, 428 U.S. 242, 253 (1976); *Jurek v. Texas*, 428 U.S. 262, 276 (1976). In *Gregg*, *Proffitt*, and *Jurek* – the first three cases following *Furman v. Georgia*, 408 U.S. 238 (1972), in which the Supreme Court found the death penalty to be constitutional – the Court upheld the capital sentencing schemes of Georgia, Florida, and Texas, respectively, in large part

because those states' statutes required in-depth appellate review of every death sentence. For example, in *Gregg*, the Court held:

> As an important additional safeguard against arbitrariness and caprice, the Georgia statutory scheme provides for automatic appeal of all death sentences to the State's Supreme Court. That court is required by statute to review each sentence of death and determine whether it was imposed under the influence of passion or prejudice, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and whether the sentence is disproportionate compared to those sentences imposed in similar cases.

*Gregg*, 428 U.S. at 198. Similarly, the provision of thorough appellate review was a significant factor in the Court's decisions upholding the capital sentencing schemes of Florida and Texas. *See Proffitt*, 428 U.S. at 253 (risk of arbitrary or capricious infliction of death penalty "is minimized by Florida's appellate review system, under which the evidence of the aggravating and mitigating circumstances is reviewed and reweighed by the Supreme Court of Florida 'to determine independently whether the imposition of the ultimate penalty is warranted'") (citation omitted); *Jurek*, 428 U.S. at 276 ("By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under the law.").

In *Zant v. Stephens*, 462 U.S. 862 (1983), the Court reiterated the importance of appellate review to the constitutionality of a death penalty scheme. The Court

124

observed that the appellate review of every death penalty proceeding "to determine whether the sentence was arbitrary or disproportionate" was one of the primary features upon which the Court's approval of the Georgia scheme in *Gregg* had rested. *Zant*, 462 U.S. at 877. In reaffirming the validity of the Georgia statute, the Court found that appellate review process central to its holding that the statute was constitutional. *Id.* at 876-77. *See also Pulley v. Harris*, 465 U.S. 37, 58 (1984) (Stevens, J., concurring) ("While the Court [in *Zant*] did not focus on the comparative review element of the scheme in reaffirming the constitutionality of the Georgia statute, appellate review of the sentencing decision was essential to upholding its constitutionality.").

In *Parker v. Dugger*, 498 U.S. 308, 321-23 (1991), the Court reversed a death sentence in part because the Florida Supreme Court had failed to conduct the meaningful appellate review required by the Constitution. The Court held that the state court's affirmance of the death sentence "neither based on a review of the individual record in the case nor in reliance on the trial judge's findings based on that record," 498 U.S. at 321-23, rendered the sentence unconstitutionally arbitrary in violation of the Eighth Amendment. A death sentence that is not subject to meaningful appellate review, the Court held, cannot survive constitutional scrutiny. Similarly, in *Dobbs v. Zant*, 506 U.S. 357 (1993), the Court reversed a denial by the Court of Appeals for the Eleventh Circuit of a petition for habeas corpus in a

Case: 20-99001, 01/15/2021, ID: 11965948, DktEntry: 30-7, Page: 137 of 170

capital case, based upon that court's failure to consider the full sentencing transcript. The Supreme Court stated "[w]e have emphasized before the importance of reviewing capital sentences on a complete record," 506 U.S. at 558, and quoted *Gregg* for the proposition that appellate review of a complete record is important as a "'safeguard against arbitrariness and caprice.'" *Id.* (*quoting Gregg*, 428 U.S. at 167). Thus, the Supreme Court has repeatedly made clear that for a capital punishment system to be constitutional, "some form of meaningful appellate review is required." *Pulley v. Harris*, 465 U.S. 37, 45 (1984); *see also id.* at 59 (Stevens, J., concurring) ("some form of meaningful appellate review is an essential safeguard against the arbitrary and capricious imposition of death sentences by individual juries and judges").

Despite this strong emphasis on rigorous appellate review in its Eighth Amendment jurisprudence, the Supreme Court has never squarely decided the question of whether a capital sentencing scheme must provide for automatic appellate review. In none of the Court's well-known death-row "volunteer" cases did it reach the fundamental issue whether the Eighth Amendment requires at least one level of mandatory appellate review. Instead, the Court declined on grounds of standing to entertain a federal challenge to a state court death penalty scheme without mandatory appellate review.

For example, in *Gilmore v. Utah*, 429 U.S. 1012 (1976), which involved a Utah statute that did not require an appeal and a choice by the defendant not to appeal,[23] the Court held that Article III's standing requirement precluded it from reaching the question whether the Eighth Amendment requires an initial round of appellate review regardless of a defendant's wishes because the petition for review of Gilmore's sentence had been filed by Gilmore's mother. *See Gilmore v. Utah*, 429 U.S. at 439 (Burger, C. J., concurring) (noting that question of whether Gilmore was unable as a matter of law to waive the right to state appellate review "simply is not before us").

Similarly, in *Whitmore v. Arkansas*, 495 U.S. 149 (1990), the Court did not reach the question of whether a person sentenced to death may waive direct appellate review. Instead, the Court dismissed the petition for certiorari which had been filed by another death row inmate, on the ground that the petitioner lacked standing. *Id*. at 166. As Chief Justice Rehnquist wrote in the opening sentence of his opinion: "[t]his case presents the question whether a third party has standing to challenge the validity of a death sentence imposed on a capital defendant who has elected to forgo his right of appeal to the State Supreme Court." 495 U.S. at 151. Finding that the third party – the other death row inmate – did not have such

---

[23] After Gilmore's execution, Utah amended its law to provide for automatic, nonwaivable appellate review of all death sentences. *See* 495 U.S. 149, 175 (1990); Utah

127

Case: 20-99001, 01/15/2021, ID: 11965948, DktEntry: 30-7, Page 138 of 170

standing, the Court held that it could not reach the underlying question of whether "the Eighth and Fourteenth Amendments require the State of Arkansas to conduct an appellate review of his conviction and sentence before it can proceed to execute him." *Id*. at 154.[24]

In sum, the Supreme Court has never held that, consistent with the Eighth Amendment, a defendant may waive direct appeal of his death sentence. In *United States v. Hammer*, 226 F.3d at 236-37, the Third Circuit rejected the Eighth Amendment challenge to an interpretation of the Federal Death Penalty Act that would make appellate review contingent on a defendant's choosing to appeal in a six sentence analysis, which amounts to little more than an supported leap of logic: because the Supreme Court has never expressly held that the Eighth Amendment's reliability requirement dictates at least one level of mandatory review, no such requirement exists.

While the Supreme Court has discussed the importance of making appellate review available to defendants, *see, e.g.*, *Parker v. Dugger*, 498 U.S. 308, 321 (1991) (discussing the "crucial role of meaningful appellate review in ensuring that

---

Code Ann. § 77-35-26(10) (Supp. 1989); *see also* Utah Code Ann. § 76-3-206(2) (1978).
[24] In a case involving this Court, *Demosthenes v. Baal*, 495 U.S. 731 (1990), the Supreme Court applied the same reasoning to hold that Article III required federal courts to dismiss a petition for habeas corpus filed by the parents of a death row inmate. *Demosthenes*, however, involved no question whether the Eighth Amendment makes

the death penalty is not imposed arbitrarily or irrationally"), it never has suggested

that this right cannot be waived. *Cf. Pulley v. Harris*, 465 U.S. 37 (1984). In

*Harris*, the Court upheld the California death penalty statute which had no

provision for proportionality review. It noted that several, but not all, of state death

penalty statutes provided for (1) proportionality review; and (2) an automatic

appeal. It concluded that the former was not constitutionally necessary, and made

no comment about the latter. *See id*. at 44-45, 104 S.Ct. at 876. Furthermore, the

Court has never held that society at large has a constitutionally cognizable interest

in appellate review of capital sentences. *See Whitmore v. Arkansas*, 495 U.S. 149

(rejecting third party attempt to raise appeal on defendant's behalf); *Gilmore v.*

*Utah*, 429 U.S. 1012 (1976) (same).

Several state supreme court decisions take an opposite view. For instance the

New Jersey Supreme Court wrote in *State v. Martini*, 677 A.2d 1106 (N.J. 1996):

> In *Gilmore v. Utah*, 429 U.S. 1012, 97 S. Ct. 436, 50 L. Ed. 2d
> 632 (1976), the United States Supreme Court declined on standing
> grounds to consider an appeal by Gary Gilmore's mother that the Utah
> death penalty act was unconstitutional. That approach may be
> constitutionally permissible for the United States Supreme Court
> because it is not part of a state system of administration of the death
> penalty. In contrast, the New Jersey judiciary is an integral part of the
> administration of the death penalty. There are three requirements for
> the constitutionality of a death penalty statute: (1) that sentencers be
> "given guidance regarding the factors about the crime and the

appellate review a necessity; *Demosthenes* involved only a waiver of post-conviction
review after affirmance by the Nevada Supreme Court.

> defendant that the State, representing organized society, deems particularly relevant to the sentencing decision," *Gregg v. Georgia*, 428 U.S. 153, 192, 96 S. Ct. 2909, 2934, 49 L. Ed. 2d 859, 885 (1976) (opinion of Stewart, Powell, and Stevens, JJ.), (the aggravating and mitigating factors); (2) that there be an individualized determination of the sentence on the basis of the character of the individual and the circumstances of the crime, *Eddings v. Oklahoma*, 455 U.S. 104, 110-12, 102 S. Ct. 869, 874-75, 71 L. Ed. 2d 1, 8-9 (1982); and (3) that "the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously … ." *Gregg*, *supra*, 428 U.S. at 195, 96 S. Ct. at 2935, 49 L. Ed. 2d at 886-87.

*Id*. at 1112. In *Calhoun v. State*, 297 Md. 563, 607 (Md. 1983), the Maryland Supreme Court interpreted *Gregg*, *Proffitt*, and *Jurek* as "saying that [mandatory] appellate review of capital punishment cases is essential to the constitutionality of the death penalty statutes." *Accord Judy v. State*, 416 N.E.2d 95, 108 (Ind. 1981) (observing that "[m]andatory review by this Court, in each case, of the articulated reasons for imposing the death penalty, and the evidence supporting those reasons, assures 'consistency, fairness, and rationality in the evenhanded operation' of the death penalty statute") (*quoting Proffitt*, 428 U.S. at 259-60); *Commonwealth v. McKenna*, 383 A.2d 174, 181 (Pa. 1978) (appellate review of death sentences cannot be waived, in light of the "overwhelming public interest [in] insuring that capital punishment in this Commonwealth comports with the Constitution of the United States"); *State v. Brewer*, 826 P.2d 783, 790 (1992) (Eighth and Fourteenth Amendments require Arizona Supreme Court to review all death sentences to ensure that they are in compliance with Arizona law). Moreover, the fact that the

130

vast majority of other states require automatic appellate review of all death sentences suggests that those states, too, regard automatic appellate review as constitutionally required.

### 3. At a Minimum FDPA Should Be Interpreted to Avoid Constitutional Problems

With these principles in mind, the Court should interpret the Federal Death Penalty Act to provide for automatic, mandatory appellate review of every death sentence imposed pursuant to its provisions, in order to avoid a square conflict with the Eighth Amendment to the United States Constitution. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress"); *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 508-09 (1979); *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909) (court should interpret statute to avoid "grave and doubtful constitutional questions"); *Sandoval v. Reno*, 166 F. 3d 225, 237 (3d Cir. 1999); *National Union Fire Ins. Co. of Pittsburgh v.City Sav., F.S.B.*, 28 F. 3d 376, 389 (3d Cir. 1994); *Rappa v. New Castle County*, 18 F.3d 1043, 1051 n. 10 (3d Cir. 1994). If this Court construes the Federal Death Penalty Act as allowing a defendant to waive direct

review of his death sentence by the Courts of Appeals, then it must necessarily reach the constitutional question of whether the Eighth Amendment requires automatic, mandatory appellate review.

This question is not forced by the text of the statute. Automatic, mandatory appellate review is not "plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp.*, 485 U.S. at 575. In fact, an examination of the appellate provisions of the statute, 18 U.S.C. § 3595, reveals Congress's plain intention to provide searching appellate review of federal death sentences for consistency with constitutional requirements.

That the statute directs the Courts of Appeals to engage in such thorough review of death sentences at least suggests that the dominant purpose of the appellate provision is to ensure the reliability of every federal death sentence. Each of the subsections of § 3595 must be interpreted in light of this guiding purpose. *See Jones v. United States*, 527 U.S. 373, 389 (1999) ("Statutory language must be read in context and a phrase gathers meaning from the words around it.") (internal quotation marks and citation omitted); *Philbrook v. Glodgett*, 421 U.S. 707, 713 (1975) ("In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."); *Kokoszka v. Bedford*, 417 U.S. 642, 650 (1974) ("When interpreting a statute, the court will not look merely to a particular clause in which general

132

Case: 20-99001, 01/15/2021, ID: 11965948, DktEntry: 30-7, Page: 144 of 170

words may be used, but will take in connection with it the whole statute … and the objects and policy of the law, as indicated by its various provisions."); *Smith v. Magras*, 124 F.3d 457, 462 (3d Cir. 1997) ("interpretation of a statute involves the examination of the statute as a whole").

An excessively literal reading of § 3595(a), which conditions appellate review on a defendant's decision to himself trigger it, would frustrate Congress's larger concern that death sentences under the Act be reliable. Moreover, such a requirement would also be in tension with § 3595(c), which appears to contemplate review in all cases. That subsection provides that the Courts of Appeals "shall address all substantive and procedural issues raised on the appeal of a sentence of death, *and* shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of an aggravating factor." § 3595(c) (emphasis added). Section 3595(c) thus draws a distinction between issues raised by the defendant on appeal and those issues automatically requiring review and accordingly establishes that Congress contemplated that the Courts of Appeals would review the statutory considerations even absent an appeal by the defendant – in sum, that there would be "review" under § 3595(b) even where there had been no "appeal" under § 3595(a).

This interpretation is further supported by § 3595(c)(2), which requires the Courts of Appeals to remand a death sentence for reconsideration or imposition of a sentence less than death in two categories of cases: (1) where "the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor," or "the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor" (*i.e.*, the situation in which the Courts of Appeals engage in the statutorily-prescribed review of the sentence because the defendant fails to appeal); or (2) "the proceedings involved any other legal error requiring reversal of the sentence that was properly preserved for appeal under the rules of criminal procedure" (*i.e.*, the situation in which the Courts of Appeals also consider additional arguments raised by the defendant who prosecutes his appeal).

These provisions are substantively indistinguishable from those set for in many of the states' mandatory statutory considerations set forth in the statutes cited above. *See e.g.*, *Geary v. State*, 977 P. 2d 344, 346-47 (Nev. 1999) (Nevada's death penalty statute requires court to review, regardless of defendant's waiver, "whether the evidence supports the aggravating circumstances [and] whether the death sentence was imposed under the influence of passion, prejudice, or any arbitrary factor"); *Cole v. Nevada*, 707 P.2d 545, 590 (Nev. 1985) (Nevada's death penalty statute "requires this court to review certain issues where a judgment of death has

134

been entered, regardless of an attempted waiver of appellate review"); *State v. Dodd*, 838 P.2d at 95-96 (under Washington death penalty statute, capital defendant may waive "his right of general review, but may not waive statutory sentence review"); *Vandiver v. State*, 480 N.E.2d 910, 912 (Ind. 1985) (limiting consideration on automatic review to statutory factors, where defendant wished to waive appeal); *State v. Ivey*, 502 S.E.2d 92, 95 (S.C. 1998) (engaging in statutorily prescribed mandatory review of death sentence). The similarity between these state statutes, which substantially predate the Federal Death Penalty Act, and § 3595 of the Act, suggests that Congress intended to adopt the mandatory review schemes well established in the states. *See Carolene Products Co. v. United States*, 323 U.S. 18, 26 (1944) ("[T]he general rule that adoption of the wording of a statute from another legislative jurisdiction, carries with it the previous judicial interpretations of the wording … is a presumption of legislative intention … which varies in strength with the similarity of the language, the established character of the decisions in the jurisdiction from which the language was adopted and the presence or lack of other indicia of interpretation"); *Richerson v. Jones*, 551 F. 2d 918, 927 n.17 (3d Cir. 1977).

Here, the statute clearly contemplates, at a minimum, review by the Courts of Appeals of the statutory concerns set forth in § 3595(c)(1) and § 3595(c)(2)(A) and (B). However, it also may be read as requiring, even in the absence of the

135

defendant's participation at the appellate stage, review of "any other legal error requiring reversal of the sentence that was properly preserved for appeal under the rules of criminal procedure." § 3595(c)(2)(C). This last provision suggests that any error which the defendant preserved in the district court may be reviewed by the Court of Appeals, even where the defendant wishes to abandon his direct appeal. Indeed, such an approach is consistent with the authority of a Court of Appeals generally to reach any properly-preserved issue – in addition to plain error – as it deems necessary to decide a case. *See United States v. Miller*, 197 F.3d 644, 648 n. 1 (3d Cir. 1999) ("[W]e have discretion to consider issues not raised in the briefs, particularly where substantial public interests are involved.") (*quoting Hatley v. Lockhart*, 990 F.2d 1070, 1073 (8th Cir. 1993)). Because of the substantial public interest involved in the imposition of a sentence of death, § 3595(c)(2)(C) should be construed as authorizing a Court of Appeals to consider any legal error preserved in the district court that the Court deems necessary to ensure that a death sentence is not imposed in violation of statutory or constitutional requirements, even absent a defendant's participation in the appeal.

In sum, should the Court's resolution of the other issues presented in this brief require it, the Court should interpret the FDPA as requiring direct appellate review of every federal death sentence, even where a capital defendant wishes to waive such review. Any other interpretation would raise serious doubts about the

136

Act's constitutionality. Moreover, any other interpretation would be inconsistent with the Act's overall purpose of ensuring the reliability of death sentences. Accordingly, this Court should at a minimum construe 18 U.S.C. § 3595 as requiring review of Mr. Duncan's death sentence for consistency with the statutory concerns set forth at § 3595(c)(1) and § 3595(c)(2)(A) and (B), as well as any other error the Court deems it appropriate to reach.

D. ***The Very Troubling Circumstances of this Proceeding Require that At a Minimum the Entire Case Be Reviewed In Connection With Deciding Jurisdiction***

**1. Facts Preceding the Remand Provide Additional Reasons for Rejecting the Purported Waiver**

A throng of extraordinary facts and circumstances converged in district court to make Mr. Duncan's trial little more than a farce and mockery. The relevant procedural trial facts can be stated as follows:

**a. Pre-plea Proceedings: The Incapacity of Lead Defense Counsel, The District Court's Unrecorded Refusal to Consider Requests for Any Continuance, and Defense Efforts to Obtain Adequate Time to Prepare**

On January 18, 2007, the Government obtained a ten count indictment against Mr. Duncan charging him with murder and other offenses related to the kidnapping and abuse of two juveniles, S.G. and D.G., in 2005. (Doc. 1.) The federal charges followed Idaho State proceedings on related charges, which were

137

resolved by a guilty plea and a sentence of life imprisonment. Roger Peven, Executive Director of Federal Defenders of Eastern Washington and Idaho, Inc., was appointed prior to the return of the federal indictment when it first became evident federal charges would be filed.

### b. The Setting of a Trial Date

Mr. Duncan had his initial appearance in federal court on January 19, 2007. In accord with local practice, a trial date a mere three months away—March 20, 2007—was set at that time. (Doc. 9.) On January 23, 2007, the Government filed a six page Notice of Aggravating Factors and Intent to Seek the Death Penalty (Doc. 11), and on January 26, Seattle attorney Mark Larranaga joined the case as learned capital counsel pursuant to 18 U.S.C. § 3005. (Doc. 13 [sealed].)

On March 7, the Government moved for a brief continuance of the trial date until July 9, 2007. (Doc. 22.) The next day, the defense moved for a continuance until August 18, 2008, based on its need to review the voluminous discovery recently provided, to interview potential witnesses, to gather documents and compile the client's life history, to investigate several prior unadjudicated offenses asserted in the notice of aggravating evidence, and to retain and consult with experts. (Doc. 24.)

A hearing was held and on March 22, 2007, the Court set January 28, 2008—the precise mid point between the dates requested by the Government and

defense—as the date for trial. (Doc. 32.) The district court selected the January 2008 trial date based on the presumption that Mr. Peven's prior involvement in the Idaho State proceedings would speed defense team readiness for trial. *Id*. at 9 (noting that Mr. Peven's prior involvement would be "invaluable in pursuing the preparation required for this case.")

As the defense would later explain to the court, Mr. Peven's involvement in the state case had been limited to "work[ing] with this very complex, mentally ill client to prepare him for the possibility of a guilty plea in state court." (Doc. 68 [Declaration of Roger Peven] at 2.) The court was also soon to learn that no later than a month after Mr. Larranaga was appointed, events occurring in Mr. Peven's life made it impossible for him to fulfill any meaningful defense responsibilities.

### c. The District Court's In-Chambers Meeting, Alone, With Defense Counsel Peven, and The Appointment of New Counsel

On August 8, 2007, Mr. Peven sent Mr. Larranaga an email stating he was contemplating withdrawing from the case. (Doc. 80 [Declaration of Mark Larranga] at 11.) The email did not provide any reason and Mr. Larranga could not reach Mr. Peven to discuss the matter further. *Id*. By August 17, Mr. Peven apparently had decided that he would move to withdraw and asked Mr. Larranaga to alert the court at the next status conference, which was scheduled for August 22, 2007. *Id*.

At that status conference, which was unrecorded, Mr. Larranaga advised the court that Mr. Peven wanted to speak privately to the court about needing to withdraw from the case. *Id*. at 11. With a trial date just five months away, the Government expressed concern over the apparent lack of investigation by the defense, including Mr. Peven's failure to review the physical evidence despite a Government email indicating that it had been available for months. *Id*.

An ex parte conference was arranged for August 28, 2007, at the beginning of which Mr. Peven asked to meet privately with the district court in chambers. 8/28/07 RT 1. Mr. Larranga's request to attend the meeting was denied. *Id*. at 3-4. After approximately 15 minutes, Mr. Larranga was summoned to chambers and was informed that Mr. Peven would not be withdrawing but would be taking on the role of "advisory counsel" for Mr. Duncan. (Doc. 179 at 3-4.) The court instructed Mr. Peven to prepare a sealed ex parte declaration describing the in-chambers proceeding. *Id*. at 4.

On September 7, 2007, Mr. Peven filed a sealed declaration "in support of appointment of attorney" which was written to "memorialize information I provided to the Court during a private off the record meeting … on Tuesday, August 28, 2007, and to detail some of the resulting impact of the personal and professional pressures I am experiencing." (Doc. 68 at 1.) Mr. Peven then detailed a number of personal and professional disasters that had befallen him, beginning in

140

February 2007, and which had prevented him from fulfilling his obligations in this case. *Id*. at 5. In the concluding paragraph, Mr. Peven stated that he had advised the court that "[n]ew counsel need to be appointed to meet the necessary responsibilities of investigation and preparing the case for trial," but inasmuch as "I have a good relationship with Mr. Duncan and have built credibility with the victim's family, I advised the court I can remain in an advisory capacity to the defense team." *Id*.

Neither the declaration nor the record as a whole discloses whether assumption of an advisory capacity role was something Mr. Peven had requested, or something to which he had acquiesced upon being denied leave to withdraw. The declaration also fails to describe any discussion regarding whether new counsel would or would not be able to obtain a continuance of the trial date in order to prepare. However, following the hearing, Mr. Peven told Mr. Larranaga that his request had been for leave to withdraw entirely, but that the court had assigned him the role of advisor to any new counsel and the remainder of the team. (Doc. 179 at 8.) In describing the in-chambers conversation to Mr. Larranaga, Mr. Peven also said nothing about a preemptive denial of a continuance by the court. Since Mr. Peven and Mr. Larranaga had previously discussed the need for a continuance, Mr. Larranaga's understanding was that nothing had occurred in chambers that would preclude a continuance. *Id*.

141

Accordingly, on September 11, 2007, the defense filed a motion to have Judy Clarke of Federal Defenders of San Diego, Inc. appointed to replace Mr. Peven as counsel of record and to have Federal Defenders of San Diego, Inc. replace Federal Defenders of Eastern Washington and Idaho, Inc. as the institution responsible for funding the case. (Doc. 69.) In a September 17, 2007, sealed order the District Court appointed Ms. Clarke, not in Mr. Peven's stead, but in addition to him, citing the need for Mr. Peven to "reduce his involvement in the matter." (Doc. 70.) The order also transferred the funding authority for the case to Federal Defenders of San Diego, as the motion requested. *Id.* at 2.

### d.  New Counsel's Request for a Continuance

On October 3, 2007, the defense filed a 19-page motion, (Doc. 74), supported by the sealed declarations of Mr. Larranaga and others (Doc. 80), requesting a one (1) year continuance of the trial date, until January 2009. The defense relied on the "numerous obstacles" that the defense had encountered after the Court established the January 2008 trial date. The defense described the substantial difficulties it had encountered in distributing the enormous amount of discovery materials to the members of the team. As a result, defense investigators were unable until late June 2007 to begin interviewing Mr. Duncan's relevant life history witnesses, the number of which was staggering. The motion noted that there had been no investigation of the guilt phase, no defense investigation into the

Case: 20-99001, 01/15/2021, ID: 11965948, DktEntry: 30-7, Page: 154 of 170

Government's allegations in the Notice of Intent to Seek the Death Penalty, and no defense experts had been identified, let alone retained, despite an impeding due date for the filing of the defense's Fed.R.Crim.P. 12.2 notice of expert evidence of a mental condition.

Mr. Larranaga's sealed declaration detailed many of the difficulties he had encountered attempting to have Mr. Peven secure adequate funding for experts and investigators. For instance:

> During late June and early July 2007, I sent drafts of a supplemental budget to Mr. Peven, but often numerous days would pass before I received any response. Although I inquired, I was never provided a complete explanation for the reasons for the lack of communication or why there were delays in submitting a supplemental budget to the Administrative Office of the Courts. Out of frustration and desperation, I contemplated seeking the appropriate funds through the District Court since I—as a CJA attorney—did not have access to funding directly from the Administrative Office of the Courts.

(Doc. 80 at 9.) Notably, Mr. Larranaga advised the court that until he received Mr. Peven's September 7, 2007 declaration, he had been unaware that Mr. Peven had been neglecting the defense for which he was responsible. *Id.* at 11-12. Mr. Larranaga explained:

> While I was primarily focused on getting the "life history" investigation started, I was led to believe that other investigation and preparation was being done by [Mr. Peven's] Office. However, promised work, including production of witness lists and files, discovery summaries, and investigation of factors related to the guilt phase and aggravation was not being done, and largely remains at this time not even a work in progress.

143

*Id*. at 3. The defense explained, "It is not Mr. Peven's withdrawal from the case that affects the trial date; it is the state of the defense preparation prior to that withdrawal that drives this request to vacate the current trial date." *Id*. at 6 n. 6.

### e. The District Court's Revelation that the Entry of New Counsel Had Been Premised On Counsel Not Seeking a Continuance

A hearing was held on October 12, 2007, at which the court denied a continuance explaining inter alia that Mr. Peven had not been allowed to withdraw from the case and that "[h]e is a valuable tool to the defense because of the information he had prior to present counsel entering the case." 10/12/07 RT 41. Regarding the need to investigate the court stated, "[M]y judgment is that while it is a difficult situation, it is a complex situation, it is not an extreme circumstance, so I am staying with the trial date of January 20." *Id*. at 45. Even though the motion had explained that funding for experts had been unavailable through Mr. Peven's office, the court ordered:

> the defense is going to have to disclose its expert witnesses in accordance, at least give notice of those experts, pursuant to Rule 12.2 and then comply with Rule 16 as far as the summary of the testimony and experience is concerned. So there is going to have to be a disclosure of those witnesses as well and that is within the deadline set for the motions. So that is November 5[, 2007] as well.

*Id*. at 47.

On October 25, 2007, Mr. Peven filed a motion, which was prompted by the court's comments about him, "formaliz[ing] and renew[ing] [his previous]

144

unrecorded request of this Court to withdraw as counsel." (Doc. 89.) The motion was supported by a declaration filed under seal describing Mr. Peven's psychological problems as far more severe than previously disclosed to the court. (Doc. 90.)

On November 1, 2007, the district court entered a sealed order denying the motion. (Doc. 104.) The court wrote that during their private in-chambers meeting Mr. Peven had not asked to withdraw but only to reduce his involvement and the Court had advised Mr. Peven that any attorney coming into the case due to Mr. Peven's reduced involvement "would have to know up front" that the Court would not continue the trial date. The court also wrote that there was nothing in Mr. Peven's declaration "that would suggest that the difficulties Mr. Peven is undergoing would prevent him from assisting the defense team in [] a limited capacity [in that] Mr. Peven has been and remains the Executive Director of the Federal Defenders of Eastern District of Washington and Idaho." *Id.* at 2-3.

### f.  Defense Counsel Peven's Incapacity

On or about November 13, 2007, the President of the Board of Directors of Federal Defenders of Eastern Washington and Idaho, Inc., wrote to the Court that after meeting with the Executive Committee of the Board on November 8, 2007, Mr. Peven had been put on indefinite leave of absence based on information set forth in declarations executed by several senior staff members of the organization.

Case: 20-99001, 01/15/2021, ID: 11965948, DktEntry: 30-7, Page: 157 of 170

The declarants had sworn that Mr. Peven had been virtually incapacitated by psychiatric problems for a considerable time. On November 20, 2007, Stephen Hormel, Acting Executive Director of the Federal Defenders of Eastern Washington and Idaho, followed up on November 13th letter with a motion for the agency to be relieved as counsel for Mr. Duncan. (Doc. 173, 174.)

On November 5, 2007, the defense filed a motion to extend the time to file its Fed.R.Crim.P. 12.2 notice of expert testimony (Doc. 117), because "inadequate work has been completed to provide reliable or accurate notice." More specifically, the motion stated that "to date, appropriate experts have not been retained, and what may be necessary evaluation and/or testing has not been completed." *Id*. at 2. On November 21, the district court denied the motion. (Doc. 175.)

On November 24, 2007, the defense filed a motion to clarify what had occurred during the August 28, 2007, private in-chambers meeting with Mr. Peven. (Doc. 179.) The motion recited that at various times the court had stated that the meeting with Mr. Peven was limited to personal issues not affecting the case, while the November 1, 2007, order denying the motion to continue said something quite different. The motion pointed out that the record was unclear as to what assurances Mr. Peven had made to the court and what conditions were placed on his being "advisory counsel." In particular, the defense noted that Mr. Peven had never told Ms. Clarke or other members of the team that he had requested merely a reduced

146

role in the case and with that role he could insure the case could go forward on the same time table. *Id.* at 8.

On November 28, 2007, the district court denied the motion to clarify (Doc. 185), stating that there was no ambiguity in the record as to what had occurred and chiding counsel for implying otherwise. The court reiterated that Mr. Peven had only asked to have a reduced role and that the court had made clear at that time (and thereafter) that any new counsel coming into the case in light of Mr. Peven's reduced role "would have to be apprised of the trial date so that he or she would know of the time requirements that would apply." *Id.* at 3.

### g. Guilty Plea, Mental Health Experts, and Defense Efforts to Obtain Time to Prepare

#### 1) *The Guilty Plea*

On December 3, 2007, without the benefit of any plea agreement, Mr. Duncan entered a plea of guilty to each of the ten charges alleged in the indictment, whereupon the previously-selected January 28, 2008, trial date was confirmed as the date the penalty trial would begin. (Doc. 189.) On December 5, the Government moved to continue the trial date until April 7, 2008—the estimated date on which the sentencing hearing would have begun had the guilt phase gone to trial—in return for a defense stipulation that S.G.'s testimony could be presented through the statements she made to law enforcement officers at the time of Mr.

Duncan's arrest. (Doc. 192 at 5.) A defense motion to continue the trial date, with a requested date of September 15, 2008, was also filed on December 5. (Doc. 193.) The defense motion stated that twice before the defense had "sought sufficient time to investigate and prepare this capital case for trial, and now seeks again to persuade this court of the need for additional time, to provide this Court with new information and to challenge the assumptions relied on by the Court in denying a continuance." (Doc. 193 at 1-2.)

By order entered December 12, 2007 (Doc. 202), the district court granted the Government's request and denied the defense's; trial was set for April 14, 2008. The court expressed great irritation with the defense, see e.g., *id.* at 3-4 (characterizing the defense arguments concerning the magnitude of necessary preparations as the "marching out once again the Sixth Amendment"), criticizing them for "placing blame for their alleged unpreparedness upon not only Mr. Peven but also with the Court." *Id.* at 4. Although the issues regarding Mr. Peven were only one of the many grounds argued by the defense, the court stated that "[f]or the defense to continue to argue that it has been so hamstrung by the personal issues of Mr. Peven that they are still unprepared to go forward in this matter any earlier than next fall indicates either a lack of diligence or gamesmanship on the part of the defense." *Id.* at 5. Despite the history of having refused to allow the defense any additional time as a result of Mr. Peven's disability, the court also stated: "The

148

issues surrounding Mr. Peven have been utilized to the fullest by the defense and do not justify any further basis for delay. The issue is closed." *Id.*

### 2) *Disclosure of Possible Expert Testimony*

At a February 12, 2008, status conference, the court set March 12, 2008, as the due date for the defense's written summary of expert witness testimony under Fed.R.Crim.P. 16(b)(1)(C). (Doc. 266 (minute order)). On February 20, the district court issued orders authorizing the defense to conduct medical and psychological tests and examinations of Mr. Duncan. (Doc. 273, 274.) On March 12, the defense filed a sealed "Status Report and Notice of Defense Experts" (Doc. 306), stating that only limited information regarding defense experts could be provided because

> Experts who have been retained (1) have not completed their review of materials, (2) have not had an opportunity to interview potential witnesses regarding Mr. Duncan's genetic and developmental history, including critical developmental years in prison as well as others relevant to an understanding of Mr. Duncan's life, and/or (3) have not been able to review and interpret testing that has recently been completed.

(Doc. 306 at 3.) The notice did indicate, however, that psychologist Ruben Gur, Ph.D., may offer an opinion interpreting neuropsychological testing that was in progress at the time of the notice, and that psychiatrist and neurologist James Merikangas may offer an opinion regarding Mr. Duncan's neurological, physical, genetic and psychiatric impairments after reviewing test results likely to be unavailable for another month. *Id.* at 6-8.

149

On March 20, the Government moved to bar the testimony of Drs. Gur and

Merikangas on the ground that their opinions seemed to relate to a mental disease

or defect, and as such the defense had been obligated, but had failed, to make the

required Fed.R.Crim.P. 12.2 disclosures on November 5, 2007, as ordered by the

court. (Doc. 322.) On March 25, the defense filed a response conceding that Drs.

Gur and Merikangas would be testifying about a mental disease or defect and that

the court had never extended the November 7, 2007, Rule 12.2(b) deadline, but

asserting that since that time it had twice sought to continue the trial date on

grounds that included a detailed account of its problems retaining experts. (Doc.

330 at 3-4 (citing Doc. 193, 194 (sealed, ex parte); 239, 240-242 (sealed, ex

parte)).

Before the court could rule on issues relating to mental health expert

testimony at the penalty trial, the case took the different direction described below.

### h. The Request for Self-Representation, The Absence of Competency Proceedings, and the Pro Se Sentencing Trial, and The Death Penalty

From the end of March to mid-April 2008, both sides filed various motions

regarding the procedures for selecting the sentencing trial jurors and conducting

the sentencing trial. Jury selection began on April 14, 2008. On April 16, the

second day of jury selection, Mr. Duncan advised the court that he would waive

counsel and proceed pro se. As described in more detail below, see infra at 32, the

question of Mr. Duncan's competency to represent himself was raised by the court sua sponte and by defense counsel in various pleadings. On July 24, 2008, after reviewing the reports of three defense experts, including Drs. Gur and Merikangas, concluding that Mr. Duncan was incompetent, and of two court-appointed experts holding the contrary view, the district court, without holding a hearing, found Mr. Duncan competent to proceed and to represent himself. (Doc. 493 [sealed version]; 494 [redacted public version].)

As a result of the court's ruling, Mr. Duncan represented himself at the sentencing trial with former counsel in a standby role. Mr. Duncan did next to nothing on his own behalf during the trial. For most of the witnesses he had no questions at all; when he did examine it was rarely to ask more than a handful of questions. See e.g., 8/20/08 RT 2543-44, 2620; 8/21/08 RT 2702 (2 questions); 8/26/08 RT 3112 (1 question), 3234 (1 question). After the Government rested, Mr. Duncan called himself as a witness, and the following transpired:

> THE COURT: You may proceed.
>
> MR. DUNCAN: I have no statement prepared. I was just intending to sit and answer whatever questions the Government might have.
>
> THE COURT: You have nothing to testify to?
>
> MR. DUNCAN: No.
>
> THE COURT: No questions?
>
> MR. MOSS: No, Your Honor.

151

8/21/08 RT 2635-36. Mr. Duncan then rested his case.

On August 27, 2008, the jury returned verdicts recommending a sentence of death on each of Counts One, Five and Seven. 18 U.S.C. § 3593(e). The court then imposed the death sentences as required under 18 U.S.C. § 3594. (Doc. 598.) On November 3, 2008, the court sentenced the defendant on the remaining seven counts of the indictment to which the defendant had pled guilty. (Doc. 601.) The Court entered written judgments on the capital counts on November 3 and on the remaining aspects of sentencing on November 5. The Court entered an amended judgment on November 13, 2008. (Doc. 602.)

### 2. The Nature of the Proceeding Undermines Any Reasonable Assurance of Proper Conviction and Sentence; An Appeal Should Be Heard

Despite the case's exceptional complexity, the trial court gave the shattered defense only 12 months to prepare for trial. The schedule, unusually prompt for a capital case, was based on the court's assumptions that an adequate defense investigation had taken place during the prior state-court proceedings and that Mr. Peven's prior participation in the state-court plea negotiations would substantially benefit the federal defense effort. Both assumptions were false. The state-court defense investigation was scant. Within thirty days after Mr. Duncan's indictment in federal court, Mr. Peven began suffering a series of personal tragedies that prevented him from fulfilling his professional obligations. Instead of timely

152

notifying cocounsel so that alternate arrangements could be made, Mr. Peven covered up his failure to perform for six months, leaving the remainder of the defense team still at the starting gate with only five months left to prepare.

Then with four months left, Ms. Clarke, believing that she would be allowed time to prepare, agreed to take over the lead counsel role and was so appointed. Despite repeated efforts and an extraordinary showing of need, the court refused to allow any additional time to prepare for the guilt trial. The court continued to maintain that Mr. Peven was able to assist the defense in some capacity, even though his Board of Directors had removed him from his position at the Federal Defender office. The court also repeatedly invoked assurances made by Mr. Peven (or alternatively warnings given to him) during their private in-chambers meeting as grounds for denying continuances, even though there is no record of that conversation, Mr. Peven never suggested to the other trial participants that any such matters were discussed, and Ms. Clarke was not so advised.

In any event, the court was advised that funding for experts was unavailable until Ms. Clarke was appointed. Yet the court refused even to extend the deadline for providing the reports of designated defense experts, even though Ms. Clarke was appointed only seven weeks before the reports were due. The expert evaluations of Mr. Duncan did not occur until well after the due date had past.

Because defense counsel were so utterly unprepared, they allowed Mr. Duncan to plead guilty in the hopes of getting additional time to prepare for the sentencing phase. Mr. Duncan was first seen by experts retained for the federal proceedings after the guilty plea, and they promptly concluded that Mr. Duncan was incompetent to represent himself due to an inability to think rationally about his case.

Using the defense's failure to raise the issue earlier as a way of discounting the experts' written opinions, the district court nonetheless allowed Mr. Duncan to "represent" himself, *i.e.*, by declining to present a defense case and doing nothing of any significance to challenge the prosecution's case. Finally, in the absence of a single rational reason not to appeal, the district court accepted equivocal, rambling, delusional statements as a knowing, intentional, and voluntary waiver of appeal.

The cumulative effect has been to eliminate any meaningful check on the Government's power to obtain a death judgment in this case. Even if this Court continues to harbor doubts about jurisdiction, the fair administration of justice demands a searching review of the proceedings. At a minimum, the panel should reconsider the order for bifurcated briefing and consider questions of jurisdiction together with the appeal on the merits. As this Court observed in another case involving a condemned prisoner's attempt to waive review, there is "a strong interest in the accuracy and fairness of all its criminal proceedings; this interest is

154

most pronounced in a case such as this where a defendant pleaded guilty and was sentenced to death without the assistance of counsel." *Massie v. Sumner*, 624 F.2d 72, 74 (9th Cir. 1980). The *Massie* court also quoted the Pennsylvania Supreme Court's admonition that

> the waiver concept was never intended as a means of allowing a criminal defendant to choose his own sentence. Especially is this so where, as here, to do so would result in state aided suicide. The waiver rule cannot be exalted to a position so lofty as to require this Court to blind itself to the real issue the propriety of allowing the state to conduct an illegal execution of a citizen.

*Commonwealth v. McKenna*, 383 A.2d 174, 181 (Pa. 1978).

The multiple "waivers" of trial rights accepted by the district court leave review by this Court as the only means to insure the accuracy and fairness of the proceeding. Even if the Court believes that Mr. Duncan's appellate waiver was likely valid, it should direct full appellate briefing in furtherance of those ends.

## VI.   CONCLUSION

For all of the foregoing reasons, this Court should reverse the district court's order construing Mr. Duncan's bizarre and ambiguous statements regarding abstaining from appeal as a clear, unequivocal, competent, knowing and voluntary waiver of appeal. After further briefing on all issues regarding the conviction and sentence, the Court should engage in full appellate review including the sentence review required by the Federal Death Penalty Act of 1994.

DATED:  August 4, 2014

          Respectfully submitted,
          HEATHER E. WILLIAMS
          Federal Defender

          MARK E. OLIVE
          Law Offices of Mark E. Olive, P.A.


          /s/Joseph Schlesinger
          JOSEPH SCHLESINGER
          Assistant Federal Defender

# STATEMENT OF RELATED CASES

This matter is related to three prior proceedings in this Court:

*Duncan v. United States District Court*, No. 08-73057, filed July 16, 2008

and voluntarily withdrawn July 18, 2008,

*Duncan v. United States District Court*, No. 08-73243, filed July 26, 2008

and denied July 27, 2008.

*United States v. Duncan*, No. 08-99031, reversed and remanded July 11,

2011.

DATED:  August 4, 2014

/s/   Joseph Schlesinger
Joseph Schlesinger
Assistant Federal Defender

## BRIEF FORMAT CERTIFICATION
## PURSUANT TO CIRCUIT RULE 32-1

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, I

certify that this brief is proportionately spaced, has a type face of 14 points or more

and contains **39,593** words.

DATED: August 4, 2014

/s/ Joseph Schlesinger
Joseph Schlesinger
Assistant Federal Defender

# CERTIFICATE OF SERVICE

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Appellant's Opening Brief and Excepts of Record Volumes I through III were electronically filed on August 4, 2014. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Wendy.Olson@usdoj.gov

Traci.Whelan@usdoj.gov

Syrena.Hargrove@usdoj.gov

Justin.whatcott@usdoj.gov

/s/  Joseph Schlesinger
Joseph Schlesinger
Assistant Federal Defender