No. 20-99001

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOSEPH EDWARD DUNCAN III, | D.C. Nos.   2:17-cv-0091-EJL |
| | 2:07-cr-00023-EJL-1 |
| Petitioner/Appellant, | |
| vs. | |
| | District of Idaho, |
| UNITED STATES OF AMERICA, | Boise |
| Respondent/Appellee. | **DEATH PENALTY CASE** |

APPELLANT'S REPLY IN SUPPORT OF APPLICATION FOR A
CERTIFICATE OF APPEALABILITY

JEAN E. GILES, IN Bar No. 21643-49
Assistant Federal Defender
Jean_Giles@fd.org
F. ITALIA PATTI, IN Bar No. 34725-02
Assistant Federal Defender
Italia_Patti@fd.org
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
Telephone: (317) 383-3520
Fax: (317) 383-3525

*Attorneys for Petitioner/Appellant*
Joseph Edward Duncan III

# TABLE OF CONTENTS

Table of Authorities ................................................................................ i

I. Introduction.........................................................................................1

II. Argument ...........................................................................................2

    A. It is at least debatable that Duncan's *Davis* claim is not procedurally defaulted—as evidenced by the multiple cases in which the Government has acknowledged that the rule in *Davis* was not previously available.......................2

    B. It is at least debatable that Duncan did not procedurally default his claim that the private, off-the-record meeting between Peven and the district court violated Duncan's constitutional and statutory rights. ......................................7

    C. It is at least debatable that Duncan received ineffective assistance of trial counsel. ..................................................................................................15

III. Conclusion ......................................................................................19

# TABLE OF AUTHORITIES

**Cases**

*In re Franklin*, 950 F.3d 909 (6th Cir. 2020) ............................................4

*In re Hall*, 979 F.3d 339 (5th Cir. 2020)....................................................5

*In re Hammoud*, 931 F.3d 1032 (11th Cir. 2019) ...................................4, 5

*In re Mullins*, 942 F.3d 975 (10th Cir. 2019) ................................ 2, 3, 5, 6

*James v. United States*, 550 U.S. 192 (2007) ............................................5

*King v. United States*, 965 F.3d 60 (1st Cir. 2020).............................. 2, 4, 5

*Massaro v. United States*, 538 U.S. 500 (2003) .....................................11

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ..............................................6

*Slack v. McDaniel*, 529 U.S. 473 (2000) ..............................................6, 18

*United States v. Cronic*, 466 U.S. 648 (1984). .................................. 12, 18

*United States v. Davis*, 139 S. Ct. 2319 (2019) ........................................2

*United States v. King*, 554 F.3d 177 (1st Cir. 2009).................................4

*United States v. Mullins*, Case No. 11-10205-EFM, 2019 WL 10984254 (D. Kan. Nov. 8, 2019.........................................................................................3

*United States v. Ross*, 969 F.3d 829 (8th Cir. 2020) .............................6, 7

*United States v. Schaflander*, 743 F.2d 714 (9th Cir. 1984)............. 18, 19

*Woods v. Donald*, 575 U.S. 312 (2015) ...................................................................12

**Statutes**

18 U.S.C. § 924(c) ............................................................................................2
28 U.S.C. § 2255 ..............................................................................................3

**Other Authorities**

American Bar Association's Guidelines for the Appointment and Performance of
    Defense Counsel in Death Penalty Cases, 31 Hofstra L. Rev. 913 (2003) .........14

## I. INTRODUCTION

In this Reply in Support of Application for a Certificate of Appealability, Petitioner-Appellant Joseph Duncan specifically responds to three of the arguments in the Government's Response to Application for Certificate of Appealability: (1) the argument that Duncan procedurally defaulted his *Davis* claim; (2) the argument that Duncan procedurally defaulted his claim that the private, off-the-record meeting between Roger Peven and the district court violated Duncan's constitutional and statutory rights; and (3) the argument that Duncan's claim that he received ineffective assistance of counsel could not be debated by reasonable jurists, even though Peven, while appointed as lead counsel, was suffering from debilitating psychological problems, and the district court denied the trial team more time to prepare because it erroneously thought that Peven was assisting with the case while he was actually in in-patient treatment for psychological and substance-abuse problems. As to the other points raised in the Government's Response, Duncan stands on the arguments in his Application for a Certificate of Appealability.

## II. ARGUMENT

**A. It is at least debatable that Duncan's *Davis* claim is not procedurally defaulted—as evidenced by the multiple cases in which the Government has acknowledged that the rule in *Davis* was not previously available.**

In this case, the Government suggests that Duncan's claim under *United States v. Davis*, 139 S. Ct. 2319 (2019), is procedurally defaulted. The Government argues that a vagueness challenge to 18 U.S.C. § 924(c) was previously available, and consequently defaulted because Duncan did not raise it in a direct appeal. *See* Resp. at 11 (chart); Resp. at 14-15 & n.2.

The Government's argument that a vagueness challenge to § 924(c) was available prior to *Davis* is wrong—the Government has repeatedly conceded in other cases that the rule in *Davis* was "previously unavailable." *See, e.g.*, *King v. United States*, 965 F.3d 60, 64 (1st Cir. 2020) ("Here, the Government concedes that *Davis* has announced a new rule of constitutional law that both applies retroactively and was previously unavailable."); *In re Mullins*, 942 F.3d 975, 977 (10th Cir. 2019) ("Mullins contends that his challenge based on *Davis* satisfies the gatekeeping provision in § 2255(h)(2): his claim relies on 'a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.' The government concedes in its response to Mullins' motion for authorization that his *Davis* claim meets this standard.").

*Mullins* is instructive. Like Duncan, "Mullins did not file a direct appeal." 942 F.3d at 976. Nevertheless, when Mullins sought authorization to file a second § 2255 motion arguing that *Davis* invalidated his § 924(c) conviction, "[t]he government concede[d] in its response to Mullins' motion for authorization that his *Davis* claim meets [the § 2255(h)] standard," which requires that "his claim relie[d] on 'a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, *that was previously unavailable*.'" *Id.* at 977 (emphasis added) (quoting 28 U.S.C. § 2255(h)).[1] Following the Tenth Circuit's authorization of Mullins's second § 2255 motion, the Government not only conceded that Mullins had made a prima facie case that *Davis* announced a previously unavailable rule (as required for authorization) but also conceded that Mullins was entitled to relief pursuant to *Davis*. *See United States v. Mullins*, Case No. 11-10205-EFM, 2019 WL 10984254, at *1-2 (D. Kan. Nov. 8, 2019).

---

[1] The § 2255(h) gatekeeping standard, applicable to second or successive § 2255 motions, includes requirements not applicable here because this is an initial § 2255 motion. Nonetheless, the § 2255(h) standard is relevant here because it includes, among other requirements, the requirement that the claim rely on a rule "that was previously unavailable." § 2255(h). Thus, the Government's multiple concessions that *Davis* claims satisfy the § 2255(h) standard all entail the concession that *Davis* claims are based on a previously unavailable rule. And in cases such as *Mullins*, the Government has not only conceded that movants have made a prima facie case that *Davis* claims are premised on a previously unavailable rule, but determined that it is so obvious that *Davis* claims are premised on a previously unavailable rule that they have conceded that the movant is entitled to relief, not just authorization to file a successive motion.

*King* is also instructive. King filed a direct appeal but did not argue that § 924(c)'s residual clause was unconstitutionally vague in either his direct appeal, *see United States v. King*, 554 F.3d 177, 179-82 (1st Cir. 2009), or his first § 2255 motion, *see King*, 965 F.3d at 63. Yet when King sought authorization to file a second § 2255 motion raising a *Davis* claim, "the Government concede[d] that *Davis* has announced a new rule of constitutional law that both applies retroactively and *was previously unavailable*." *King*, 965 F.3d at 64 (emphasis added). The First Circuit denied King's motion but did so because *Davis* did not apply to the crime King was convicted of, not because King had procedurally defaulted his *Davis* claim by failing to raise it on direct appeal. *Id.* at 64, 71.

Additionally undermining the Government's argument that a vagueness challenge to § 924(c) was available prior to *Davis*, every court of appeals to address the issue has determined that second or successive § 2255 motions premised on *Davis* satisfy § 2255(h)'s gatekeeping standard, which includes the requirement that the claim rely on a previously unavailable rule. *See, e.g.*, *In re Franklin*, 950 F.3d 909, 910-11 (6th Cir. 2020); *In re Matthews*, 934 F.3d 296, 301 (3d Cir. 2019); *In re Hammoud*, 931 F.3d 1032, 1037-39 (11th Cir. 2019).

Yet in its Response to this Court, the Government argues that the rule in *Davis* was previously available because "Justice Scalia had contended since 2007 that the residual clause was unconstitutionally vague." Resp. at 15 n.2 (citing

4

*James v. United States*, 550 U.S. 192, 230-31 & n.7 (2007) (Scalia, J., dissenting)).

However, the binding majority opinion in *James* said that "we are *not* persuaded

by Justice Scalia's suggestion . . . that the residual provision is

unconstitutionally vague." *James*, 550 U.S. at 210 n.6 (emphasis added). As such,

*James* did not make vagueness challenges to § 924(c) available. The Government

also points out that "the foundational principle undergirding the residual clause

cases including *Davis*—that vague criminal laws violate due process—has been on

the books for nearly a century." Resp. at 15 n.2. However, that assertion has no

bearing on this case. A general prohibition on vague laws does not create an

available challenge to § 924(c), as at least five Circuits have held. *See King*, 965

F.3d at 64; *Mullins*, 942 F.3d at 979; *Franklin*, 950 F.3d at 910-11; *Matthews*, 934

F.3d at 301; *Hammoud*, 931 F.3d at 1039.

Therefore, despite the Government's argument in this case that Duncan

procedurally defaulted his *Davis* claim, this Court should acknowledge what the

Government has admitted in other cases and what every court of appeals to decide

the issue has determined: *Davis* announced a previously unavailable rule.[2] One

cannot waive a claim that did not exist at the time. Consequently Duncan did not

---

[2] In *In re Hall*, 979 F.3d 339 (5th Cir. 2020), two judges questioned whether *Davis* is retroactive. However, the majority explicitly did not reach the issue of whether *Davis* is retroactive, and, more relevant to the Government's argument in this case, the *Hall* majority did not address whether *Davis* was previously available.

procedurally default his *Davis* claim by waiving his direct appeal at a time when *Davis* claims did not exist. *See Mullins*, 942 F.3d at 979.

Moreover, at this stage, Duncan does not have to establish that his *Davis* claim is not procedurally defaulted; he just has to demonstrate that reasonable jurists could debate whether his *Davis* claim is procedurally defaulted. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The Government's acknowledgement in other cases that *Davis* claims were not previously available makes this issue is at least debatable.

Finally, the Government's Response does not even argue that Duncan would not win on the merits of this claim; it does not make any argument that *Davis* does not invalidate Duncan's § 924(c) conviction (Count Seven) and resulting death sentence. For the reasons discussed in Duncan's Application for a Certificate of Appealability, it is at least debatable that *Davis* invalidates Duncan's § 924(c) conviction and the resulting death sentence. *See* COA App. at 76-88.[3]

---

[3] The *Hall* majority, as well as the majority in *United States v. Ross*, 969 F.3d 829 (8th Cir. 2020), held that kidnapping resulting in death is a crime of violence. For the reasons discussed in Duncan's Application for a Certificate of Appealability, these nonbinding decisions reached the wrong result; adherence to Supreme Court precedent dictates that kidnapping resulting in death is not a crime of violence under § 924(c)'s elements clause. *See* COA App. at 80-83.

More to the point, the issue is unquestionable debatable, which is enough to require a Certificate of Appealability. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (COA must issue if "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further'") (quoting *Slack*, 529 U.S. at 484). Both *Hall* and *Ross* were split decisions. *See Hall*, 979 F.3d at 354 (Dennis, J., dissenting) ("It makes sense, then, that this court has never held that kidnapping resulting in death necessarily involves the

6

**B. It is at least debatable that Duncan did not procedurally default his claim that the private, off-the-record meeting between Peven and the district court violated Duncan's constitutional and statutory rights.**

The Government also incorrectly argues that Duncan procedurally defaulted his claim that the private, off-the-record meeting between Peven and the district court violated his constitutional and statutory rights. The Government states that, "Duncan's statutory, due process, and Eighth Amendment claims regarding the private meeting between the trial court and attorney Peven (claim 2) rely on the same record that existed at the time he waived direct appeal" and that "[t]hese records provided an adequate basis to advance the underlying claims in his, ultimately abandoned, appeal." Resp. at 16.

Each of these statements is incorrect. First, the claims do not "rely on the same record that existed at the time he waived direct appeal." *Id.* at 15-16. Duncan's claims rely on affidavits from, among others, Mark Larrañaga, who was learned counsel, and Judy Clarke, who initially advised the team as resource counsel and ultimately stepped in as lead counsel because of Peven's failures.

---

use, attempted use, or threatened use of physical force. In short, it is conceivable that a particular kidnapping by inveiglement resulting in unintended death might not satisfy the elements clause of § 924(c) but instead could be found to constitute a COV under § 924(c)'s residual clause, which the Supreme Court declared unconstitutionally vague in *Davis*."); *Ross*, 969 F.3d at 845 (8th Cir. 2020) (Stras, J., dissenting) ("[W]e must determine whether a kidnapping resulting in death necessarily requires the 'use . . . of physical force.' Under what has come to be known as the 'categorical approach,' I would conclude that it does not.") (second alteration in original) (internal citations omitted). That is to say, jurists could not just theoretically debate this issue, but are actually debating it.

These declarations show that, despite Larrañaga and Clarke explaining to Peven that it was important for Larrañaga to be present at any meeting with the district court, Peven decided to meet with the court alone, and, after the meeting, other members of the trial team were surprised by the outcome and unsure of what Peven and the district court said to each other. *See* Ex.1 (Clarke) ¶15; Ex.7 (Larrañaga) ¶¶22-23. Second, because the claim relies on extra-record information such as Larrañaga's and Clarke's declarations, the trial record did not "provide[] an adequate basis" to litigate the claim on direct appeal. Resp. at 16.

In fact, to this day there is confusion as to what happened during the private, off-the-record meeting. To very briefly summarize:

First, at times, the district court has indicated that the meeting did not include any discussion of the case. *See* Ex.7 (Larrañaga) ¶22 (immediately after the meeting, the district court told Larrañaga that it was "limited to private matters and did not include any discussion of the case."). Conversely, the court has also stated that the meeting included a discussion of what role Peven would take in the case and the timeline—which is, of course, a discussion of the case. *See* Ex.7 (Larrañaga) ¶22 (while telling Larrañaga the meeting did not involve discussing the case, the district court also explained to Larrañaga that during the meeting, it was decided that Peven would remain on the case in role of advisory counsel); CR 104 at 1 ("Mr. Peven made known to the Court that he intended to take a less

8

active role in this case. . . . During this meeting Mr. Peven assured the Court that if he were allowed to take a less active role in the above referenced matter he would work with the defense team so that this case could go forward in a timely manner.").

Second, the district court has indicated that, during the meeting, Peven said he wanted to take a less active role in the case, not withdraw. CR 104 at 1. Peven has sometimes disputed this view, and at other times been more ambiguous. Peven indicated to Clarke that he specifically asked to get off the case, and the district court denied this request. *See* Ex 50 (Clarke email to Larrañaga, Monaghan, and Garvey 10/15/2007); Ex.1 (Clarke) ¶15. But in an affidavit—which should have been Peven's opportunity to clarify that he could not actually help with the case— Peven made the equivocal statement that, "[n]ew counsel needs to be appointed to meet the necessary responsibilities of investigating and preparing this case for trial. In as much as I have a good relationship with Mr. Duncan and have built credibility with the victim's family, I advised the court I can remain in an advisory capacity to the defense team." CR 68 at 5.

Additionally, although the Government contends that the reconstituted defense team was able to correct any misunderstandings about their preparation, *see* Resp. at 30, confusion surrounding what role Peven would play in the case persisted long after the meeting. On November 19, 2007, the district court denied a

9

continuance, partly premised on its understanding that Peven was assisting with the case, explaining: "In this motion the defense repeatedly asserted that one of their team had 'withdrawn' from this case. Such assertions are in error. The Court appointed an additional attorney to the defense team. The motion to withdraw filed later has been denied. Roger Peven was privy to much of the proceedings in the State case and while he will take a less active role in this case, he has been specifically left on as counsel so that the defense team has access to his knowledge and information . . . ." CR 157 at 4 n.3. But a few days earlier, the Federal Defenders of Eastern Washington and Idaho Board President had informed the district court that Peven was not working at all: "Please be advised that after meeting with the Executive Committee of the Board of Directors on November 8, 2007, Roger Peven has taken an indefinite leave of absence from the office." Ex.56. Peven was at that time receiving in-patient treatment for mental health and substance-abuse issues. *See* Ex.5 (Hormel) ¶11; Ex.8 (Monaghan) ¶19.

Thus, the Government's argument that these issues are procedurally defaulted because "Duncan could have—but did not—challenge this district court's exercise of its discretion on direct appeal," Resp. at 32, is inaccurate. Any challenge made at that time would have been without the facts that are now before the Court through trial counsel's affidavits and thus inherently a different challenge. The possibility that some different argument could have been raised in

10

direct appeal does not change the fact that the claim now before this court, in Duncan's § 2255 motion, relies on evidence from outside the trial record (and, as discussed below, asserts the ineffective assistance of Duncan's trial counsel) and is not procedurally defaulted. *See Massaro v. United States*, 538 U.S. 500, 504 (2003).

Consequently, because this claim relies on extra-record evidence, it is not procedurally defaulted. *See Waley v. Johnston*, 316 U.S. 101, 104 (1942) (per curiam); *cf. Massaro*, 538 U.S. at 504 (explaining why ineffective-assistance claims are not procedurally defaulted, with reasoning that applies to any claims that rely on evidence outside the trial record).

Additionally, Duncan did not procedurally default this claim because it is a claim of ineffective assistance of counsel, and therefore is not defaulted even if not raised in a direct appeal. *See Massaro*, 538 U.S. at 509 ("We do hold that failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255").

The Government's substantive arguments on this claim are equally unpersuasive. The Government contends that Duncan was not denied his right to unconflicted counsel at this hearing because, it argues, "this discussion was no critical stage." Resp. at 30. A critical stage of the proceedings is one that holds "significant consequences for the accused." *Woods v. Donald*, 575 U.S. 312, 315

(2015). The private, off-the-record meeting was a critical stage because the district court relied on it when making some of the most consequential rulings in this case. The district court referred to its recollection of the meeting in denying Peven's motion to withdraw, *see* CR 104 at 1-2, and in denying the reconstituted trial team's request for a continuance, *see* CR 157 at 3 n.2. Given the importance of the hearing to later, enormously consequential rulings, the hearing was a critical stage.

Although the hearing was a critical stage, no counsel actually representing Duncan's interests was present at the hearing. The Government mischaracterizes Duncan's argument as an attempt to extend *Cronic* in violation of *Teague*. No extension of *Cronic* is necessary for this Court to determine that the absence of counsel representing the defendant during a hearing where decisions about the case where made violated his Sixth Amendment rights, given that *Cronic* holds that it is "obvious, of course" that "[t]he presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial." *United States v. Cronic*, 466 U.S. 648, 659 (1984).

As is true for many *Cronic* claims, the ineffectiveness of trial counsel also alternatively meets the *Strickland* criteria. By allowing the meeting to go forward, without objection, privately and off-the-record, Peven and Larrañaga both provided deficient performance that prejudiced Duncan: Peven performed deficiently by

asking for a private meeting. Larrañaga performed deficiently by failing to object. Both errors prejudiced Duncan.

First, Peven erroneously requested the private meeting despite Clarke's and Larrañaga's urging that Larrañaga should be present at any meeting. Ex.1 (Clarke) ¶15. Because Peven knew that he would be asking to withdraw from the case, he should have made sure another lawyer was present to represent Duncan's interests. Additionally, Peven's failure to ensure that an adequate record was made of the meeting prevented other members of Duncan's team from challenging or rebutting Peven's apparently skewed account of the work that he and others had done on the case.

Second, Larrañaga erred by failing to object to the meeting being held outside his presence and off-the-record. Larrañaga initially told the clerk that he wanted to be present. CR 179 at 3. Larrañaga, Monaghan, and Clarke all had expressed concerns that Peven would fail to be as forthcoming as he should with the court about "the extent of his personal issues and the devastating effect they were having on his ability to provide constitutional representation to Mr. Duncan." Ex.7 (Larrañaga) ¶¶19-20. Although he expressed his desire to be present, Larrañaga did not formally object to being excluded, insist on a court reporter's presence, or insist on a ruling from the court on either issue, in violation of the American Bar Association Guidelines. *See* CR 187 at 3; American Bar

13

Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 31 Hofstra L. Rev. 913, 1015 (2003).

Duncan was prejudiced by these failures. Before the meeting, Larrañaga was concerned that Peven would not be forthcoming. Ex. 7 (Larrañaga) ¶19. "Peven's behavior up to that point had given [Larrañaga] serious reasons to question his reliability," *id.* at ¶20, and, based on the district court's reaction to the meeting, it appears that Larrañaga's concerns were justified. Had he been allowed to attend the meeting or even been able to review a transcript of exactly what was said, Larrañaga would have been able to give the district court a more accurate picture of Peven's problems and how they affected the entire team, and caused the district court to think differently about the necessity of a continuance. A formal objection could have led the district court to put the hearing on the record or allow Larrañaga to be present.

At the very least, each the above points is debatable, which is all Duncan has to show to be entitled to a Certificate of Appealability and proceed with his claim that the private, off-the-record meeting violated his constitutional rights. It is at least debatable that Duncan did not procedurally default this claim—or, it is certainly *at least* debatable that Duncan is entitled to a hearing on whether he procedurally defaulted this claim. A hearing would shed light on whether the extra-record evidence is necessary to assessing the claim, and consequently on whether it

was procedurally defaulted. It is at least debatable that the private, off-the-record meeting violated Duncan's constitutional rights, given the devastating cascading effects of the meeting.

### C. It is at least debatable that Duncan received ineffective assistance of trial counsel.

The Government incorrectly argues that Duncan's ineffective assistance of counsel claims are not even debatable. *See* Resp. at 25-31. In making this argument, the Government largely ignores the chaos that consumed the trial team for almost a year, during a period crucial to investigating the case and learning about the client.

To briefly summarize, in May 2007, coworkers noted that Peven was drinking an enormous amount and had more than once discussed his need for counseling. Ex.10 (Proctor) ¶14; Ex.56 (Hormel) ¶10. Meanwhile, "despite multiple requests, [Larrañaga] could not get [Peven] to provide . . . any details of the work supposedly being conducted . . . . Additionally, Ms. Garvey [a mitigation specialist] and [Larrañaga] received almost no support from Mr. Peven. [A]t times, he actively resisted or rejected [their] efforts." Ex.7 (Larrañaga) ¶11. Co-counsel Tom Monaghan "had an increasingly sinking feeling that [they] were not living up to [their] obligations to [their] client." Ex.8 (Monaghan) ¶12. "When [Monaghan] voiced . . . concerns to Roger that [they] were not adequately preparing for Mr.

Duncan's trial, he was dismissive and defensive." *Id.* At the same time, Peven assured Clarke that the team was on top of matters, and she accepted his reassurances. Ex.5 (Hormel) ¶7.

Things got increasingly worse throughout the summer and fall of 2007, culminating in FDEWI attorney Steve Hormel growing so concerned about Peven that he made Peven "promise he would step down from the Duncan case immediately which he promised he would contact Judge Lodge for that purpose." Ex.56 (Hormel) ¶12. Peven did not immediately contact the district court, and did not finally decide to move to withdraw until two weeks later. *See id.*; Ex.7 (Larrañaga) ¶17.

On August 24, the district court held its private, off-the-record meeting with Peven. Peven called Hormel immediately after the meeting and said that the district court did not want him completely off the case, but wanted him to stay on in a limited role. Ex.56 (Hormel) ¶15. That is also when it became clear to the trial team that representations Peven made about work he had been doing were untruthful. Ex.7 (Larrañaga) ¶27.

The district court insisted that Peven remain on the case, and denied the trial team a continuance based on the court's mistaken impression that Peven was an asset to the team, and could help them prepare for trial. Meanwhile, the FDEWI Board "placed Roger on leave, and directed him to get professional help." Ex.5

16

(Hormel) ¶11. "Shortly thereafter, he was admitted for inpatient treatment for mental health and alcohol issues." Ex.8 (Monaghan) ¶19.

Clarke has explained that, "[t]oward the middle to end of November 2007, out of time to retain experts in time for a January 2008 trial and with no continuance in sight, our team discussed advising Mr. Duncan to enter guilty pleas in exchange for an agreement by the prosecution to join in a request for a continuance of the penalty phase." Ex.1 (Clarke) ¶¶19-20, 26. Clarke describes their decision to advise Duncan to plead guilty as "an untenable Hobson's choice: prepare inadequately for both the guilt/innocence and the penalty phase . . . or have Mr. Duncan plead guilty, obtain the Government's cooperation in extending the date to commence the penalty phase, and shift all focus entirely to preparation for the penalty phase." *Id.* ¶19. "At the time, we had no idea whether Mr. Duncan would have any mental state defenses or any expert testimony regarding his mental condition that would be admissible during a guilt phase of this case." *Id.* at ¶20. [4]

---

[4] In 2020, Duncan was diagnosed with a glioblastoma, stage IV brain cancer. He underwent surgery, but has declined chemotherapy and radiation. In November 2020, Bureau of Prisons medical staff determined his life expectancy to be 6-12 months (approximately 3-9 months from now). For further information on his diagnosis and prognosis, see Declaration of Jean E. Giles in Support of Appellant's Motion to Extend Time to File Reply in Support of Appellant's Application for Certificate of Appealability and the medical records attached thereto.

As relevant here, counsel notes that previously no one observed tumors or masses that would have impacted his brain functioning or behavior in brain imaging conducted earlier in this case. If there was already a mass on Duncan's brain that potentially impacted cognition or other functioning, it was not discovered earlier.

Despite the situation facing the reconstituted trial team, which was under duress and without adequate time to develop an understanding of their client's competency or mental health issues when they made the decision to advise him to plead guilty, the Government suggests that it is not even debatable that a hearing is necessary to explore whether the trial team was deficient and whether that either prejudiced Duncan, or was so obviously likely to prejudice him that prejudice need not be litigated. *See* Resp. at 25; *see also Cronic*, 466 U.S. at 659; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir. 1984).

That suggestion is untenable. It is at least debatable that there should be a hearing on whether and how the utter chaos that consumed the trial team throughout 2007 impacted the proceedings. As discussed in Duncan's Application for a Certificate of Appealability, it is possible to imagine many ways that the outcome of the proceedings, specifically the plea bargaining process, could have been different if counsel had not performed deficiently: If the reconstituted team had been better prepared, they could have secured a plea in exchange for life imprisonment, not just a few more months to prepare. This is a strategy that experienced capital defenders, and Clarke in particular, have employed successfully, even in highly aggravated cases. Alternatively, if they not been desperate for more time to prepare, trial counsel could have proceeded to a guilt-

phase trial, and used the guilt phase to begin making the case that the jury should spare Duncan's life. This is another strategy that experienced capital defenders, and Clarke in particular, have employed successfully, even in highly aggravated cases. *See* COA App. at 53-54. None of the Government's arguments make it beyond debate that a hearing could not possibly shed light on whether Duncan is entitled to relief on this claim—and all Duncan has to show for a Certificate of Appealability on this issue is that reasonable jurists would debate that Duncan "has made specific factual allegations that, if true, state a claim on which relief could be granted." *Schaflander*, 743 F.2d at 717; *see also Slack*, 529 U.S. at 484.

## III. CONCLUSION

Therefore, for the reasons explained above and in his Application for a Certificate of Appealability, Duncan is entitled to a Certificate of Appealability on his claims that *Davis* invalidates his § 924(c) conviction; that the private, off-the-record meeting between Peven and the district court violated his constitutional and statutory rights; and that his trial counsel provided ineffective assistance. Additionally, for the reasons discussed in his Application for a Certificate of Appealability, he is entitled to a Certificate of Appealability of each of the claims raised in his § 2255 motion.

<u>s/Jean E. Giles</u>
JEAN E. GILES
F. ITALIA PATTI
INDIANA FEDERAL COMMUNITY
DEFENDERS

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _20-9901_____

I am the attorney or self-represented party.

**This brief contains __4855_____ words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ x ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
　　[ ] it is a joint brief submitted by separately represented parties;
　　[ ] a party or parties are filing a single brief in response to multiple briefs; or
　　[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s Jean E. Giles_____ **Date** _3-1-2021_____
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                *Rev. 12/01/18*